TQM

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

# FILED

MAY 11 2016 ᵇᵂ

Vernon Henry )
)
_____ )  CIVIL ACTION  **THOMAS G. BRUTON**
(Name of the plaintiff or plaintiffs) )  **CLERK, U.S. DISTRICT COURT**
)
v. )  NO. 15-cv-10961
)
KENCO LOGISTIC SERVICES, LLC, a __ )
)
Tennessee Limited Liability Company, ___ )
)
Mars, Inc, Kelvin Walsh, Mike Manzello, __ )
)
David Jabaley, and Mario Lopez _____ )

## AMMENDED COMPLAINT OF EMPLOYMENT DISCRIMINATION

1. Plaintiff X DOES ❑ DOES NOT demand a jury trial.

### I. PARTIES

2. The plaintiff is <u>Vernon Henry</u> ,

whose street address is _4541 W. 175th Place_____ ,

(city) _Country Club Hills____ (state) _IL_____ (ZIP) _60478__

(Plaintiff's telephone number) _(708) 261-7892_

3. The defendant is _KENCO LOGISTICS, a Tennessee Limited Liability Company, Mars, Inc.,_

_Kelvin Walsh, Mike Manzello, David Jabaley, and Mario Lopez_____, whose

street address is _2001 Riverside Dr,_____,

(city) _Chattanooga,_____ (state) _TN_____ (ZIP) _37406 __

(Defendant's telephone number) _(423) –756-5552____

4. The alleged discrimination occurred at <u>Mars-Manteno Facility 1125 W. Sycamore, Rd</u>

(city)Manteno_____ (state) _Il___ (ZIP) _60950___

5. The plaintiff [*check one box*]

(a) ❑   was denied employment by the defendant.

(b) ❑   was hired and is still employed by the defendant.

(c) ☒   was employed but is no longer employed by the defendant.

6. The defendant discriminated against the plaintiff on or about, or beginning on or about, (month)___December__, (day)_____, (year) __2013__.

## II. JURISDICTION

7. Jurisdiction over this claim is based on 28 U.S.C. § 1331. Plaintiff alleges that the defendant(s) discriminated against Plaintiff because of Plaintiff's:

❑ Age (The Age Discrimination in Employment Act, 29 U.S.C. § 621)

❑ Color (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

❑ Disability (The Americans with Disabilities Act, 42 U.S.C. § 12101 and/or

The Rehabilitation Act, 29 U.S.C. § 701)

❑ National Origin (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

☒ Race (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

☒ Race (42 U.S.C. § 1981)

❑ Religion (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

☒ Sex/Gender (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

❑ Sex/Gender (Equal Pay Act, 29 U.S.C. § 206)

❑ Use of Leave (Family and Medical Leave Act, 29 U.S.C. § 2611)

☒ Other (list): <u>Conspiracy, Intentional and Willful Interference, Aiding and Abetting</u>

8. Plaintiff ☒ HAS ❑ HAS NOT filed a charge before the United States Equal Employment Opportunity Commission (EEOC) relating to this claim of employment discrimination. **[Attach a copy of charge to this complaint.]**

9. Plaintiff ☒ HAS ❑ HAS NOT filed a charge before the Illinois Department of Human Rights (IDHR) relating to this claim of employment discrimination. **[Attach a copy of charge to this complaint.]**

2

10. Plaintiff ☒ HAS ☐ HAS NOT received a Right to Sue Notice. If yes, Plaintiff's Right to Sue

Notice was received on or about (date) <u>September 8, 2015</u>, +1 April 15, 2016 .

**[Attach copy of Notice of Right to Sue to this complaint.]**

### III. FACTS IN SUPPORT OF CLAIM

11. The defendant intentionally discriminated against Plaintiff [*check only those that apply*]:

(a) ☒     by failing to hire the plaintiff.

(b) ☒     by terminating the plaintiff's employment.

(c) ☒     by failing to promote the plaintiff.

(d) ☒     by failing to stop harassment;

(e) ☐     by failing to reasonably accommodate the plaintiff's disabilities.

(f) ☐     by failing to reasonably accommodate the plaintiff's religion.

(g) ☒     by retaliating against the plaintiff because the plaintiff did something to assert rights protected by the laws;

(h) ☒     by coercing, intimidating, threatening or interfering with the plaintiff's exercise or enjoyment of rights;

(i) ☒     with respect to the compensation, terms, conditions, or privileges of employment;

(j) ☒     other (specify):  Hostile and Animus Work Environment Based on Race, Misrepresentation, Intentional Infliction of Emotional Distress

_____

_____

_____

12. State here briefly and as clearly as possible the essential facts of your claim. Describe precisely how each defendant in this action is involved. Give dates and places. Concentrate on describing as clearly and simply as possible what employment action or situation you allege to have been illegal and how it violated your rights. It is not necessary to make legal arguments or cite any cases or statutes.

See Attached

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

13. THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

(a) ❑   Direct the defendant to hire the plaintiff.

(b) ❑   Direct the defendant to re-employ the plaintiff.

(c) ❑   Direct the defendant to promote the plaintiff.

(d) ❑   Direct the defendant to reasonably accommodate the plaintiff's religion.

(e) ❑   Direct the defendant to reasonably accommodate the plaintiff's disabilities.

(f) ❑   Direct the defendant to (specify): _____

4

_____

_____

_____

_____

_____

(g) ☑  If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h) ☑  Grant such other relief as the Court may find appropriate.

_____

(Plaintiff's signature)

Vernon Henry
_____

(Plaintiff's name)

4541 W. 175th Place
_____

_____

(Plaintiff's street address)

(City) Country Club Hills        (State) IL        (ZIP) 60478 _____

(Plaintiff's telephone number) (708) –261-7892

Date: May 11, 2016

5

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

HENRY has complied with the administrative prerequisites of §506 of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5 as follows:

1.     On or about, July 9, 2014, HENRY timely filed a formal charge of discrimination with the Illinois Department of Human Rights (hereafter the "IDHR") which was cross-filed with the Equal Employment Opportunity Commission (hereafter "EEOC") as Charge Numbers 2015CF099 and 21B-2014-02563, respectively.

2.     On or about, October 21, 2014, HENRY timely filed a formal charge of discrimination with the Illinois Department of Human Rights (hereafter the "IDHR") which was cross-filed with the Equal Employment Opportunity Commission (hereafter "EEOC") as Charge Numbers 2015CF0990 and 21B-2015-00126, respectively.

3.     On or about, November 19, 2014, HENRY timely filed a formal charge of discrimination with the Illinois Department of Human Rights (hereafter the "IDHR") which was cross-filed with the Equal Employment Opportunity Commission (hereafter "EEOC") as Charge Numbers 2015CF1315 and 21B-2015-00333, respectively.

4.     HENRY promptly and diligently accommodated all IDHR and EEOC requests for information and fully cooperated in the agency's investigation of this matter.

5.      HENRY has exhausted all available administrative remedies in

accord with the aforementioned statutes prior to instituting this Civil

Action, and HENRY formally requested a Notice of Right to Sue from

EEOC on September 4, 2015.  In addition, on or about April 11, 2016

the EEOC issued a Right to Sue to 2015CF0990 and 21B-2015-00126

and    2015CF1315    and    21B-2015-00333    respectively.    No

administrative prerequisites are required before a plaintiff files a

complaint pursuant to the Civil Rights Act of 1866, as amended by the

Civil Rights Act of 1991, 42 U.S.C. §1981.

**12.**
## FACTUAL ALLEGATIONS

6.      HENRY was employed at the Mars Manteno Warehouse through a temporary agency, Temporary Reserve Network, from on or about December 18, 2013 until April 13, 2014, as a Warehouse Associate, for Kenco, a 3rd party Management Company, whom at all times acted as Manager/agent of Mars Inc., since April 21, 2013 at the Mars' warehouse in Manteno, Illinois.

7.      On or about April 14, 2014, HENRY became employed at the Mars Manteno Warehouse, as a full-time Warehouse Associate, for Kenco, the 3rd party management company whom at all times acted as Manager/agent of Mars Inc., since April 21, 2013 at the Mars' warehouse in Manteno, Illinois

8.      At all relevant times, Defendant KENCO employed in excess of fifteen (15) employees for at least twenty (20) calendar weeks in 2013, 2014 and 2015.

9.      At all relevant times, Defendant MARS, Inc. employed in excess of fifteen (15) employees for at least twenty (20) calendar weeks in 2013, 2014 and 2015.

10.     At all relevant times, all matters regarding compensation, terms, conditions, rights and privileges of HENRY's employment were governed and controlled by Defendant MARS, Inc. and its "Super Manager" Kenco.

11.     At all relevant times, all matters regarding compensation, terms, conditions, rights and privileges of HENRY's employment were governed and controlled by Defendant MARS, Inc. and its "Super Manager" Kenco.

12.     At all relevant times HENRY possessed the skills, experience and qualifications necessary to work in his employment position and adequately and completely performed all of the functions, duties and responsibilities of his employment with Defendant MARS, Inc. and its "Super Manager" Kenco.

13.     KENCO, upon information and belief was acting as the agent of MARS, Inc. and in its conduct and actions as alleged herein and was acting in a capacity within the scope of its authority, or, if said conduct was outside the scope of its authority, said conduct was known; authorized and ratified by MARS, Inc.

14.     Kenco Logistics is a 3rd party logistics company that manages warehouse and distribution centers for other companies.

15.     Kenco Logistics stated to the Illinois Department of Human Rights in its Position Statement beginning on or about November 2014 in case number 2014CF0475, and subsequently again in case number(s) 2014CF2858, 2014CF2992, 2014CF3057, 2014CF3161, 2015CF0310, 2015CF0811, 2015CF1145, 2015CF0342, 2015CF0990, 2015CF1315, 2015CA1464, 2014CF3162, 2015CF0003, 2015CF0006, 2015CF0515, 2015CF0516, 2051CF0699, 2015CA1054, 2015CA1590 and others that "Kenco is a third-party logistics company ("3PL") that operates and manages warehouses and order fulfillment operations for other companies."

16.     "On April 21, 2013, Kenco began managing such a warehouse in Manteno, Illinois for Mars, Inc."

17.     Kenco Logistics is a privately held company in the state of Tennessee

18.     Kenco Logistics corporate structure, operating structure and legal structuring is not synonymous with any other company.

19.     Kenco Logistics is part of the Kenco Group

20.     Kenco Group current Chairman & CEO is Jane Kennedy Greene

21.     Kenco Group President and COO David Caines

22.     Kenco Logistics was hired to Manage the Mars, Inc. Manteno facility in Manteno, IL in 2013

23.     Mars, Inc. is a privately held company in Virginia

24.     Mars, Inc. paid Kenco Logistics a management fee to manage the Mars Manteno facility

25.     Mars, Inc. passed thru their costs through Kenco Logistics with the exception of the lease, taxes, fire protection, insurance, rack expense/amortization, management fee, material handling fee were direct pays.

26.     Specifically, Mars, Inc. passed thru Kenco Logistics the salaries of all the employees (temporary and part & full time employees) any applicable taxes, including but not limited to FICA, Social Security and the like, as well as, any invoices of the Mars Manteno facility.

27.     This function performed was synonymous to that of the services provided by ADP, LLC.

28.     MARS, Inc. managed Kenco Logistics, just as it did its other distribution centers in the network.

29.    Specifically. Mars, Inc. would provide daily guidance to the Mars, Manteno facility.

    a.  On site Regional Distribution Manager

    b.  Morning meetings regarding the daily "Plan"

    c.  Fulfillment orders generated by Mars, Inc. through the WMS-SAP

    d.  Through put of a Billion pounds or more annually of candy at the Mars Manteno facility

    e.  Mars, Inc. warehouse quality manual

    f.  Cross-functional collaboration between departments

    g.  Employee incentives

30.    Mars Manteno is part of the Mars Distribution Network

31.    MARS Distribution Network is comprised of five (5) Distribution Centers:

| Region | Facility | Management Company |
|---|---|---|
| West coast | Victorville ,CA | Xcel |
| Southwest | Waco, TX | Romark |
| Southeast | Kennesaw ,GA | ABW |
| East coast | Hazelton ,PA | Romark |
| Midwest | Manteno, IL | 4T's/Kenco/Xcel (1999-2016) |

32.    Pointedly the General Manager of the Mars Manteno Facility reported to, conferred with and took directives from the Regional Distribution Manager who managed what would be the largest Distribution center in the Mars North America Chocolate Network, Mars Manteno.

33.    The Reserve Network is a temporary staffing employment agency that supplies temporary help to companies.

34.    The Reserve Network performed such a function for Defendant MARS, Inc. and its "Super Manager" Kenco.

35. The Reserve Network is an independent company and/or entity than that of Defendant MARS, Inc. and its "Super Manager" Kenco.

36. *Black's Law Dictionary* defines "employee" as "a person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed.

37. Mars, Inc. provided and stipulated such terms and conditions of employment, to Kenco Logistics, as well as, compliance; specifically with the Mandates of Mars outlined in the **Mars US Warehouse Quality Manual** and public policy, including but not limited to FSMA (Food safety and Modernization Act, 2001 Bioterrorism Act, CFR Title 21, and any other applicable public policy, just as it would with any employee and as it had done with the previous Management Company at the Mars Manteno Facility and its various other warehouse.

38. Mars, Inc. required Kenco Logistics and Kenco Logistics agreed to be compliant with Public Policy, as it relates to the codified laws of the land, just as it would with any employee.

39. Specifically, Mars, Inc. provided Kenco Logistics with company policies, procedures, manuals and the like, just as it would with any employee. In addition, Mars, Inc. provided the necessary tools to perform the assigned job functions, such as but not limited to:

   a. Leasing the facility, the equipment (warehouse and office), the computers, the software, as well as, the maintenance, upkeep and repairs of such, just as it would for any employee.

40.     Specifically, Mars, Inc. provided to Kenco Logistics, just as it had its former management company on a regular and ongoing basis, a comprehensive standard to safeguard the Quality and Food Safety of its products in the outbound pipeline. The document was developed in conjunction with Global Quality and Food Safety Requirements.

41.     Specifically, Mars, Inc. set the performance management standards and goals for Kenco Logistics, just as it would with any employee.

42.     Kenco Logistics because of its multifunctional and multilayers of management types can be coined as a "Super Manager."

43.     Specifically, Mars, Inc. provided it's "Super Manager" Kenco Logistics with ongoing guidance, support and management continually, just as it would with any other employee.

44.     Specifically, Mars, Inc. provided this support, guidance and management, just as it would with any employee, to its "Super Manager" Kenco logistics and the Mars Manteno Facility, by way of an in-house Regional Distribution Manager (RDM).

45.     Kenco Logistics, it's "Super Manager" just as any employee would, on an ongoing regular and regimented basis conferred with, Mars, Inc. for directives and goals, while conforming to these directives, and reporting the results of such to Mars, Inc.

46.     Just as any manager would, Kenco Logistics a type of "Super Manager" dovetailed their management styles to synergize the mandates of it employer, Mars, Inc. and public policy to meet the performance management goals set by Mars, Inc.

47.     Pointedly, Public policy drives industry standards that drive company policy. Specifically, in this case the Food, Drug and Cosmetic Act (FD&C Act), Food Safety and Modernization Act (FSMA, the 2001 Bioterrorism Act and other Acts, as well as, The World Health Organization (WHO), Codex Alimentarius, FAO and other organizations, shape and form the various recognized Global Food Safety Initiative (GFSI) benchmarks; which include but are not limited to: FSSC 2200, ISO2200, BRC, IFS, SQF and other food safety standards.

48.     Specifically, Kenco Logistics was assigned the task of implementing a written Quality Management System based upon the current non-documented procedures and protocols being performed at the Mars Manteno facility. This standard was based upon ISO, the International Standard of Organization.

49.     ISO International Standards ensure that products and services are safe, reliable and of good quality.

50.     A standard is a document that provides requirements, specifications, guidelines or characteristics that can be used consistently to ensure that materials, products, processes and services are fit for their purpose.

51.     ISO 9001:2008 specifies requirements for a quality management system where an organization:

　　　　　　　i. needs to demonstrate its ability to consistently provide product that meets customer and applicable statutory and regulatory requirements, and

　　　　　　　ii. aims to enhance customer satisfaction through the effective application of the system, including processes for continual improvement of the system and the assurance of conformity to customer and applicable statutory and regulatory requirements.

52.    All requirements of ISO 9001:2008 are the generic infrastructural framework and are intended to be applicable to all organizations, regardless of type, size and product provided.

53.    Where any requirement(s) of ISO 9001:2008 cannot be applied due to the nature of an organization and its product, this can be considered for exclusion.

54.    Where exclusions are made, claims of conformity to ISO 9001:2008 are not acceptable unless these exclusions are limited to requirements within Clause 7, and such exclusions do not affect the organization's ability, or responsibility, to provide product that meets customer and applicable statutory and regulatory requirements.

55.    Kenco Logistics Quality Management System is based on an ISO, the International Standard of Organization; the specific ISO standard is 9001:2008.

56.    All governmentally regulated industries are to conform to a Quality Management System.

57.    Specifically, Kenco Logistics implemented a written Quality Management System at the Mars Manteno Facility.

58.    Mars, Inc. and Kenco Logistics are both certified to some Global Food Safety Initiative standard and or benchmark.

59.    Pointedly, yearly external audits are required to remain compliant to the Quality Management System, along with internal audits.

60.    Furthermore, the Federal Government under the 2001 Bioterrorism Act and the 2011 Food Safety Modernization Act, require all august body participants along the food supply chain to be complaint; Essentially from farm to fork.

61.     Kenco Logistics publicly purports to "ensure all requirements are documented according to the ISO-9001:2008 structure and are incorporated into the sites' standard operating procedures. Through regular internal audits and program development, Kenco's quality team provides support and industry expertise in FDA, OSHA, EPA, DEA, DOT, and numerous other compliance agencies."

62.     Specifically, the system implemented at the Mars Manteno facility was to be a standardization of all policies, procedures, mandates and the like. This included, but was not limited to job analysis, job descriptions and the corresponding operating procedures for each job. These and all-encompassing documents are authored and vetted.

63.     Pointedly, all Quality Management systems, including but not limited to this Mars Manteno Quality Management System, mandate that all documents are to be catalogued, controlled, maintained, and stored amongst other requirements.

64.     Pointedly, Kenco Logistics developed an Appendix A for the Mars Manteno Facility, just as it had for all other facilities it managed.

65.     Appendix A catalogued the corresponding standardized documents for the Mars Manteno Facility. This included but was not limited to Job descriptions, Standard Operating Procedures, policies, protocols, forms and the like.

66.     Pointedly, Kenco Logistics also maintained an Appendix F, a higher matrix of Appendix A, top tier documents, that catalogued the corresponding standardized documents for the Kenco Logistics as a whole, inclusive of the Manteno Facility, as well as, other managed facilities. This included but was not limited to Job functions by titles, Standard Operating Procedures, policies, protocols, forms and the like.

67.     Pointedly the documents itemized in Appendix A for the site super ruled those documents in Appendix F because they were customized to the specific employer's and site requirements.

68.     Pointedly no policy, procedure, protocol or the like was to be effectuated without it being subject to this Quality Management System.

69.     To ensure proper dissemination and training, each policy and or procedure were to be signed off by each employee and a record retained of such for a specified time according to the document.

70.     Pointedly, no deviation from any policy and procedure is to occur, without following the procedure of the exception procedure and an approval of such on any level.

71.     President, David Caines, of the Kenco Group referred to the employees of the Mars Manteno site specifically as Mars, Inc. employees.

72.     The "Super Manager's" role was to manage and enforce the directives and mandates of Mars, Inc. at the Mars Manteno facility that was owned, leased and operated by Mars, Inc. since the Mars, Inc. Manteno inception in 1999.

73.     The means test based upon the Common-law test, the Economic realities test, and the Hybrid tests indicate that MARS, Inc. is the employer of not only its "Super Manager" Kenco, but HENRY and the other employees past and present of the Mars Manteno facility since its inception in 1999.

74.     MARS, Inc. was not initially named as a Respondent in the aforementioned charges filed at the Department of Human Rights and crossed filed at the EEOC. As HENRY did not have the specific knowledge of the causal connectional relationship between MARS, Inc. and its "Super Manager" Kenco.

    a. Pointedly, Kenco, MARS, Inc. and its "Super Manager" held itself out to be employer, when in fact they are not by any of the means test used to establish an employer/employee.

    b. However, the charges filed were delivered to the Mars Manteno facility that was managed by the Regional Distribution Manager of MARS, Inc.

    c. Furthermore, it was MARS, Inc. "Super Manager's" fiduciary obligation to apprise them of such matters.

75.    Consequently, MARS, Inc. had an opportunity to participate in conciliation proceedings aimed at voluntary compliance, as well as, censure, remediate or sanction the behaviour of its "Super Manager."

76.    Therefore, the Eggleston exception is being invoked into these proceedings.

77.    At all times, David Jabaley, ("Jabaley"), a White, American male, held the position of Director of Operations. Jabaley was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of HENRY's employment with Defendant KENCO.

78.    At all relevant times, Jabaley, acting on behalf of KENCO Corporate the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

79.    At all times, Kelvin Walsh, ("Walsh"), a White, American male, held the position of General Manager. Walsh was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of HENRY's employment with Defendant KENCO.

80.     At all relevant times, Walsh, acting on behalf of KENCO the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

81.     At all times, Mario Lopez, ("Lopez"), a non-African American male, held the position of General Manager. Jabaley was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of HENRY's employment with Defendant KENCO.

82.     At all relevant times, Lopez, acting on behalf of KENCO the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

83.     At all times relevant, Mike Manzello, ("Manzello"), a White male, held the position of Operations Manager, reporting to Jabaley. Manzello was in a position of authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of HENRY's employment with KENCO, MARs, Inc., "Super Manager.

84.     At all relevant times, Manzello managed operational activities relative to the receipt and distribution of inventory for Mars, Inc., including but not limited to: hiring, scheduling, workflow and the like.

85.     Immediately upon HENRY's employment, he was harassed and subjected to unequal terms and conditions of employment than other non-black and non-African-American warehouse associates, when Manzello failed to exercise the same rights and privileges to HENRY, to adjust his shift start time, as those of other similarly situated, female and male, white, non-black and non-African-American co-workers.

86.     Upon information and belief, Pete Monstwillo, a White, American male, was placed on assignment as a temporary employee almost simultaneously with HENRY in December of 2013; Monstwillo was allowed to adjust his shift start time.

87.     This adjustment in scheduling allowed Monstwillo to be afforded more overtime.

88.     Denying HENRY the shift time adjustment denied HENRY additional overtime.

89.     Upon information and belief, Monstwillo was a personal friend of Manzello's.

90.     Upon information and belief it was a customary practice for overtime to be worked before or after an individual's assigned shift, or on an unscheduled day of work.

91.     Overtime is not only worked, but mandated more often than not by MARS, Inc., especially during busy season.

92.     Upon information and belief Saul Beck stated in the November 13, 2014 FFC that were overtime groups relative to shifts 3.1 and 3.2.

93.     On or about April 22, 2015, Defendant's attorney intentionally, willfully, wantonly, and disingenuously told the Illinois Department of Human Rights that there was no documentation to support the 3.1. and 3.2 shifts.

94.     Again this was another intentional, insidious, willful, retaliatory and wanton attempt to vitiate HENRY of justice and recompense in regards to the violation of his protected rights.

95.     On or about February 20, 2014, HENRY was racially harassed by Monstwillo, who stated that "did I {HENRY} look in the mirror and check my skin color, and that I {HENRY} was black and that he {Monstwillo} was white and that if I {HENRY} did not leave him alone he could get me fired, as management was his best friend."

96.     This racially motivated incident was reported to Human Resource Personnel; Human Resource Personnel consulted with Walsh. The incident was also reported by a co-worker who witnessed the incident as well to Human Resource Personnel, as well as, Walsh.

97.     Shortly thereafter, Manzello summoned HENRY for meeting regarding the incident.

98.     HENRY was subjected to further subjugation, when Manzello told HENRY that there had been too many other instances like this that had occurred and that they did not want this to go to corporate; as they had been in trouble before for the other instances. Manzello stated that HENRY needed to find a way to squash this thing as men.

99.     The disparity did not end and was further perpetuated, as Manzello went on to minimalize the matter and contrive an alternate variation of this heinous rant, by stating that maybe HENRY misunderstood Monstwillo; that he meant he was paying HENRY a compliment, instead of threatening HENRY.

100.     HENRY was intentionally, purposefully, and willfully harassed, intimidated and coerced into abandoning his right to be free from discrimination in the workplace and pursue any further remedies under company or public policy.

101.    In retaliation for voicing opposition to such treatment, HENRY was subjected to continued unequal terms and conditions, by being reassigned a less favorable shift than Monstwillo; Monstwillo was rewarded by retaining the premium shift.

102.    Manzello represented that this shift change would help squash the situation between Monstwillo and HENRY

103.    Walsh and Manzello intentionally and willfully aided and abetted Monstwillo in the violation of HENRY's constitutional rights to oppose disparate and disparaging treatment, as well as, to not be treated differently, disparagingly, or biasly regarding HENRY's fundamental protected rights of being free from a hostile work environment, hate crimes, harassment, nepotism, favoritism, racism, retaliation, being subjugated to harsher and more strenuous work assignments and scrutiny, less opportunities, and less hours afforded to be worked.

104.    Walsh and Manzello intentionally and willfully conspired to violate HENRY's and other protected class person's constitutional rights to oppose disparate and disparaging treatment, as well as, to not be treated differently, disparagingly, or biasly regarding HENRY's fundamental protected rights of being free from a hostile work environment, hate crimes, harassment, nepotism, favoritism, racism, retaliation, being subjugated to harsher and more strenuous work assignments and scrutiny, less opportunities, and less hours afforded to be worked.

105.    Such pervasive and blatant discriminatory, hostile and disparate treatment by Defendant KENCO, gave rise to a rash of harassment from other employees and subordinates.

106.    The conduct was sufficiently severe or pervasive to alter the conditions of the HENRY's employment and create a racially charged, animus and abusive or hostile work environment;

107.    HENRY perceived the working environment to be racially charged, abusive, and/or hostile; and

108.    A reasonable person in the HENRY's circumstances would consider the working environment to be racially charged, abusive and/or hostile.

109.    The harassment and discrimination followed the complaint to management and Human Resources within such a period of time as to raise an inference of retaliatory motivation.

110.    Defendant KENCO's policies dictate that when such infractions and discrepancies occur within the facility, proper company protocol and procedure is to be followed as it relates to the Standard Operating Procedure of timely investigation and its disposition to be placed in the employees personnel file.

111.    Shortly thereafter, on or about March 25, 2014, while HENRY was still a temporary employee, engaged in protective activity, at the Mars Manteno facility, HENRY applied for two (2) open positions: Co-Pack Coordinator and Co-Pack Lead.

112. At all relevant times HENRY possessed the skills, education, and qualifications necessary to perform the duties of the Co-Pack Coordinator's position, and exceeded the requirements for the Co-Pack Lead position.

113. In Defendant's continued systemic discrimination, despite having a qualified applicant, Defendant willfully and intentionally refused to even interview HENRY in retaliation for complaining about racially motivated threats and epithets imposed upon him a few weeks earlier. Pointedly, Defendant continued to search for other applicants and take applications for the Co-Pack Coordinator's even after the posting date expired for the Co-Pack Coordinator's position.

114. On or about March 26, 2014, Michael Lanoue, non-black, completed a job application for the Co-Pack Coordinator's position.

115. On or about April 2, 2014, Melissa Hansen, non-black, completed a job application for the Co-Pack Coordinator's position.

116. On or about April 3, 2014, Jeffery Keller, non-black, completed a job application for the Co-Pack Coordinator's position.

117. Defendant KENCO has an internal hiring/promotion policy the relevant policy at the time was CP-HR-6.2.2013.

118. HENRY was never interviewed for the Co-Pack Coordinator's position. Effectively denying HENRY the opportunity to be promoted.

119. MARS, Inc., "Super Manager" contends that HENRY did not apply for the position of Co-Pack Coordinator, according to their October 3, 2014 position statement to the Illinois Department of Human Rights.

120.     The "Super Manager" goes on to say that even if "HENRY had applied, he was not yet qualified for *any* other position at Kenco. In order for a non-exempt employee to be eligible for another position at Kenco, he or she must have been employed in his or her current position for at least six months. See Exhibit 4 ¶and Exhibit 5 ¶5 to Kenco's response to IDHR Questionnaire"...They go on to say: "Therefore, even if Mr. Henry had applied for a position, he would not have been qualified."

121.     Pointedly, it should be noted that the policies Defendant's legal counsel proffered as Exhibit 4 ¶and Exhibit 5 ¶5 were not the relevant policies for the time in question; the policies were effectuated after the relevant time in question.

*122.*     It should be further noted, that Defendant's legal counsel stated to the Illinois Department of Human Rights in correspondence dated November 20, 2015 regarding Charges 2015CA1804 and 2015CA2495,another employment matter relative to MARS, Inc. and its "Super Manager, " Kenco, on pages 1&2 ¶3 that *"subject to and without waiving these objections, see attached Exhibits A-D. Kenco does not have written policies that cover promotions, demotions, and layoffs."*

123.     Again this is an intentional, woeful, wanton, blatant and outright lie, coupled with a reckless disregard, to intentionally manipulate the circumstances surrounding and the outcome of the disparate and disparaging treatment and impact imposed upon HENRY and others that the Defendant does not have policies that address promotions, demotions and layoffs.

   a. Pointedly public policy stands with regards to layoffs under the WARN Act and all other policies would be in subornation and compliance.

124.     Pointedly the policies that Defendant had to address promotions, demotions and layoffs during the relevant times were performance management policies for exempt and non-exempt employees, Progressive Discipline-Performance Improvement Plans (PIP) & Opportunity for Improvement (OFI), Exempt Hiring Procedures, Non-Exempt Hiring Process, termination process and others. These and other policies are indexed in Appendix F and other appendices.

125.     Furthermore, according to industry standards, Society for Human Resource Management-(SHRM), within the performance management system policies and various tools are used to govern performance management and compliance with nondiscrimination laws.

126.     Embedded in the frame of these and other polices were perquisites, performance planning, execution, assessment, review, renewal and re-contacting.     The quintessential elements that drive compensation, promotions, demotions and terminations.

127.     These and other policies, procedures, protocols and forms are listed in Defendant's Appendix F of Top Tier Documents and are governed by policy CP-BR-4.2.1001.

128.     As we can _see_ in this matter Defendant intentionally and willfully chose to reference such a policy in its contrived scheme of conspiracy in its position statement to the Illinois Department of Human Rights in an effort obstruct and impede justice, avoid culpability, defraud and deny HENRY out of his enjoyed rights, while simultaneously continuing to retaliate and violate his protected rights, as well as, the other complainant

129.    However, even in light of the policies not being relevant to the matter in question, the irony and stipulated fact in the policy supplied by MARS, Inc., "Super Manager" does not stipulate, mention, implicitly or explicitly state that temporary employees fall within the scope or definition of a non-exempt employee of MARS, Inc. and its "Super Manager" Kenco.

130.    Furthermore, the court should note, this theory of HENRY being an employee of Mars Manteno facility is juxtaposed and diametrically opposed to MARS, Inc. "Super Manager's" position statement dated October 3, 2014 page 1, Background section 1 ¶1; whereby it clearly states the following: *"The complaint was temporarily assigned to Kenco through Temporary Resource Network Staffing on December 18, 2013 and hired as a full-time warehouse associate on April 14, 2014. A warehouse associate is a non-exempt position."*

131.    Pointedly, making such blatantly false, misleading and disingenuous statements to the Illinois Department of Human Rights to obstruct and impede justice, as well as, avoid culpability is again another prime example of another contrived scheme of discriminate and retaliatory behaviour of MARS, Inc., "Super Manager" that violates the protected rights of HENRY and others, as well as, continuing to subjugate HENRY to various other forms of disparate and disparaging treatment and impact.

132.    After HENRY continued to enquire about the various employment opportunities. HENRY was summoned into an alleged interview for the Co-Pack Lead, as a matter of course, a substantial lesser position than the Coordinator's position; HENRY was more than qualified to perform the Lead position.

133.     In tandem of this contrivance, HENRY continued to be the victim of unequal terms and condition of employment in that he was subjected to a disparity in not being given a proper interview relative to similarly situated white, non-black, non-African American co-workers, that included recent hires. Defendant KENCO and its agent's misrepresented HENRY's interview for the position, as it consisted of few minutes of small talk; irrelevant to the job and tasks ahead.

134.     The interview was granted as a mere pretext to be non-discriminate against HENRY.

135.     According to Jay Elliott, MARS, Inc., "Super Manager's" Vice President of Legal at Kenco, proffered to Illinois Department of Human Rights that "the sign up sheets for employees to indicated an interest in transferring into a non-exempt positions were not kept, so we don't have a copy to send you for the Co-Pack Leader position at issue. "

136.     Failure to keep the signup sheet is a violation of company policy, as it is a controlled document and subject to the record retention policy.

137.     Specifically, in this case the signup sheet was a part of the application process; therefore, as a matter of public policy the signup sheet should have been retained for the one (1) requirement, as well as, due to the impending litigation.

138.     Pointedly, given all things being equal and according to Respondent's policy cited in the October 3, 2014 relating to "a non-exempt employee to be eligible for another position at Kenco, he or she must have been employed in his or her current position for at least six months;" then the following should not have occurred:

I.     Temporary Employee promotion

A.     A temporary employee applied for the Co-Pack Leader Position after being instructed by Kenco's Corporate Talent Coordinator that it was permissible to do so; despite not having been in his current position for a minimum of six (6) months.

B.     The temporary employee was promoted to Co-Pack Leader within in six (6) months of being in his temporary position.

C.     Temporary employment is a prerequisite to employment at the Mars Manteno Facility.

a.     The prerequisite terms of employment as a temporary employee is ninety (90) days temporary to permanent employment.

b.     Pointedly, as a matter of ordinary course of business practice and company policy, a temporary employee would not be upwards of or in excess of six (6) months as temporary before becoming a permanent employee.

II.     Exempt employee promotion within the 12 month policy requirement

A.    According to the policy provided by Respondent in the October 3, 2014 position statement page 2 of 6 ¶3 states "Exempt employees must have twelve (12) months tenure in their current position to be considered for positions up to and including the Director level.

B.    Melissa Hansen, non-black, was hired on or about May 2014, as the Co-Pack Coordinator, the same job HENRY inquired and applied for; but was not interviewed for allegedly because he did not apply and "even if Mr. Henry had applied for a position, he would not have been qualified;" because he had not been in his current position of a temporary employee for more than six (6) months.

C.    Melissa Hansen, non-black, possessed some work related experience for the Co-Pack Coordinator position, but did not possess a college degree which was a preferred prerequisite to the position.  A qualification that HENRY had along with required work related experience.

D.    Pointedly, upon information and belief Melissa Hansen, non-black, had no college education or training at all.

E.    Contrarily and directly opposed to Respondent's own Exempt Hiring Policy CP-HR-1002, Hansen began performing the job duties and functions of the Operations Manager in September 2014, less than four (4) months after being hired as the Co-Pack Coordinator.  A  significantly less time than required and specified in Defendant's policy it offered to the Illinois

Department of Human Rights as Exhibit 5 on or about October 3, 2014 in HENRY's charge of discrimination 2015CF0034.

139.     Again MARS, Inc. "Super Manager," in its continued pattern and practice of discrimination and retaliation, violated its own company policy by applying a different standard, as well as, more favorable terms and conditions of employment when it came to HENRY and the other temporary and permanent employees who were either non-black, had not opposed disparate and disparaging treatment or impact, as well as, who had not filed formal charges against Defendant or a combination thereof.

140.     HENRY had received work related commendations and good performance reviews, as well as, incentives for his work performance on an ongoing and regular basis.

141.     Defendant KENCO failed to completely and fairly adhere to their own company policy and instead, chose to completely ignore Defendant's own company policy and exhibit a blatant disregard for company and public policy; grossly failing to remediate and mitigate the situations at hand. Defendant KENCO maliciously and intentionally failed to follow the public and company policy with respect to violation of HENRY's and others constitutional right to be free from discrimination, harassment and retaliation in the workplace. This caused substantial damage to HENRY. HENRY, upon information and belief, alleges that his race; and retaliation were substantial motivating factors in Defendant KENCO's:

142.     (1) Refusal to afford HENRY the same rights, privileges and benefits afforded to white, non- Black, non-African American's; (2) Refusal to uphold and enforce HENRY's constitutional rights by failing to follow its policies, custom and past practice, as it related to the investigation of alleged misconduct; (3) Failure to treat HENRY and other similarly situated non-white employees of Defendant KENCO fairly with respect to any adverse employment decisions; (4) Defendant's failure to follow its own policies, custom and best practices, as it relates to anti-harassment and workplace violence policies; (5) Defendant's failure to follow criminal and civil policy; and (6) Defendant's failure to follow its policies, custom and past practice as it related to promotions; (7) its decision to continue to subject HENRY to hostile and discriminatory treatment.

143.     Upon information and belief, HENRY's reduction in shift and hours, as well as, the intentional and willful dereliction of duties and obligations under company and public policy was against the normal practices of the Defendant KENCO with respect to such alleged discrepancies and as such, violated Defendants normal due process afforded to affected parties. Defendant's KENCO punitive actions directed toward HENRY was motivated by a racial animus, discrimination and retaliation, and was unjustified and violative of his rights under Federal and the state of Illinois anti-discrimination laws.

144.     Upon information and belief, HENRY's similarly situated, white, non-black, non-African American co-workers were not subjected to humiliation, harassed, and punished in such a manner. None of HENRY's similarly situated, white, non-black, non-African American co-workers were humiliated, harassed and subjected to such punitive measures.

145.     HENRY continued to be further subjected to other forms of disparate treatment and harassment, after HENRY continued to question, complain and

report the matters to Human Resource personnel, HENRY and other African Americans were subjected to harsher discipline and closer scrutiny than his similarly situated, white, non-black, non-African American co-workers.

146.     HENRY and other African Americans have been subjected to public humiliation, harassment, retaliation, and retribution when questioning or complaining about working conditions, as well as, the unfair discriminatory treatment and practices of Defendant KENCO while his white, non-black, non-African-American counterparts were not subjected to such treatment.

147.     Defendant KENCO's and its various agents, in turn became more openly hostile, retaliatory and discriminatory towards HENRY as well as other black and African American employees and those who opposed such disparate treatment encouraging supervisors, leads and other non-black, non-African workers under their management to do likewise. This included but was not limited to all phases of employment, i.e.: hiring, discharge, performance management, conditions of employment, promotion, paid time off, furlough/leave of absences, discipline, work shifts, benefits, and wages.

148.     Defendant KENCO sought every opportunity to treat HENRY unfairly in relation to similarly situated, white, non-black, non-African American co-workers, who did not oppose disparate and disparaging treatment of African Americans.

149.     The harassment and discrimination followed the complaint to corporate, management and Human Resources within such a period of time as to raise an inference of retaliatory motivation.

150.     Defendant KENCO's policies dictate that when such infractions and discrepancies occur within the facility, proper company protocol and procedure is to be followed as it relates to the Standard Operating Procedure.

151.     Upon information and belief, Defendant KENCO, hired Pete Monstwillo in 2014, a white, non-black, non-African American, male as a warehouse associate. Monstwillo was not subjected to such discriminatory, unequal terms and conditions of his employment as was HENRY.

152.     Pointedly, Monstwillo was hired by MARS, Inc. "Super Manager", as a full-time employee, after Monstwillo had violated the company's supposed zero tolerance policies as it relates to: Harassment, Prohibited Conduct and other company and public policies; when he threatened HENRY in racial animus.

153.     Defendant KENCO also hired external candidates for the various warehouse positions. These similarly situated, non-black, non-African American co-workers of HENRY were Esmeralda Phillips, Michael DeGirolamo, and others whom were hired during the period of the summer 2013 to September 2014. None of these persons were subjected to such discriminatory, unequal terms and conditions of their employment as was HENRY.

154.     On, or about June 3, 2014, Walsh, Defendant's then General Manager of the Manteno facility was terminated allegedly for a reason unrelated to the numerous disparate and disparaging incidents that had occurred at the Mars Manteno facility.

155.     Upon information and belief, Defendant KENCO through its VP of Operations, Paula Hise, on or about June 3, 2014, openly praised and lauded Walsh as a valued employee and friend, as well as, characterizing his separation from Defendant as a great loss. Hise made these statements about Walsh despite, Defendant being possessed of firsthand knowledge and evidence of Walsh's violation of company and public policy against discriminatory treatment in the workplace. This constituted another form of harassment, and racial animus by Defendant KENCO.

156.     Upon information and belief, Defendant KENCO's, employee Tony Willis, was involuntarily promoted to Supervisor, from a clerk's position, after HENRY had relentless complained and filed charges at the Illinois Department of Human Rights.

157.     HENRY, along with those who opposed such treatment, was subjected to discriminatory treatment.

158.     HENRY was paid an hourly rate and at times eligible bonuses. As part of his employment compensation package, he also received or was entitled to medical benefits, insurance, Paid Time Off and overtime as well as other benefits.

159.     HENRY was continually harassed and retaliated against throughout his tenure of employment with Defendant KENCO.

160.     While employed by Defendant KENCO, HENRY was the victim of race and disability discrimination, harassment, retaliation coercion, conspiracy, willful and intentional interference, as well as, a hostile and animus work environment. HENRY is an African American male. Due to his race he was treated differently from other similarly situated non-black, non-African American employees in the terms and conditions of his employment.

161.     Upon information and belief, HENRY alleges that he and other
African American co-workers belonging to protected classes pursuant to the
federal and the state of Illinois anti-Employment Discrimination laws were
held to different standards than other employees of Defendant.

162.     HENRY upon information and belief, alleges that African Americans
and other employees that are members of the protected class have
substantially lower employment and retention rates at KENCO, due to
unfavorable terms, conditions and privileges of employment, such as: (1)
lack of equal opportunity; (2) unfair and poor treatment; and (3) less
tolerance and leniency when making adverse employment decisions,
amongst other things. HENRY believes KENCO has a disproportionately lower
number of African American employees in various management level
positions.

163.     HENRY, upon information and belief, alleges that there were
substantially more non-African American employees, especially in
management level positions, at the Manteno facility, as well as, other
facilities. The non-African American employees at the Manteno facility were
treated much more favorably than HENRY and other African American
employees.

164.     On or about October 8, 2014, HENRY was accosted again in racial
animus by Monstwillo, who in enacted upon HENRY a racially motivated
hate crime, when he attacked him with a moving forklift truck while jeering
the fork blades at HENRY in an attempt to inflict bodily harm and perhaps
even death upon HENRY.

165.    Again witnesses stepped forward corroborating HENRY's version of the incident.

166.    Monstwillo was sent home that night; however, Monstwillo continued to call all through the night into the office threatening to do harm to HENRY.

167.    Defendant again did not follow its own policy and did not call the police, nor placing any investigative notes and dispositions in HENRY's file as required.

168.    Because of a previous shooting in the MARS, Inc. Mars Manteno warehouse in 2012, due to a hostile work environment, HENRY attempted to take a medical leave of absence, until the matter could come to some resolve, as he was fearful, stressed out, and devastatingly shaken about the progressive and real racially motivated threats and actions towards his person by Monstwillo.

169.    HENRY was denied FMLA due to not having accumulated enough working hours; HENRY had accumulated 1229.39 hours between April 14, 2014 and October 8, 2014 his last day worked. HENRY was short 20.61 working hours according to MARS, Inc. "Super Manager" Kenco to meet the 1250 hour requirement for FMLA.

170.    HENRY had worked as a temporary employee at the MARS, Inc. Manteno facility from December 18, 2013 to April 13, 2014 and had accumulated 824.62 working hours.

171.    Contrarily, MARS, Inc. "Super Manager" Kenco stated that HENRY was ineligible to for any position within the organization because HENRY had not completed his six (6) months in his current position. They referenced December 18, 2013, as HENRY's initial working day at the MARS, Inc. Mars Manteno facility.

172.    Based upon Defendant's rational of marking time, HENRY would have had 2054.01 working hours; more than enough to comply with the 1250 hours work requirement for leave under the FMLA.

173.    Pointedly, there were other leaves available to HENRY, including but not limited to: an unpaid leave of absence.

174.    Upon information and belief, MARS, Inc. "Super Manager" Kenco in its continued systemic discrimination made accommodations and leave for a newer hire, who was non-black that had less seniority than HENRY.

175.    Again this was another intentional, willful, woeful and wanton violation of HENRY's protected rights, including, but not limited to his rights under the American's with Disability Act, as well as, other protected rights that he should have enjoyed.

176.    Upon information and belief, HENRY was on leave of absence since October 10, 2014; with him being officially terminated sometime in November of 2014, despite being on a medical leave of absence.

177.    Again another intentional, willful, woeful and wanton retaliatory and discriminate act imposed and enacted upon HENRY.

178.     This unpaid leave was not offered to HENRY, but a more permanent leave: termination.

179.     Coincidentally, according to MARS, Inc. "Super Manager" Kenco on the exact same day Monstwillo enacted a racially motivated hate crime against HENRY, HENRY supposedly violated an alleged company cell-phone policy by posting a picture on Facebook of a "downed pallet" (a pallet that had fallen over).

180.     MARS, Inc. "Super Manager" Kenco was swift to bring justice to this incident, as it had decided on Friday, October 10, 2014 to terminate HENRY's employment because of this alleged infraction.

181.     Pointedly, MARS, Inc. "Super Manager" Kenco began terminating persons in the photo allegedly taken and posted to Facebook by HENRY; Dylan Brooks and Francisco Villarreal.

182.     MARS, Inc. "Super Manager" Kenco has an incident policy; the policy mandates investigation into any incident that occurs on the premises.

183.     MARS, Inc. "Super Manager" Kenco has a progressive disciplinary policy; Opportunity for Improvement for hourly employees, such as HENRY.

184.     MARS, Inc. "Super Manager" Kenco progressive disciplinary policy; Opportunity for Improvement for hourly employees mandates that form be signed by site Human Resource Personnel.

185.     Pointedly, HENRY was never debriefed or questioned about the incident or his alleged participation in the matter.

186.     Pointedly, MARS, Inc. "Super Manager" Kenco in retaliation and continued disparate treatment intentionally, willfully, woefully and wantonly failed to follow its own incident and progressive disciplinary policies, as it related to HENRY in order to contrive a scheme that would give rise to a non-discriminate pretext for termination; that ultimately resulted into an adverse employment action of the irreparable harm of termination

187.     The cellphone policy cited in the termination letter dated October 20, 2014 and accompanied Opportunity For Improvement Form dated October 14, 2014 and signed October 15, 2014 cited CP-RM-6.4.112 as the governing cellphone policy, for the basis of termination.

188.     Pointedly this policy CP-RM-6.4.112 has an acknowledgment form CP-RM-6.4.112-1 that is to be signed off by each employee affirming his or her knowledge of such policy.

189.     HENRY never signed such a form CP-RM-6.4.112-1 nor was Defendant able to produce such form with HENRY's signature.

190.     This form CP-RM-6.4.112-1 (record) would have been kept from as a matter ordinary business records for a retention time of seven (7) years.

191.     Therefore, according to MARS, Inc. "Super Manager" Kenco this policy CP-RM-6.4.112 regarding cellphone use was never effectuated or relevant to HENRY.

192.     Specifically it states, "Vernon's employment is being terminated for using a cell phone on the warehouse floor in violation of CP-RM-6.4.112 Cellular Phone/Electronic Device use, section 3.2.1 which reads: 'The use of personal electronic devices such as cell phone, I-pods, etc. is prohibited on site unless authorized by the Site Manager for specific positions (jobs) areas and time.' " It goes onto say, that "on October 8, 2014, Vernon Henry posted a photograph on Facebook that showed Dylan Brooks and Francisco Villarreal with cell phones in hand."

193.     MARS, Inc. "Super Manager" Kenco included in HENRY's personnel file and provided to the Illinois Department of Human Rights the Illinois Department of Labor a photograph of three (3) persons in a picture with two (2) persons holding a cellphone.

194.     None of the persons identified within the photograph were HENRY.

195.     MARS, Inc. "Super Manager" Kenco had no substantial or tangible evidence that HENRY took or posted the photograph to Facebook, or that he may have even been around when the incident occurred.

196.     Pointedly, according to company policy any investigative notes or findings should have been compiled and placed in HENRY's personnel file.

197.     There are no such findings in HENRY's file, despite it being a company policy.

198.     Again MARS, Inc. "Super Manager" Kenco, again violated its own company policy to continue to retaliate, violate and subjugate HENRY and others to disparate and disparaging treatment and impact rooted in racial animus.

199.    From 2013-2015, HENRY was unfairly singled out and treated differently from his non-African American colleagues due to his race. HENRY's was notified by mail on or about October 25, 2014 that is employment ended on or about October 14, 2015. The reason given by Defendant KENCO for HENRY's discharge was that he violated the company's cell phone policy.

200.    As swift as justice was imputed upon HENRY, it was not so, if at all for Monstwillo.

201.    Upon information and belief Monstwillo was not immediately punished, if at all, for the heinous hate crime that was rooted and grounded in racial animus that Monstwillo inflicted upon HENRY in trying to cause him bodily harm or even death, as HENRY had been for by all means an allegedly lesser infraction of taking a picture and posting it on Facebook.

202.    MARS, Inc. "Super Manager" Kenco proffered to the Illinois Department of Human Rights that it had allegedly issued a three (3) day suspension without pay on October 15, 2014, five (5) days after the decision to terminate HENRY to Monstwillo.  Again a disparate treatment against HENRY enacted upon him by MARS, Inc. "Super Manager" Kenco

203.    Upon information and belief this alleged three (3) day suspension without pay did not occur.

204.    Furthermore, the court should take notice that the Opportunity For Improvement form proffered to Illinois Department of Human Rights, indicated that Monstwillo refused to sign the Opportunity For Improvement form regarding the incident and its three (3) day suspension allegedly issued by MARS, Inc. "Super Manager" Kenco.

205.     At any instance of punishment towards Monstwillo for such a heinous, wicked, racially rooted and hated filled driven animus act was quantifiably less severe and harmful than that of the retaliatory, intentional wanton, and willful irreparable harm of termination imposed upon HENRY by MARS, Inc. "Super Manager" Kenco for such a lesser infraction.

206.     Pointedly, not only could of HENRY been hurt, harmed, killed or a combination thereof, but innocent bystanders could have suffered the same fate, as well as, causing property damage or a business interruption.

207.     Again another prime example of the admitted systemic discriminatory practices of MARS, Inc. "Super Manager" Kenco.

208.     According to MARS, Inc. "Super Manager" Kenco policies, procedures, and protocols Monstwillo should have been terminated, but MARS, Inc. "Super Manager" Kenco intentionally, willfully, and wantonly chose to foster, condone, perpetuate, and support the pervasive and egregious behavior or racism, in stark contrast to its own policy, as well as, public policy.

209.     HENRY applied for unemployment benefits from the Illinois Department of Employment Security.

210.     MARS, Inc. "Super Manager" Kenco, again in retaliation disparately treated HENRY by denying his unemployment benefits by stating that HENRY was discharged for "misconduct."

211.     HENRY was denied this benefit by the Illinois Department of Employment Security on or about November 14, 2014.

212.    HENRY appealed this decision on or about November 18, 2014.

213.    In 2014 and 2015, Defendant KENCO willfully submitted false and inconsistent information to Regulatory and Public Policy agencies. Such as, but not limited to Illinois Department of Human Rights and the Illinois Department of Employment Security.

214.    On or about December 10, 2014 by facsimile Thomas and Thorngren, a third party unemployment cost control provider, located in Nashville, TN, transmitted documents relevant to the impending unemployment determination hearing on behalf of MARS, Inc. "Super Manager" Kenco to the Illinois Department of Employment Security, specifically, Mr. Thomas Plotke. These same documents were mailed via UPS to HENRY

215.    The documents tendered by Thomas and Thorngren specifically included: the cover letter, the completed Opportunity For Improvement Form for HENRY, a Personal Electronic Device Policy-SOP-6.2.2005, and HENRY's termination letter dated October 20, 2014.

216.    That the court may take judicial notice the Personal Electronic Device Policy-SOP-6.2.2005 that was submitted was not the policy referenced in the Opportunity For Improvement form nor the termination letter served upon HENRY.

217.    That the court may take further judicial notice that the policy submitted was that of a policy relegated to another facility outside of MARS, Inc. that MARS, Inc. "Super Manager" Kenco managed. That facility was Keurig-Green Mountain Coffee Roasters, Inc. in Robbinsville, N.J. A separate and distinct operation and entity from MARS, Inc. "Super Manager" Kenco.

218.    That the court may continue to take further judicial notice the policy that was submitted was not properly executed as it was not signed and dated as required by company policy and compliance with the ISO 9001 standard.

219.    The culminating point for the court to notice is that this Personal Electronic Device Policy-SOP-6.2.2005 that was intentionally and willfully submitted by Thomas and Thorngren on behalf MARS, Inc. "Super Manager" Kenco mirrors the retaliatory and discriminate actions, sanctions and irreparable harms imposed and enacted upon HENRY, as a means of justifying the alleged pretexted non-discriminate reason for HENRY's termination. A continued violation of HENRY's enjoyed and protected rights.

220.    The court should be advised that the Illinois Department of Employment Security Administrative Law Judge, Thomas Plotke determined, ruled and concluded " based upon a preponderance of the evidence, the claimant was discharged not for misconduct in connection with the work and is not disqualified from receiving benefits under Section 602A of the Illinois Unemployment Insurance Act." He also stated that HENRY was discharged without ever being questioned about the matter.

221.    HENRY upon information and belief believes that Thomas & Thorngren aided and abetted MARS, Inc. and its "Super Manager" Kenco in efforts to obstruct and impede justice, as well as, continue to retaliate and violate HENRY's protected rights.

222.    HENRY upon information and belief believes that Thomas & Thorngren, Kenco and MARS, Inc. General Manager of the Mars Manteno facility conspired against HENRY.

223.     Defendant KENCO's actions toward HENRY were unlawful, malicious, deceptive, defamatory, slanderous, fraudulent, conspiring, and contrary to principles of fairness and common decency. Defendant intentionally and willfully coerced Plaintiff into a quid pro quo that would abandon his constitutional and protected rights to continue his employment. Moreover, HENRY, upon information and belief, alleges that other similarly situated, non-black, non-African American co-workers were subjected to such treatment.

224.     Defendant KENCO has admitted in the past to the Court's its disparate and disparaging treatment of African Americans in Brown Vs. Kenco in the .

13

EEOC Form 161-B (11/09)                        **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Vernon Henry**<br>**c/o Jordan Hoffman, Esq.**<br>**Jordan Travaille Hoffman**<br>**11528 S Halsted St**<br>**Chicago, IL 60628** | From: | **Chicago District Office**<br>**500 West Madison St**<br>**Suite 2000**<br>**Chicago, IL 60661** |
|---|---|---|---|

☐   *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **21B-2014-02027** | . **Daniel Lim,**<br>**State & Local Coordinator** | **(312) 869-8082** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☒   More than 180 days have passed since the filing of this charge.

☐   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒   The EEOC is terminating its processing of this charge.

☐   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for **any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Julianne Bowman /sr*

             *September 4, 2015*

Enclosures(s)

         **Julianne Bowman,**
         **District Director**

                *(Date Mailed)*

cc:

         **Chief Executive Officer**
         **KENCO LOGISTICS SERVICES**
         **1125 W Sycamore Rd**
         **Manteno, IL 60950**

This form is affected by the Privacy Act of 1974: See Privacy act statement before completing this form.

☒ IDHR

☐ EEOC

#15W0703.03

2015CF0034

## Illinois Department of Human Rights and EEOC

| NAME OF COMPLAINANT (indicate Mr. Ms. Mrs.) | TELEPHONE NUMBER (include area code) |
|---|---|
| Mr. Vernon Henry | (708) 261-7892 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 4541 W. 175th Place | Country Club Hills, IL 60478 | M    D    YEAR |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)

| NAME OF RESPONDENT | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE NUMBER (include area code) |
|---|---|---|
| Kenco Logistics Services | 15+ | (815) 468-9999 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1125 W. Sycamore Road | Manteno, IL 60950 | Kankakee |

| CAUSE OF DISCRIMINATION BASED ON: | DATE OF DISCRIMINATION EARLIEST (ADEA/EPA) LATEST (ALL) |
|---|---|
| Race   Sex   Retaliation | 12/13          03/14 |
| | ☐ CONTINUING ACTION |

THE PARTICULARS OF THE CHARGE ARE AS FOLLOWS:

I.  A.   ISSUE/BASIS

UNEQUAL TERMS AND CONDITIONS OF EMPLOYMENT – DECEMBER 2013 THROUGH MARCH 2014, DUE TO MY RACE, BLACK

B.  PRIMA FACIE ALLEGATIONS

1.  My race is black.

2.  My work performance as a forklift operator meets Respondent's expectations. I was hired in December 2013.

Page 1 of 4

I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SUBSCRIBED AND SWORN TO BEFORE ME

THIS 9th DAY OF July , 2014.

*Donna M. Evans*
NOTARY SIGNATURE

OFFICIAL SEAL
DONNA M EVANS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/03/18

NOTARY STAMP

X _____          7-9-14
SIGNATURE OF COMPLAINANT          DATE

I declare under penalty that the foregoing is true and correct I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

EEO-5 FORM (Rev. 7/12-INT)

3. Beginning in late December 2013, and continuing through March 2014, I was subjected to unequal terms and conditions of employment by Mike Monzello (white), Operations Manager, when he repeatedly denied me the opportunity to start work earlier when doing overtime.

4. A similarly situated non-black employee, Pete (last name unknown), was allowed to do overtime before his shift started.

## II. A. ISSUE/BASIS

UNEQUAL TERMS AND CONDITIONS OF EMPLOYMENT – DECEMBER 2013 THROUGH MARCH 2014, DUE TO MY SEX, MALE

### B. PRIMA FACIE ALLEGATIONS

1. My sex is male.

2. My work performance as a forklift operator meets Respondent's expectations. I was hired in December 2013.

3. Beginning in late December 2013, and continuing through March 2014, I was subjected to unequal terms and conditions of employment by Mike Monzello (male), Operations Manager, when he repeatedly denied me the opportunity to start work earlier when doing overtime.

4. Similarly situated female employees were not subjected to these terms and conditions of employment.

## III. A. ISSUE/BASIS

FAILURE TO PROMOTE – LATE FEBRUARY 2014 AND/ OR EARLY MARCH 2014, DUE TO MY RACE, BLACK

### B. PRIMA FACIE ALLEGATIONS

1. My race is black.

2. My work performance as a forklift operator meets Respondent's expectations. I was hired in December 2013.

3. In late February 2014 and/or early March 2014, I applied for the vacant position of co-pack coordinator.

4. I am well qualified for said position.

> 5. In late February 2014 and/or early March 2014, I not promoted to the position in question.
>
> 6. Despite my qualifications, the position was given to a less qualified non-black individual, Melissa Hansen.

IV. A. **ISSUE/BASIS**

**FAILURE TO PROMOTE – LATE FEBRUARY 2014 AND/ OR EARLY MARCH 2014, DUE TO MY SEX, MALE**

B. **PRIMA FACIE ALLEGATIONS**

> 1. My sex is male.
>
> 2. My work performance as a forklift operator meets Respondent's expectations. I was hired in December 2013.
>
> 3. In late February 2014 and/or early March 2014, I applied for the vacant position of co-pack coordinator.
>
> 4. I am well qualified for said position.
>
> 5. In late February 2014 and/or early March I was not promoted to the position in question.
>
> 6. Despite my qualifications, the position was given to a less qualified female individual, Melissa Hansen.

V. A. **ISSUE/BASIS**

**FAILURE TO PROMOTE – LATE FEBRUARY 2014 AND/ OR EARLY MARCH 2014, IN RETALIATION FOR HAVING COMPLAINED ABOUT RACIAL DISCRIMINATION IN THE WORKPLACE**

B. **PRIMA FACIE ALLEGATIONS**

> 1. Prior to me applying for the promotional position I engaged in a protected activity when I complained to Mike Monzello, Operations Manager, that I was being racially harassed by Peter (last name unknown), co-worker.
>
> 2. In late February 2014 and/or early March 2014, I applied for the vacant position of co-pack coordinator.

3. I am well qualified for said position.

4. In late February 2014 and/or early March I was neither interviewed nor promoted to the position in question.

5. The adverse action followed my involvement in a protected activity, thereby, raising an inference of retaliatory motivation.

## VI. A. ISSUE/BASIS

FAILURE TO PROMOTE – LATE FEBRUARY 2014 AND/ OR EARLY MARCH 2014, DUE TO MY RACE, BLACK

## B. PRIMA FACIE ALLEGATIONS

1. My race is black.

2. My work performance as a forklift operator meets Respondent's expectations. I was hired in December 2013.

3. In late March 2014 and/or early April 2014, I applied for the vacant position of co-pack leader.

4. I am well qualified for said position.

5. In late February 2014 and/or early March I was interviewed Mike Monzello . Operations Manager. On or about March 2014, I was not promoted to the position in question. No reason was cited for the failure to promote.

6. Despite my qualifications, the position was given to less qualified non-black employees, Roger Payne, Jose Correra, and Brian Camp.

HMS/RCG/hms

EEOC Form 161 (11/09)  **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To: **Vernon Henry**<br>c/o Jordan Hoffman, Esq.<br>**Attorney at Law**<br>**11528 S. Halsted**<br>**Chicago, IL 60628** | From: **Chicago District Office**<br>**500 West Madison St**<br>**Suite 2000**<br>**Chicago, IL 60661** |
|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|
| EEOC Charge No. | EEOC Representative | Telephone No. |
| **21B-2015-00126** | **Daniel Lim,**<br>**State & Local Coordinator** | **(312) 869-8082** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

    ☐    The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

    ☐    Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

    ☐    The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

    ☐    Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

    ☐    The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

    ☒    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

    ☐    Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Julianne Bowman/ht*

**Julianne Bowman,**
**District Director**

April 11, 2016

*(Date Mailed)*

Enclosures(s)

cc:
    **Jay Elliott**
    **KENCO LOGISTICS SERVICES, LLC**
    **2001 Riverside Drive**
    **Chattanooga, TN 37406**

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974: See Privacy act statement before completing this form. #15W1015.08 | ☒ IDHR ☐ EEOC | 2015CF0990 |

## Illinois Department of Human Rights and EEOC

| NAME OF COMPLAINANT (indicate Mr. Ms. Mrs.) | TELEPHONE NUMBER (include area code) |
|---|---|
| Mr. Vernon Henry | (708) 261-7892 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 4541 W. 175th Place | Country Club Hills, Illinois 60478 | / / M D YEAR |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)

| NAME OF RESPONDENT | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE NUMBER (include area code) |
|---|---|---|
| Kenco Logistics Services | 15+ | ( 815 ) 468-9999 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1125 W. Sycamore Road | Manteno, Illinois 60950 | Kankakee |

| CAUSE OF DISCRIMINATION BASED ON: | DATE OF DISCRIMINATION EARLIEST (ADEA/EPA) LATEST (ALL) |
|---|---|
| Race    Retaliation | / / 10/8/14 ☐ CONTINUING ACTION |

THE PARTICULARS OF THE CHARGE ARE AS FOLLOWS:

I. A. **ISSUE/BASIS**
   HARASSMENT – OCTOBER 8, 2014, BECAUSE OF MY RACE, BLACK

   B. **PRIMA FACIE ALLEGATIONS**
   1. My race is black.

   2. My job performance as a forklift operator meets Respondent's expectations. I was hired in March 2014.

Page 1 of 2

I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SUBSCRIBED AND SWORN TO BEFORE ME

THIS 21S DAY OF October , 2014.

NOTARY SIGNATURE

OFFICIAL SEAL
YOLANDA G GODWIN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/21/15

10/21/14

X _____ 10-21-14
SIGNATURE OF COMPLAINANT    DATE

I declare under penalty that the foregoing is true and correct I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

NOTARY STAMP

EEO-5 FORM (Rev. 7/12-INT)

Charge Number: 201 F 0990
Complainant: Vernon Henry
Page 2 of 2

      3. On October 8, 2014, I was harassed by Pete (last name unknown, non-black) co-worker, who attempted to hit me with his forklift. He followed me around the warehouse got off his forklift walked up to me and said he was not intimidated by me and tried to hit me on purpose.

      4. Similarly situated non-black employees are not treated in this manner.

II.    A.    ISSUE/BASIS
           HARASSMENT – OCTOBER 8, 2014, IN RETALIATION FOR FILING AN EARLIER DISCRIMINATION CHARGE WITH THE ILLINOIS DEPARTMENT OF HUMAN RIGHTS

    B.    PRIMA FACIE ALLEGATIONS
           1. On July 9, 2014, I filed charge #2015CF0034, against Respondent with the Illinois Department of Human Rights.

           2. On October 8, 2014, I was harassed by Pete (last name unknown, non-black), co-worker, who attempted to hit me with his forklift. He followed me around the warehouse got off his forklift walked up to me and said he was not intimidated by me and tried to hit me on purpose.

           3. The harassment followed the filling of my discrimination charge with such a period of time as to raise an inference of retaliatory motivation.

MFP/JJT/mfp

EEOC Form 161 (11/09)                    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | **Vernon Henry** | From: | **Chicago District Office** |
|---|---|---|---|
| | **c/o Jordan Hoffman, Esq.** | | **500 West Madison St** |
| | **Attorney at Law** | | **Suite 2000** |
| | **11528 S. Halsted** | | **Chicago, IL 60661** |
| | **Chicago, IL 60628** | | |

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| | **Daniel Lim,** | |
| **21B-2015-00333** | **State & Local Coordinator** | **(312) 869-8082** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

    The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

    Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

    The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

    Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

    The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

**[X]**    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

    Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Julianne Bowman/kt*          April 11, 2016

Enclosures(s)           **Julianne Bowman,**          *(Date Mailed)*
                **District Director**

cc:

    **Jay Elliott**
    **KENCO LOGISTICS SERVICES, LLC**
    **2001 Riverside Drive**
    **Chattanooga, TN 37406**

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974: See Privacy act statement before completing this form.<br>#15W1027.14 | AGENCY<br>☒ IDHR<br><br>☐ EEOC | CHARGE NUMBER<br><br>2015CF1315 |
| --- | --- | --- |

## Illinois Department of Human Rights and EEOC

| NAME OF COMPLAINANT (indicate Mr. Ms. Mrs.)<br><br>Mr. Vernon Henry | | TELEPHONE NUMBER (include area code)<br><br>(708) 261-7892 | |
| --- | --- | --- | --- |
| STREET ADDRESS<br><br>4541 W. 175th Place | CITY, STATE AND ZIP CODE<br><br>Country Club Hills, Illinois 60478 | | DATE OF BIRTH<br>//<br>M D YEAR |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)

| NAME OF RESPONDENT<br><br>Kenco Logistics Services | NUMBER OF EMPLOYEES, MEMBERS<br>15+ | TELEPHONE NUMBER (include area code)<br><br>(815) 468-9999 | |
| --- | --- | --- | --- |
| STREET ADDRESS<br><br>1125 Sycamore Road | CITY, STATE AND ZIP CODE<br><br>Manteno, Illinois 60950 | | COUNTY<br><br>Kankakee |
| CAUSE OF DISCRIMINATION BASED ON:<br><br>Race    Retaliation | | DATE OF DISCRIMINATION<br>EARLIEST (ADEA/EPA) LATEST (ALL)<br>//    10 /25/14<br>☐ CONTINUING ACTION | |

THE PARTICULARS OF THE CHARGE ARE AS FOLLOWS:

I. A.  **ISSUE/BASIS**
   **DISCHARGE – OCTOBER 25, 2014, BECAUSE OF MY RACE, BLACK**

  B.  **PRIMA FACIE ALLEGATIONS**
   1. **My race is black.**

   2. **My job performance as a forklift operator met Respondent's expectations. I was hired in March 2014.**

Page 1 of 2

| I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SUBSCRIBED AND SWORN TO BEFORE ME<br><br>THIS 19th DAY OF November , 2014.<br><br>Donna M. Evans<br>NOTARY SIGNATURE |
| --- | --- |
| OFFICIAL SEAL<br>DONNA M EVANS<br>NOTARY PUBLIC - STATE OF ILLINOIS<br>MY COMMISSION EXPIRES:06/03/18<br>NOTARY STAMP | X _____    11-19-14<br>SIGNATURE OF COMPLAINANT    DATE<br><br>I declare under penalty that the foregoing is true and correct I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

EEO-5 FORM (Rev. 7/12-INT)

Charge Number: 201??1315
Complainant: Vernon Henry
Page 2 of 2

3. On October 25, 2014, I was discharged. The reason given was for violation of Respondent's cell phone policy.

4. Similarly situated non-black employees were not discharged under similar circumstances.

II.   A.   ISSUE/BASIS
           DISCHARGE – OCTOBER 25, 2014, IN RETALIATION FOR FILING EARLIER DISCRIMINATION CHARGE

      B.   PRIMA FACIE ALLEGATIONS
           1. On July 3, 2014, I filed charge #2015CF0034, against Respondent with the Illinois Department of Human Rights.

           2. On October 25, 2014, I was discharged. The reason given was for violation of Respondent's cell phone policy.

           3. The discharge followed the filing of my earlier discrimination charge within such a period of time as to raise an inference of retaliatory motivation.

MFP/RCG/mfp