# EXHIBIT A

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                     EASTERN DIVISION

4

5    VERNON HENRY,                    )

6              Plaintiff,             )

7          vs.                        )   No. 15-cv-10961

8    KENCO LOGISTICS SERVICES, et     )

9    al.,                             )

10             Defendants.            )

11

12

13          The video deposition of VERNON HENRY,

14    called for examination pursuant to the Rules of

15    Civil Procedure for the United States District

16    Court pertaining to the taking of depositions, at

17    150 North Michigan Avenue, Suite 2400, Chicago,

18    Illinois, on October 20, 2016, at the hour of

19    11:20 a.m.

20

21

22

23    Reporter:  Kimberly D. Bures, CSR, RDR, CRR, CRC.

24    Illinois CSR License No.:  084-003292.

Page 2

1 APPEARANCES:
2   MR. VERNON HENRY,
      4541 West 175th Place,
3     Country Club Hills, Illinois 60478,
      vernhenry31@gmail.com,
4       appearing pro se;
5   JACKSON LEWIS P.C., by
      MS. JODY W. MORAN, and
6   MS. JULIA P. ARGENTIERI,
      150 North Michigan Avenue, Suite 2500,
7     Chicago, Illinois 60601,
      (312) 787-4949,
8     moranj@jacksonlewis.com,
      julia.argentieri@jacksonlewis.com,
9       - and -
    KENCO MANAGEMENT SERVICES, by:
10  MR. JAY ELLIOTT,
      Vice President of Legal,
11    2001 Riverside Drive,
      Chattanooga, Tennessee 37406,
12    (423) 643-3398,
      jay.elliott@kencogroup.com,
13      representing the defendant
        Kenco Logistics Services;
14
    HARMON & DAVIES, P.C., by:
15  MR. THOMAS R. DAVIES,
      2306 Columbia Avenue,
16    Lancaster, Pennsylvania 17603,
      (717) 291-2236,
17    tdavies@h-dlaw.com,
        representing the defendant Mars, Inc.
18
    ALSO PRESENT:
19  MR. STEPHAN HOOG, Videographer.
20
21
22       * * * * *
23
24

Page 3

1            I N D E X
2  WITNESS                    EXAMINATION
3  VERNON HENRY
4    By Ms. Moran.......................... 5
5    By Mr. Davies........................ 205
6    By Ms. Moran (Further)............... 238
7
8
9
10          E X H I B I T S
11  NUMBER              MARKED FOR ID
12  Henry Deposition Exhibit
13    Exhibit 1............................ 29
14    Exhibit 2............................ 77
15    Exhibit 3............................ 89
16    Exhibit 4........................... 107
17    Exhibit 5........................... 108
18    Exhibit 6........................... 111
19    Exhibit 7........................... 114
20    Exhibit 8........................... 128
21    Exhibit 9........................... 145
22    Exhibit 10.......................... 185
23
24

Page 4

1      THE VIDEOGRAPHER:  We are now on the record.
2  My name is Stephan Hoog, representing Veritext
3  Legal Solutions.  Today's date is October 20, 2016.
4  The time is 11:20 a.m., as indicated on the video
5  screen.  This deposition is being held at 150 North
6  Michigan Avenue, Chicago, Illinois.  The caption of
7  the case is Vernon Henry versus Kenco Logistics
8  Services, et al., Case No. 15-cv-10961.  The name
9  of the witness is Vernon Henry.
10     Will the attorneys please identify
11  themselves for the video record?
12     MS. MORAN:  Sure.  My name is Jody Moran, and
13  I'm here on behalf of Kenco.
14     MR. DAVIES:  Tom Davies on behalf of Mars, Inc.
15     THE VIDEOGRAPHER:  The court reporter today is
16  Kim Bures with Veritext.
17     Can you please swear in the witness?
18     THE COURT REPORTER:  Would you raise your right
19  hand please?
20     (Witness sworn.)
21     THE VIDEOGRAPHER:  Please proceed.
22     MS. MORAN:  Okay.
23     VERNON HENRY,
24  called as a witness herein, having been first duly

Page 5

1  sworn, was examined and testified as follows:
2          EXAMINATION
3  BY MS. MORAN:
4    Q.  Hi, Mr. Henry.  My name is Jody Moran, and
5  I'm an attorney on behalf of Kenco.
6    A.  Okay.
7    Q.  And have you ever had your deposition
8  taken before?
9    A.  No.
10   Q.  Okay.  So I'm just going to -- since this
11  is a new experience for you, I'll just kind of
12  explain a little bit what's happening here.  So the
13  court reporter is to your left, and she's going to
14  take down now every word that is said in the room,
15  and so it is helpful if you answer in words as
16  opposed to uh-huh or nodding your head --
17   A.  Okay.
18   Q.  -- that are typical things that we do in
19  conversation where we understand each other, but at
20  a deposition that's not a response that can be
21  picked up.
22   A.  Okay.
23   Q.  So if you do that -- and people tend
24  to -- hopefully I'll catch it and then just remind

2 (Pages 2 - 5)

Veritext Legal Solutions

800-567-8658                                         973-410-4040

Page 6

1  you to use a word --
2     A.  Okay.
3     Q.  -- instead of that, okay?
4        In normal conversation people often
5  interrupt one another and, you know, talk over one
6  another, and, again, that's something that's very
7  difficult in this proceeding, so if you could just
8  wait -- even if you think you know where my
9  question is going, if you could just wait until I
10 finish my question for your answer, and I will try
11 not to interrupt you as well so that you can answer
12 the question completely.
13    A.  Okay.
14    Q.  Okay.  If there's a question that you
15 don't understand, then just let me know that you
16 don't understand it, and I'll try to rephrase it so
17 that I have a better question for you.
18    A.  Okay.
19    Q.  Okay?  If you don't ask me to do that, I'm
20 going to assume that you understood my question.
21    A.  Okay.
22    Q.  Okay.  If you don't remember something or
23 you don't know something, then just say that.
24    A.  Okay.

Page 7

1     Q.  Don't speculate.
2     A.  Okay.
3     Q.  Okay?  You recognize that you're under
4  oath.
5     A.  Yes.
6     Q.  If you need to take a break at any point,
7  just let me know, and this is flexible.  If you
8  need to take a break for whatever reason, just let
9  me know, and we'll take a break.
10    A.  Okay.
11    Q.  And then when I refer to Kenco, you
12 understand that I'm referring to your former
13 employer, Kenco Logistics Services?
14    A.  Yes.
15    Q.  Okay.  Any questions about the
16 instructions?
17    A.  Not yet.
18    Q.  Okay.  Are you suffering from any illness
19 or condition that would affect your ability to
20 testify truthfully today?
21    A.  No.
22    Q.  And so I presume that means that you're
23 not taking any medications that would affect your
24 ability to testify.

Page 8

1     A.  No, no.
2     Q.  And you are representing yourself in this
3  case?
4     A.  Yes.
5     Q.  And have you received any assistance on
6  your lawsuit from anybody?
7     A.  Former employees.
8     Q.  Okay.  And which former employees?
9     A.  I received from Edith McCurry, Mary.  I
10 don't know her last name.  And what is the guy's
11 name?  Lynn Split?  I think his last name is Stiff
12 or -- Lynn -- first name, Lynn, but I don't recall
13 his last name.
14    Q.  Lynn is a male?
15    A.  Yes.  He's a former Kenco employee.
16    Q.  Anybody else?
17    A.  No.
18    Q.  And what about -- do you know who
19 Jordan Hoffman is?
20    A.  Yes.
21    Q.  Okay.  And who is he?
22    A.  He was an attorney that represented me
23 during the EEOC process.
24    Q.  And he's no longer representing you?

Page 9

1     A.  No.  I'm pro se during this case.  He
2  didn't want to -- I guess it was too much to take
3  on this, so I'm just pro se on this.
4     Q.  Okay.  And is he giving -- have you been
5  in communication with him about your lawsuit?
6     A.  No.  Just EEOC documentation, but nothing
7  about the -- this lawsuit.
8     Q.  And when was the last time you were in
9  touch with Edith McCurry?
10    A.  Maybe two months ago.
11    Q.  Okay.  And was that in person or over the
12 phone?
13    A.  It was through text message.
14    Q.  Okay.  And tell us about that, just what
15 you were communicating about.
16    A.  Just asking questions about certain things
17 that I -- would come up in court that I didn't know
18 about, and she would give me advice or things that
19 she had in her case that would be helpful to me.
20    Q.  Okay.  And what -- can you remember
21 anything that she told you?
22    A.  Not at this time.  I don't remember
23 exactly what I got from her, but I just know it was
24 information to help me at that time.

3 (Pages 6 - 9)

Page 10

1    Q.   Okay.  And what is -- what was
2 Edith McCurry's position?
3    A.   I think she was HR at Kenco.
4    Q.   And do you still have the text messages?
5    A.   No, I don't.
6    Q.   And you don't have them because you
7 deleted them?
8    A.   I have a different phone service.
9    Q.   And so the -- do you have the same phone?
10   A.   I have a different phone, but -- well,
11 same phone service, but different phone.  I don't
12 have the same phone that I had before.
13   Q.   Okay.  And where is that phone?
14   A.   It got destroyed.  It got -- the screen
15 cracked on it, so I had to get a different phone.
16   Q.   And when was that?
17   A.   Two weeks ago.
18   Q.   Have you communicated with any other Kenco
19 employees, former employees or current employees,
20 other than Edith McCurry, Mary and Lynn?
21   A.   No.
22   Q.   And when was the last time you were in
23 touch with Mary?
24   A.   It was the same time as I was in contact

Page 11

1 with Edith.
2    Q.   So a couple of months ago?
3    A.   Correct.
4    Q.   Okay.  Was that also by text?
5    A.   By e-mail.
6    Q.   And what was the substance of your
7 conversation with -- is that Mary Madison?
8    A.   Yes.
9    Q.   And what was the substance of your
10 conversation with Mary Madison in the e-mails?
11   A.   Just basically the same thing I had a
12 conversation with Edith.  I don't really recall
13 specifics of what I needed her information for at
14 that time, but I know it was in times where I was
15 going to court and I didn't understand certain
16 things that were going on during the court process,
17 and I reached out to see if they could help me.
18   Q.   Okay.  And how did you know that they had
19 lawsuits as well against Kenco?
20   A.   It was on the Internet.
21   Q.   So you found that out by searching on the
22 Internet or by communicating with them?
23   A.   Just Googled, see who had cases against
24 Kenco.

Page 12

1    Q.   And did you know Edith McCurry when you
2 were working at Kenco?
3    A.   No.
4    Q.   What about Mary Madison?
5    A.   Let me rephrase that.  Yes, I knew Edith,
6 but I did not know Mary.
7    Q.   Okay.  And what about Lynn?
8    A.   He's the guy that hired me in, so yes.
9    Q.   Okay.  Have you communicated with anybody
10 else regarding your lawsuit against Kenco?
11   A.   No.
12   Q.   And do you still have the access to the
13 e-mail exchange that you had with Mary Madison?
14   A.   Yes.
15   Q.   And is that something that you've
16 produced?
17   A.   I don't -- I've produced the information
18 that was needed.  I don't know if it was
19 sufficient, but I gave what I could.
20   Q.   Okay.  Well, can you provide for us the
21 e-mail communications that you've had with
22 Mary Madison?
23   A.   Sure.
24   Q.   Okay.  And did you have any e-mail

Page 13

1 correspondence with Edith McCurry?
2    A.   No.
3    Q.   And what about Lynn?
4    A.   No.
5    Q.   Okay.  And we can make arrangements for
6 that.  I know you can -- I don't know if you can
7 just forward it to Julia or whether you want to
8 print those out.
9    A.   Okay.
10   Q.   Any other types of written communications
11 that you had about this case?
12   A.   No.
13   Q.   Have you ever used another name besides
14 Vernon Henry?
15   A.   Vern.
16   Q.   Vern as a nickname?
17   A.   Short for Vernon.
18   Q.   Okay.  And then is your full name
19 Vernon Henry, Jr.?
20   A.   Correct.
21   Q.   And do you also use Vernon Henry, II?
22   A.   Yes.
23   Q.   And what's your date of birth?
24   A.   September 11, 1981.

4 (Pages 10 - 13)

Page 14

1   Q.   And have you ever been convicted of a
2   crime?
3   A.   No.
4   Q.   Okay.  And now I just kind of want to just
5   run through just a little bit of your education.
6   So where did you attend high school?
7   A.   Hillcrest.
8   Q.   And when were you there?
9   A.   1995 to 1999.
10  Q.   Okay.  And you graduated in 1999?
11  A.   Correct.
12  Q.   And you got a degree, high school diploma?
13  A.   High school diploma.
14  Q.   And did you take any other courses after
15  high school?
16  A.   Yes.  I went to Barat College.
17  Q.   Where is that located?
18  A.   Lake Forest, Illinois.
19  Q.   How long did you attend there?
20  A.   Four years.
21  Q.   Okay.  And did you get a degree from
22  there?
23  A.   Yes.
24  Q.   Okay.  And what the degree was in?

Page 15

1   A.   Bachelor's, computer graphics.
2   Q.   Okay.  So was it a Bachelor of Science?
3   A.   BA.
4   Q.   And you said computer science?
5   A.   Computer graphics.
6   Q.   Computer graphics.  Okay.  And what year
7   did you get that degree?
8   A.   2004.
9   Q.   Okay.  Any other schooling?
10  A.   No.
11  Q.   Okay.  Any other formal -- any formal
12  training for anything?
13  A.   After I graduated I played overseas
14  basketball.
15  Q.   And who did you play with?
16  A.   Played in Mexico and Lithuania.
17  Q.   Okay.  And what team?
18  A.   It was for the Mexico Corkabitos
19  (phonetic), and I do not recall the Lithuanian
20  team.
21  Q.   And how long did you do that for?
22  A.   Four years.
23  Q.   What position did you play?
24  A.   Power forward.

Page 16

1   Q.   Okay.  And then what did you do after
2   that?
3   A.   After that I came back home and tried to
4   find a job, got hurt overseas.
5   Q.   Okay.  And what was the nature of your
6   injury?
7   A.   I hurt my ankle.
8   Q.   Okay.  And then --
9   A.   And then I just -- I tried to fall back on
10  my college degree, but I couldn't find a job in
11  computer graphics.  Everywhere I went, they would
12  tell me that I had not enough experience or I had
13  too much experience, and so I found myself -- had
14  to pick up a trade, and that's how I started
15  driving forklifts.
16  Q.   And where did you start driving forklifts?
17  A.   At Kmart distribution center in Manteno.
18  Q.   And you received training from Kmart on
19  the forklift?
20  A.   Yes.
21  Q.   And how long were you employed by Kmart?
22  A.   Three months, I believe.  I don't know
23  exactly, but I wasn't there long.
24  Q.   Okay.  And what was the reason for your

Page 17

1   departure?
2   A.   Just wanted to find something better.
3   Q.   Okay.  So you left voluntarily?
4   A.   Correct.
5   Q.   And did you have another job when you
6   left, or you were looking for a job?
7   A.   Looking for a job.
8   Q.   And what's the next job that you found?
9   A.   That's a long time ago.  I don't remember.
10  Q.   Okay.  What's the next job that you do
11  remember afterwards?
12  A.   After Kmart -- after Kmart I think I found
13  a job in Chicago at a place called Centiv.
14  Q.   I'm sorry.  Could you say it again?
15  A.   Centiv.
16  Q.   Could you spell it?
17  A.   C-e-n-t-i-v.  It was a graphic design
18  company that did illustrations for, like, liquor
19  stores, beer, all type of alcohol products.
20  Q.   Okay.  So that's actually in the computer
21  graphics --
22  A.   Yeah.
23  Q.   -- area.
24  A.   But I was in the inventory department.  I

5 (Pages 14 - 17)

Page 18

1 wasn't in the graphic design department.
2    Q.   How long did you work there?
3    A.   Six months.
4    Q.   Okay.  And so let me just go back.  So
5 when you were working for Kmart, approximately when
6 was that, that three-month -- approximately
7 three-month period?
8    A.   I don't remember the year.
9    Q.   Well, do you remember -- when did you get
10 back from your basketball career?  When did you --
11    A.   2007, 2008.
12    Q.   Okay.  And when did you -- how long did
13 you work -- what was the period of time that you
14 worked for Centiv?
15    A.   Six months.
16    Q.   Right.  But from what -- do you
17 remember --
18    A.   I don't remember from when to when.
19    Q.   Do you have any idea what year?
20    A.   Possibly I would have to look to know the
21 exact date to date.  I don't know offhand.  I could
22 just speculate.
23    Q.   Okay.  And is your résumé something that
24 you've produced in this case?

Page 19

1    A.   No.
2    Q.   Okay.  Is that something that we can --
3 you can produce to us?
4    A.   I'm --
5    Q.   It would have been a little bit easier if
6 we had it.
7    A.   Yeah.
8    Q.   We wouldn't have to go through --
9    A.   Yeah.  I didn't know.
10    Q.   -- all this.
11    A.   I didn't know.
12    Q.   So can you send us a copy of your current
13 résumé?
14    A.   Sure.
15    Q.   And then after Centiv where did you work?
16    A.   I believe UPS.
17    Q.   Okay.  In what position?
18    A.   An unloader.
19    Q.   For how long?
20    A.   Between eight to ten months.
21    Q.   Okay.  And do you remember what year that
22 was?
23    A.   No, I don't.
24    Q.   Okay.  And what was the reason that you

Page 20

1 left UPS?
2    A.   It was a part-time position.
3    Q.   So it was part time, and you were looking
4 for full time, or it was part time and it just
5 ended?
6    A.   Part time and it ended.
7    Q.   Okay.  And where was the UPS facility that
8 you worked?
9    A.   Chicago on Jefferson.
10    Q.   Where did you work after that?
11    A.   I don't know if I came to Tyson after
12 that.  I believe it might have been Tyson.
13    Q.   Okay.  And where is Tyson?
14    A.   Where Kenco was, same facility.
15    Q.   Okay.  When did you begin working for
16 Tyson?
17    A.   I don't know the years offhand.  I
18 couldn't give you the years.
19    Q.   And what does Tyson do?
20    A.   Tyson was -- I guess it was called
21 Tyson-Mars.  I don't know.  It was the same
22 facility that was for Kenco, same warehouse.
23    Q.   Okay.  So you were doing -- working on a
24 forklift --

Page 21

1    A.   Correct.
2    Q.   -- for them?
3    A.   Right.
4    Q.   So it's a -- Tyson was a logistics
5 company?  Do you know?
6    A.   Sure.  I don't know if it was Tyson-Mars
7 or if it was just Tyson, but I know it was the same
8 building, same warehouse, same work, so I'm not
9 sure.
10    Q.   Okay.  And who -- do you remember who you
11 were getting your check from?
12    A.   I was getting my check -- I never got
13 hired into Tyson, so I was getting my check from
14 the temp agency that I went through.
15    Q.   Okay.  So after UPS you started working
16 for a temp agency?
17    A.   Yeah.  The temp agencies were -- it was --
18 at that time I don't believe it was any direct
19 hires.  It was all companies were going through
20 temp agencies.  It was no more you can go to the
21 job and get a direct application.  It was more so
22 that you go to the temp agency and they put you
23 into different positions.
24    Q.   What was the name of the temp agency?

Page 22

1    A.   I believe it was Flexible Staffing in
2 Monee, Illinois.
3    Q.   Okay.  So you began working for a temp
4 agency who then placed you at the Mars facility?
5    A.   Correct.
6    Q.   And how long -- do you remember
7 approximately when that was?
8    A.   Don't know the year.  I know I was at
9 Tyson for a little under a year, not a full year.
10    Q.   And what was the reason for your
11 departure?
12    A.   They ended my assignment, but they never
13 gave a reason.
14    Q.   Okay.  And so this assignment was at the
15 same Mars facility that you were working at when
16 you were working for Kenco --
17    A.   Correct.
18    Q.   -- is that correct?
19        And what did you do when the assignment
20 ended?
21    A.   Looked for another job.  I started working
22 at -- I went to another temp agency.
23    Q.   Which one?
24    A.   Staffmark.  And they placed me at -- what

Page 23

1 is the name of that place?  DCS Logistics.  DSC, I
2 think it is.
3    Q.   Where is that located?
4    A.   It was in University Park.
5    Q.   Which is where?  Is that a city or --
6    A.   Yeah, yes.
7    Q.   Okay.  And how long did you work for DSC
8 Logistics?
9    A.   A little under a year.
10    Q.   And what was the reason for you leaving
11 there?
12    A.   Well, I got laid off.
13    Q.   Were the others laid off as well?
14    A.   I'm not sure.
15    Q.   Okay.  Did they tell you the reason that
16 you were being laid off?
17    A.   No, they didn't.
18    Q.   And what did you do next?
19    A.   Next from there I do not recall.
20    Q.   Did you go back to Staffmark and ask to be
21 placed someplace else?
22    A.   I tried to go through Staffmark, but I
23 don't believe they had any positions at the time,
24 and I'm trying to recall what I was doing at that

Page 24

1 time for employment because I had a lot of times
2 where I had gaps in between work --
3    Q.   Uh-huh.
4    A.   -- where I wasn't working, so I -- I don't
5 remember exactly what I did right after that.
6    Q.   What's the next thing you remember doing
7 for work?
8    A.   I don't remember.  It's so long ago.  I
9 don't remember.
10    Q.   When you say it was so long ago, how long
11 ago was it?
12    A.   It had to be two or three years before I
13 started working for Kenco, so I don't -- I don't
14 recall.  It would be a lot easier if I had my
15 résumé in front of me to be able to show you, tell
16 you, but without me telling you something right
17 now, without knowing exactly...
18    Q.   Sure.  Okay.  So do you remember where you
19 worked before you started at Kenco?
20    A.   Before Kenco I was unemployed for a lot, a
21 year or two years.
22    Q.   And how were you supporting yourself?
23    A.   Family, friends, side jobs.
24    Q.   Are you married?

Page 25

1    A.   No.
2    Q.   Ever been married?
3    A.   No.
4    Q.   And who do you live with?
5    A.   My parents.
6    Q.   And in what city?
7    A.   Okay.  I do remember before Kenco I worked
8 at Jacobson.
9    Q.   Jacobson?
10    A.   Yes.  Jacobson Companies in Monee, and I
11 worked there for a little over a year and a half.
12    Q.   And what were you doing for them?
13    A.   Forklift, stand-up.
14    Q.   Do you have any kind of certificate in
15 terms of your forklift driving?
16    A.   Majority of the time it's in-house.  It's
17 not transferable.
18    Q.   What do you mean?
19    A.   Like you get an in-house certificate.
20 Every warehouse does their own certification, so if
21 I got a certificate from Jacobson to say that I
22 drive a forklift, I probably couldn't use it at
23 Kenco because Kenco does their own in-house
24 certification, so it was not transferable.

7 (Pages 22 - 25)

Page 26

1    Q.  I see.  And did you get any kind of
2  certification from Kenco?
3    A.  I don't believe so, not in hand.
4    Q.  And so you said that you -- initially you
5  said you were unemployed for one or two years
6  before Kenco, and then you said that the company
7  that you worked for before Kenco was Jacobson.
8    A.  Right.  And --
9    Q.  Was that one to two years before Kenco?
10    A.  That was one to two years before, but that
11  was the last job I held before Kenco.
12    Q.  Okay.  And then -- well, let me ask you
13  this: Did you keep any kind of diary or journal
14  about your employment with Kenco?
15    A.  No.
16    Q.  Have you ever filed for bankruptcy?
17    A.  Yes.
18    Q.  And when was that?
19    A.  I believe three years ago.
20    Q.  And what's the status of that?
21    A.  It's not dismissed, but I stopped the
22  case, so it's still on my credit report, but I'm
23  not in it right now, so I don't know the
24  terminology of what that is, but, like, if you look

Page 27

1  at my credit, it's still on there, but I'm not
2  currently in it.
3    Q.  So there's no current bankruptcy
4  proceeding pending.
5    A.  No.
6    Q.  Is that what you're saying?
7    A.  Correct.
8    Q.  Okay.
9    A.  It hasn't been dismissed, but it still
10  shows up on my credit report.
11    Q.  And did you do any preparation for this
12  deposition?
13    A.  No, I didn't.
14    Q.  Did you talk to anybody about the
15  deposition?
16    A.  No, I didn't.
17    Q.  Okay.  And so you started working for
18  Kenco in December of 2013 as a temporary employee;
19  is that correct?
20    A.  Correct.
21    Q.  And which temp agency were you working for
22  at that time?
23    A.  TRN Staffing.
24    Q.  TRN?

Page 28

1    A.  Yes.  Reserve Network.
2    Q.  Okay.  And you were working as a forklift
3  operator?
4    A.  Correct.
5    Q.  And was that a full or a part-time
6  position?
7    A.  Full.
8    Q.  What were your hours?
9    A.  On that -- at that time I was working, I
10  believe, second shift.
11    Q.  And what were the hours of the second
12  shift?
13    A.  3:00 to 11:00.
14    Q.  And that was the -- at the Manteno plant?
15    A.  Correct.
16    Q.  And that's -- and when we say the Manteno
17  plant, we're also referring to the Mars plant?
18    A.  Right.  Kenco-Mars.  I don't -- I guess it
19  was the same.
20    Q.  And you were -- then you were hired by
21  Kenco as an employee?
22    A.  Yes.
23    Q.  And does April 14 of 2014 sound right?
24    A.  It was around March, April.

Page 29

1    Q.  And you were hired as a warehouse
2  associate?
3    A.  Correct.
4    Q.  And what were your job duties as a
5  warehouse associate?
6    A.  Put away product, pick product to be
7  shipped out.
8    MS. MORAN:  Do you have -- do you want to give
9  me the position description?
10    MS. ARGENTIERI:  Yeah.
11    MS. MORAN:  Thank you.  Can we mark this Henry
12  Exhibit No. 1?
13         (Whereupon, Henry Deposition
14          Exhibit 1 was marked for
15          identification as of 10/20/2016.)
16  BY MS. MORAN:
17    Q.  Mr. Henry, so from -- during the course of
18  this deposition from time to time, I have some
19  documents I want to show you and ask you questions
20  about, and so the documents are then labeled.  As
21  you can see, there's a label on there that refers
22  to Deposition Exhibit No. 1, so that what happens
23  is after your deposition has concluded, your
24  deposition testimony is put together in a booklet.

8 (Pages 26 - 29)

Page 30

1    A.  Okay.
2    Q.  And then any of the exhibits that we use
3  are also included in that.
4    A.  All right.
5    Q.  And so I'm now showing you -- you're
6  looking at what is marked as Deposition Exhibit
7  No. 1, and it -- it's a job description for a
8  warehouse associate for Kenco.  Have you ever seen
9  that before?
10   A.  No.
11   Q.  Okay.  And would you take a look at it and
12  read it?
13   A.  The whole thing?
14   Q.  Yeah.  Take a look at it and just see if
15  there's anything -- if it accurately describes the
16  duties that you had as a warehouse associate.
17   A.  Yeah.  Right here in, I guess, Line 5 it
18  says pick, pack and load orders.
19   Q.  Sure.  Is there anything -- so there's --
20  the Deposition Exhibit No. 1 has a summary, and
21  then it has essential -- there's a section that's
22  essential duties and responsibilities.
23   A.  Correct.
24   Q.  And those essential duties and

Page 31

1  responsibilities are on the first page, and so if
2  you would just take a look at those and tell me if
3  it accurately describes the essential duties and
4  responsibilities that you had when you worked as a
5  warehouse associate for Kenco.
6    A.  Yes.  First page indicates my
7  responsibilities as a Kenco employee.
8    Q.  Okay.  So the -- just -- so the
9  essential -- the bulleted statements under
10  essential duties and responsibilities accurately
11  describes what your responsibilities were as a
12  warehouse associate?
13   A.  Correct.
14   Q.  And who hired you back in March or April
15  of 2014 for Kenco?
16   A.  Mike Manzello.
17   Q.  Do you know what his position was?
18   A.  I believe it was warehouse manager.
19   Q.  Did you interview with anybody else?
20   A.  No.
21   Q.  Okay.  And tell us, as best as you can
22  recall, the conversation that you had with
23  Mike Manzello in terms of your hire.
24   A.  He told me that I exceeded my performance

Page 32

1  needs and that I had -- on a timely fashion that
2  there was a -- I guess a grace period that I -- 90
3  days to get hired in and that I had done everything
4  that was needed, my attendance was great, and he
5  offered me a position and gave me different shift
6  times.
7    Q.  And what was the shift time that you got
8  hired in when you were hired by Kenco?
9    A.  At that time I believe they went to a
10  third shift, and I got hired in on the third shift.
11   Q.  What were the times of that shift?
12   A.  I don't know because at that time Kenco --
13  they changed the shifts a lot, so I don't remember.
14   Q.  Okay.  You're right.  And so how long did
15  you work on the third shift?
16   A.  Third shift was my position.
17   Q.  Okay.  So you worked on the third shift
18  the entire --
19   A.  Right.
20   Q.  -- time you were there.
21   A.  Yes.
22   Q.  And what time were you expected to arrive
23  at work?
24   A.  I believe it was -- then it was 11:00 or

Page 33

1  10:00, sometimes 10:00 o'clock or 11:00.
2    Q.  We're talking p.m.?
3    A.  Correct.
4    Q.  And then was the shift typically an
5  eight-hour shift?
6    A.  Ten hours.
7    Q.  So if you began at 10:00 a.m. -- excuse
8  me -- 10:00 p.m., you'd work till 10:00 a.m. the
9  following day?
10   A.  If I started at 10:00, I believe I would
11  get off at 9:00 o'clock sometimes or 10:00 o'clock
12  the next day.  I don't remember the -- because
13  sometimes it was mandatory overtime or where we had
14  to do 12 hours, so -- but for the most part at that
15  time, I guess it was considered busy season, and
16  ten hours was the mandate.
17   Q.  Okay.  And do you remember when the busy
18  season was?
19   A.  I believe busy season was during the
20  winter months.  I'm not -- if I recall.
21   Q.  When you worked for Kenco, did you meet
22  with anyone to fill out new paperwork?
23   A.  The only person I met with was Mike, and
24  then Lynn was the guy that gave me all of the

Page 34

1 information to sign, and that was the end of -- the
2 end of the paperwork.
3    Q.   Okay. So you met with Lynn to fill out
4 the new hire paperwork?
5    A.   Correct.
6    Q.   Okay. And who was your supervisor at the
7 time you were hired on that third shift?
8    A.   Saul Beck.
9    Q.   And was that -- he your supervisor the
10 entire time?
11    A.   No.
12    Q.   Okay. And when did that change?
13    A.   When I first was there, there was another
14 guy. I believe his name was Tom, Tom White. I
15 don't know if his last name is correct, but his
16 first name was Tom.
17    Q.   Okay. And so were those the only two
18 supervisors you had --
19    A.   Yes.
20    Q.   -- when you were working for Kenco?
21    A.   Well, there were other supervisors that
22 sometimes the shift would overlay, but primarily
23 those were my supervisors.
24    Q.   Okay.

Page 35

1    A.   There would be other supervisors there,
2 but I didn't -- I didn't work for them.
3    Q.   Okay. And so how did you get along with
4 Tom White?
5    A.   I got along with him great.
6    Q.   And about how long was he your supervisor?
7 Do you recall?
8    A.   Probably about six months.
9    Q.   And what's his race?
10    A.   He's Caucasian.
11    Q.   Okay. And then did he leave Kenco, as far
12 as you know, or just took another position?
13    A.   No. The shifts rotated.
14    Q.   Oh.
15    A.   So I guess the supervisors at the time,
16 they had rotating shifts.
17    Q.   Okay.
18    A.   They would stay on a shift for a certain
19 amount of time and then go to a different shift.
20    Q.   So when Tom -- when you were no longer
21 reporting to Tom, he then was rotating. He moved
22 to another shift --
23    A.   Correct.
24    Q.   -- as far as you knew.

Page 36

1    A.   Correct.
2    Q.   And you said Saul Beck then became your
3 supervisor?
4    A.   Correct.
5    Q.   And how long was he your supervisor?
6    A.   Saul Beck was my supervisor until I got
7 fired.
8    Q.   And how did you get along with him?
9    A.   Had a great relationship with him, same as
10 Tom.
11    Q.   And his race?
12    A.   Black.
13    Q.   Okay. And so now let's kind of get a
14 little bit to the crux of why we're here. And so
15 you believe that Kenco discriminated against you
16 because of your race; is that correct?
17    A.   Correct.
18    Q.   And when was the first time that you
19 thought that?
20    A.   First time was when I had an altercation
21 with a warehouse employee and was -- there was
22 nothing done about it.
23    Q.   Okay. Tell us what happened.
24    A.   Regular workday, putting away pallets.

Page 37

1    Q.   Okay. And this was at what time of year,
2 or can you remember a month or...
3    A.   This was before I became a Kenco employee.
4    Q.   This is when you were a temp?
5    A.   Yes. This is right around -- I'd say
6 about a month or two before getting hired in.
7    Q.   Okay. And so --
8    A.   I believe. I don't --
9    Q.   So you said that you were hired in in
10 March --
11    A.   March, April.
12    Q.   -- or April.
13    A.   Yeah. So this had to -- the altercation
14 had to be around December, January or January,
15 February maybe more so because in December I was
16 there at the end of the -- towards the end of the
17 month of December, so probably January, February
18 the incident occurred.
19    Q.   And that is in 2014?
20    A.   Correct.
21    Q.   And who was the warehouse employee that
22 you had the altercation with?
23    A.   His name was Pete Monstwillo, I think.
24    Q.   And what was his position, if you know?

10 (Pages 34 - 37)

Page 38

1   A.   He was a warehouse associate.
2   Q.   Same position as you?
3   A.   No. He did -- I was a stand-up forklift
4 operator. He was a picker.
5   Q.   Okay. So he was not a supervisor?
6   A.   No.
7   Q.   Or a manager?
8   A.   No.
9   Q.   Okay. And so what happened that day?
10   A.   I was putting away a pallet. They have
11 three rooms. They have a Room 1, a Room 2 and a
12 Room 3. If I recall -- I may have it backwards,
13 but I believe Room 3 was the cold room. Room 2 --
14   Q.   I'm sorry. Was which room?
15   A.   I believe Room 3 was the cold room. It
16 was --
17   Q.   Code?
18   A.   Cold like cold, like freezing.
19   Q.   Oh, cold room.
20   A.   Yes.
21   Q.   Okay, okay, okay. C-o-l-d.
22   A.   Right.
23   Q.   Got it. Okay. So cold room for products
24 that need to be refrigerator --

Page 39

1   A.   Right.
2   Q.   -- refrigerated? Okay.
3   A.   Then Room 2 was a comfortable setting, and
4 then Room 1 was, like, the warmest. So I was
5 putting away product from Room 3 to Room 1, and
6 Peter was in the aisle, and what he does takes a
7 lot longer than what I do, so I asked him could he
8 move out of the way so I could put away a pallet,
9 and he told me no and that I would have to sit
10 there and wait on him to finish picking how many
11 ever cases of product he needed to fix for his
12 pallet.
13         And I told him that I could put this a
14 lot -- I could put this away a lot faster than what
15 you're going to do as far as picking that, and if
16 you can, just let me get here so I can put the
17 pallet away.
18         And I guess he was having a bad day. He
19 basically said no, and then he continued to go on
20 and get irate with me, and he told me that he
21 wasn't going to move and that when was the last
22 time that I looked in the mirror.
23         And I asked him, what do you mean by that?
24 And he said that I was black and that he was white

Page 40

1 and that he had friends in higher powers that can
2 get me fired if I continued to antagonize him.
3         And I said, well, Pete, I'm just trying to
4 put a pallet away, I'm not trying to antagonize
5 you, I just want to get my work done faster than
6 what it would be if I sit here, because at that
7 time we had a quota. I believe it was 21 or 22
8 pallet moves per hour, so sitting there would -- at
9 the time frame of waiting on him would push that
10 down if I was already up, so it was just a matter
11 of trying to get the work done at an efficient
12 pace.
13   Q.   Okay. So he refused to move, and --
14   A.   So he --
15   Q.   -- he made these comments.
16   A.   He refused to move. He told --
17   Q.   And what did you say in response to the
18 comments?
19   A.   I didn't say anything to him. I've been
20 in situations in the workplace before where it's
21 best to just walk away from situations like that
22 because they can get heated, and when he told me
23 that I was black and he was white and that he can
24 get me fired, he had said he had friends in higher

Page 41

1 powers, and I asked him, well, who was he referring
2 to, and he never -- he never referred to the
3 person, but everyone knew he was talking in the
4 warehouse that him and Mike Manzello were drinking
5 buddies, so everyone knew that they were friends
6 outside of the workplace.
7         And at that time I basically rode off, and
8 there was another employee that overheard the
9 conversation, and I believe he reported it.
10   Q.   Who was that?
11   A.   Terrence Lindsey.
12   Q.   Terrence Lindsey?
13   A.   Yes.
14   Q.   And how did you find out that he overheard
15 the conversation and reported it?
16   A.   Because when I got called upstairs, that
17 was what was told to me, because I didn't report
18 the incident. I just basically brushed it off.
19   Q.   Okay. And why didn't you report the
20 incident?
21   A.   At that time I was just trying to get
22 hired into the company. I didn't want any --
23 anything over my head. I didn't want any problems
24 with Pete. I just wanted to continue my workday

11 (Pages 38 - 41)

Page 42

1  and get over with the day.
2    Q.  And what had your relationship been with
3  Pete prior to this incident?
4    A.  I never knew the guy.
5    Q.  That was the first time you met him?
6    A.  No.  We worked together, but I don't know
7  him outside of the job so --
8    Q.  Right.
9    A.  I don't have a relationship with him.
10   Q.  What was your working relationship like
11  before the incident?
12   A.  We just worked together.  We don't work in
13  the same position or the same spots.  I've never
14  had any interaction with him before that day, so it
15  was just, where is this coming from?
16   Q.  And so you said you didn't report the
17  incident but you did get called in to talk about
18  the incident.
19   A.  I got called upstairs.
20   Q.  And who called you?
21   A.  Mike Monstwillo -- I mean, Mike --
22   Q.  Manzello?
23   A.  Manzello.
24   Q.  How soon after the incident did Mike call

Page 43

1  you?
2    A.  Probably 15, 20 minutes.
3    Q.  And how did he get in touch with you?
4    A.  Over the intercom.
5    Q.  So you were paged?
6    A.  Yes.
7    Q.  And you were told to report --
8    A.  To report upstairs to the office.
9    Q.  And when you say the office, is that
10  Mike Manzello's office?
11   A.  Correct.
12   Q.  Okay.  And who was present when you got to
13  the office?
14   A.  Just Mike.
15   Q.  Okay.  And tell me about that
16  conversation.
17   A.  Well, Mike brought us upstairs.  It was --
18  he called me --
19   Q.  Excuse me.  When you say us --
20   A.  He brought me and Pete -- he called both
21  of us upstairs to the office.
22   Q.  So when you got there was Pete there or --
23   A.  Pete was there upstairs same time that I
24  was.

Page 44

1    Q.  Okay.  So just so we're clear, this is in
2  Mike Manzello's office about 15 to 20 minutes after
3  the incident.
4    A.  Correct.
5    Q.  And you are paged to report to
6  Mike Manzello's office.
7    A.  Correct.
8    Q.  And when you get there, Pete, who you had
9  the incident with, was already there.
10   A.  Right.  But he's not in the office.  We're
11  standing outside of the office.  And before that
12  Terrence told me that he reported the incident to
13  Edith, then Edith reported the incident to
14  Kelvin Walsh, and Kelvin Walsh gave it to
15  Mike Manzello.
16   Q.  And Terrence Lindsey, what was his
17  position?
18   A.  He was a warehouse associate.
19   Q.  And his race?
20   A.  He's black.
21   Q.  Okay.  So Terrence, who's a warehouse
22  associate, reported the incident to Edith McCurry?
23   A.  Correct.
24   Q.  And she was an HR associate?

Page 45

1    A.  Correct.
2    Q.  And then you were told that Edith then
3  reported it to Kevin Walsh?
4    A.  Kelvin, Kelvin.
5    Q.  Kelvin?
6    A.  I think.
7    Q.  Wash, Kelvin Wash, Walsh?
8    A.  Correct.
9    Q.  And Kelvin, was he the general manager?
10   A.  Correct.
11   Q.  And then your understanding is that Kelvin
12  then told Mike Manzello to handle it?
13   A.  Correct.
14   Q.  So what happened in that meeting with you
15  and Pete and Mike Manzello?
16   A.  Basically Mike brought us in individually
17  and asked us what happened.
18   Q.  When you say individually, who came in
19  first?
20   A.  Pete went in first.
21   Q.  And then when Pete was in there, was --
22  did they then close the door?
23   A.  The door was closed.  I was sitting
24  outside.  They had a private conversation.  I don't

12 (Pages 42 - 45)

1 know what they talked about.

2    Q.  Uh-huh.

3    A.  Then he brought me in, asked me what

4 happened on the floor. I told him exactly what

5 just told you, and then he said that, you know, we

6 were going to try to resolve the situation. Then

7 he brought both of us back in the office together.

8    Q.  Okay.

9    A.  And at that point he basically told me

10 that -- how can we resolve this situation as men,

11 and I said, well, I think that -- you know, that

12 was -- that was against your policy. That was

13 something -- to me that was a racial slur to say,

14 when is the last time you looked in the mirror and

15 that I'm black and you're white.

16    To me that's racial. I didn't take that

17 as a compliment. He told me that maybe he was

18 telling me -- Mike told me that maybe he was giving

19 me a compliment, and I didn't think of that as a

20 compliment. I thought of that as something that

21 was inappropriate.

22    So at that time Mike told us that they had

23 a lot of warehouse incidents up to that point. He

24 said that they had a shooting in the warehouse,

1 some other things of fighting in the warehouse and

2 that at this point in time it would not be in the

3 best interest to report this to corporate, so

4 couldn't we do something as men to squash this beef

5 that you guys have between each other.

6    And I told him -- I said, well, I felt

7 that it was a racial slur against me and

8 something should be done. I felt like -- because

9 on the policy that I read since then, it should

10 have been some type of discipline, but it was no

11 discipline.

12    Q.  And so -- well, so a couple of things. So

13 before we get into the discipline issue, so how did

14 you -- when he said to you -- and I guess --

15    A.  But I felt --

16    Q.  -- to Pete -- let me just -- as I say, you

17 may --

18    A.  I'm sorry.

19    Q.  -- know where I'm going, but just --

20    A.  Yeah.

21    Q.  So what was -- after he said to you, how

22 can we resolve this as -- you know, as men, you

23 know, and you stated that you thought that it was

24 racially derogatory, and so then what happened?

1 What was said? What --

2    A.  See, at that time, I didn't know where I

3 would go with it or where I should go with it

4 because at that time I felt like that these guys

5 are buddies, you know. I didn't -- I felt like I'm

6 trying to get hired into the company, maybe if I

7 don't say anything and look the other way, I'll,

8 you know, get hired into the company. Maybe if I

9 do say something, it will go a different route, so

10 I chose not to say anything and just to squash the

11 situation at that time.

12    Q.  Well, right. I mean, you chose not to

13 report the incident, correct?

14    A.  Right.

15    Q.  But then the incident was reported by

16 somebody else.

17    A.  Right.

18    Q.  By this Terrence.

19    A.  No. I'm saying as far as taking further

20 steps to go to corporate to --

21    Q.  So my question is, what happened in this

22 meeting? I understand what you're saying. I'm

23 saying you had Mike Manzello, who's the operations

24 manager, who speaks to both you and to Pete and

1 separately, correct?

2    A.  Right.

3    Q.  And then he brings you both in together.

4    A.  Correct.

5    Q.  And then he says, how can we resolve this

6 as men?

7    A.  Correct.

8    Q.  And so --

9    A.  But then he talks about the certain

10 situations and incidents that have happened in the

11 warehouse, so --

12    Q.  Right.

13    A.  So to me I'm sitting there wondering why

14 are you telling me about certain things that have

15 happened that have nothing to do with right now.

16    Q.  Okay.

17    A.  So at that point in time, I felt like

18 these guys are buddies, that, you know, everybody

19 knows that -- Pete says that Mike and him are

20 drinking buddies outside of the job, so at that

21 point in time, I'm feeling intimidated because

22 there's no one else in the room.

23    There was -- it was only Mike. It was --

24 you know, at that point in time, I felt like it

Page 50

1 maybe should be another person to hear our stories
2 or see what happened. So it's only me and Mike.
3 Then it's me, Mike and Pete, so I felt kind of
4 intimidated.
5    Q.  Okay. And so my question is, what else
6 was said in that meeting by --
7    A.  That was it.
8    Q.  Well, let's go back. Mike Manzello said,
9 what can we do to resolve this?
10    A.  The only thing that was done was that he
11 put us on different shifts at that time.
12    Q.  Well, what I want to know is what was said
13 in that meeting. So the last -- when you were
14 running through the meeting, you said he brought
15 you -- after meeting with you separately, he
16 brought the two of you in.
17    A.  Right.
18    Q.  And said -- and I'm paraphrasing here, but
19 rather than report this to corporate, for whatever
20 his reasons were, is there a way that we can
21 resolve this between the two of you?
22    A.  Right.
23    Q.  And so what was said after that?
24    A.  Nothing. He said that what I can do is

Page 51

1 put you guys on a different shift, maybe that will
2 help you guys not be able to get in contact with
3 each other, and that was the end of the
4 conversation. We went back to work.
5    Q.  Okay. And you didn't ask for an apology?
6    A.  No. At that -- I told you I felt
7 intimidated because I felt like if I open my mouth
8 it could go another way because you're telling me
9 about things that are happening in the warehouse
10 before I've worked here, so by you giving me the
11 information, it's kind of like I don't understand
12 why you're telling me about these certain
13 situations that have happened that have nothing to
14 do with what happened today, so I felt intimidated.
15    Q.  And who told you that Mike Manzello and
16 Pete were drinking buddies?
17    A.  Pete.
18    Q.  Okay. And did anybody else?
19    A.  No. Pete told everybody in the warehouse.
20    Q.  Okay.
21    A.  Everybody in the warehouse knew that they
22 were drinking buddies.
23    Q.  Okay. Did you ever observe them going out
24 drinking together?

Page 52

1    A.  I told you I didn't have a relationship
2 with Pete outside of the job, so I wouldn't know.
3    Q.  Right. So is it fair to say that you
4 don't have any personal knowledge that the two of
5 them were drinking buddies?
6    A.  I don't have any proof, but I just have
7 the knowledge of what he said.
8    Q.  Right. But I just want to make it clear
9 what the source of your information was. So the
10 source of your information was Pete.
11    A.  Correct.
12    Q.  And you have no way to verify whether Pete
13 was being truthful with you or not?
14    A.  No, I don't.
15    Q.  Okay. And -- okay. And then you
16 testified -- you said there was no disciplinary
17 action against Pete.
18    A.  No.
19    Q.  Okay. And how would you know that?
20    A.  Because Pete got hired in. He got hired
21 into the company after that incident.
22    Q.  Okay. And you did too.
23    A.  Yes.
24    Q.  Okay. And so do you know -- other than

Page 53

1 the fact that he got hired in, do you have any
2 other information as to whether Pete wound up
3 getting disciplined for the incident?
4    A.  We both went back downstairs and went back
5 to work, so no. Under my understanding, no
6 disciplinary action was taken.
7    Q.  Right. But have you ever viewed his
8 personnel file?
9    A.  I don't have access to his personnel file.
10    Q.  Okay. And did he ever tell you that no
11 disciplinary action was taken against him?
12    A.  Me and Pete don't talk.
13    Q.  Okay. So is it fair to say that you don't
14 know whether he was given any disciplinary action
15 as a result of the incident?
16    A.  Factually, no, but going to work and being
17 an employee and having that situation and then we
18 both go back to work and then you come back to work
19 the next day and the next day, he was never -- it
20 was never like he was suspended or anything, so he
21 was at work every day just like I was, so, to my
22 knowledge, there was no disciplinary action.
23    Q.  Do you know whether he received a written
24 warning?

14 (Pages 50 - 53)

Page 54

1    A.  I have no idea.
2    Q.  Did you have any other incidents with Pete
3  where Pete made any kind of racial comments after
4  that incident?
5    A.  No racial incidents, but I had another
6  incident after that incident later down the road.
7    Q.  Okay.  And how -- when did that happen in
8  terms of after this incident?  When did that
9  happen?
10    A.  In October.
11    Q.  October of 2014?
12    A.  Correct.
13    Q.  Okay.  And what happened then?
14    A.  I was coming out of Room 3, and Pete was
15  in the center aisle, and as I was passing him, he
16  lunged out at me with his forks in the air.
17    Q.  I'm sorry.  He lunged out at you with --
18    A.  He's on his forklift.  I'm coming out of
19  the tunnel out of Room 3.  There's a -- when you
20  come out of Room 3, there's a stop sign.  You honk,
21  let pedestrians pass or whatever.  Then I'd say
22  about two or three feet, there's where the
23  forklifts park.
24        So Pete is parked.  I'm coming through.

Page 55

1  Pete comes out with his forklift with the forks
2  because -- how can I explain it to you?  On the
3  forklift the forks are behind us, and we drive with
4  the forks behind us.
5    Q.  Okay.
6    A.  So as a safety precaution you don't drive
7  forward with the forks in front of you, you know,
8  unless, I guess, you're carrying a package.
9    Q.  Uh-huh.
10    A.  So at that particular time, I'm coming
11  this way, and he comes out with his forks in the
12  opposite direction of what they should be, coming
13  towards me, so I have to swerve out of his way, and
14  there's a co-pack area in Room 2 that is ran by a
15  different facility within the same warehouse, so I
16  have to go through there, through their product to
17  avoid him hitting me.
18    Q.  Okay.
19    A.  And at that point in time, there was an
20  altercation.  I asked him, what are you doing, you
21  tried to hit me, you know, your forks are coming
22  right at me, you could have killed me with those,
23  like.
24    Q.  This is -- when did you have that

Page 56

1  conversation?  Is it while the incident was
2  happening or after the incident?
3    A.  No.  This is after I swerved out of the
4  way and I stopped, and he came up to me, and we had
5  an altercation, and I asked him, what were you
6  doing, you tried to hit me, you almost -- you know,
7  you almost hit me, you know, and he told me, yeah,
8  I tried to hit you on purpose.
9        And at that point in time, I was -- I can
10  admit that I was heated, and I would have got off
11  my forklift, but I rode off.  I tried to be the
12  bigger man of the situation, and I rode off, and I
13  went down the aisle, and Pete followed me on his
14  forklift, got off of his forklift and walked up to
15  me and told me that he has a problem with me, that
16  he doesn't like me and that he tried to do it
17  intentionally.
18        And at that point in time, I had had
19  enough, and I reported it myself.  I reported the
20  incident to Saul of what happened, of what
21  occurred, and Saul had me write down an incident
22  report.
23        And at that time there was an employee
24  from Utah that was also there that witnessed the

Page 57

1  situation of Pete trying to hit me, and he also
2  wrote down an incident report as well, and, to my
3  knowledge, that day they sent Pete home, and --
4    Q.  And so you said an employee from Utah?
5    A.  Correct.  At that time we were really
6  busy, and they were bringing in people to help us
7  because we were on a new system.  They had switched
8  out the old system and brought in a new system, and
9  our production was kind of slow, so they brought in
10  other people from other warehouses.  I believe some
11  people were from Atlanta, Utah.  I don't remember
12  the other states.
13    Q.  Okay.  And did you know this person's
14  name, this Utah employee's name?
15    A.  I never -- I don't know.
16    Q.  And how do you know that he wrote down an
17  incident report?
18    A.  Because Saul told us both to write one.
19    Q.  Okay.  And so after the first incident
20  that happened with Pete, both of you were
21  subsequently hired by Kenco?
22    A.  Correct.
23    Q.  And so the first incident happened when
24  you were both temp employees?

15 (Pages 54 - 57)

Page 58

1    A.   Correct.
2    Q.   And then you were hired, and then the next
3  incident you have with Pete you described -- you
4  just described, that happened in October 2014.
5    A.   Right.
6    Q.   Okay.  And so this time you did report it,
7  and you reported it to Saul.
8    A.   Right, correct.
9    Q.   And Saul asked both you and the witness,
10 the Utah employee, to write down --
11   A.   Correct.  What happened, what occurred.
12   Q.   -- what happened.
13      Okay.  And then what happened, as far as
14 you know?
15   A.   As far as I know, they sent Pete home for
16 the night.  He started calling up there to the job
17 threatening to come back up there and do something
18 to me in the parking lot.
19   Q.   Okay.  Let me back up a little bit.  So
20 you reported it.
21   A.   I --
22   Q.   You reported it then, and when you
23 reported it to Saul, how did you find Saul?  Did
24 you go to his office?

Page 59

1    A.   I went to the office.
2    Q.   And was anybody there at the time?
3    A.   All the other leads were in the office.
4    Q.   I'm sorry?
5    A.   The leads.  Saul was the supervisor, and
6  then we had leads, and all the other leads were in
7  the office at the time that I reported it.
8    Q.   And did you report it while the
9  supervisors and leads were in the office?
10   A.   Yes, I did.
11   Q.   And then how do you know about the Utah
12 employee, that Saul told the Utah employee to write
13 an incident report?
14   A.   Because the Utah employee came to me and
15 told me he saw the situation, and then he told
16 Saul, and Saul had him write a report as well.
17   Q.   And then you said that Pete was sent home
18 that day, as far as you know.
19   A.   Correct.
20   Q.   Okay.  And then you said Pete was
21 communicating with you.  How was he doing that?
22   A.   He wasn't communicating with me.  He was
23 calling up to the office telling them that he
24 didn't understand why he was being suspended and

Page 60

1  that he was going to come back up there, that I
2  shouldn't be there.
3    Q.   And how do you know this?
4    A.   He was making threats.  They told me.
5    Q.   Who's they?
6    A.   The leads.
7    Q.   Okay.  Who were the leads?
8    A.   His name was -- one lead was Ivan, and the
9  other lead is -- I forgot his name, but he was
10 black.  I don't know his -- forgot his name.
11   Q.   Okay.  And Ivan, what's his race?
12   A.   Mexican.  Ivan Flores.  And there was
13 another lead, a black guy.  I forgot his name,
14 though, but the -- Ivan was telling -- we had a
15 smoke break, and Ivan was saying that he was
16 calling back up there making threats.
17   Q.   And so what did Ivan tell you that Pete
18 had been saying?
19   A.   Said that he was going to come back up
20 there.
21   Q.   Come back to work?
22   A.   To the parking lot, that I shouldn't be
23 there when he comes back to the parking lot.
24   Q.   Okay.  And what did you do with that

Page 61

1  information?
2    A.   I told Saul, and Saul told me, don't worry
3  about it.  And at that time I went back to what
4  Mike was saying about the warehouse shootings and
5  things of that nature, and in the parking lot we
6  don't have cameras or security, so once you leave
7  the gates, it's pretty much, you know, just a
8  parking lot.
9       So I was kind of intimidated not knowing
10 if he was just making claims or if he was going to
11 act on his claims because at that time I don't know
12 what he's capable of because he just tried to hit
13 me with the forks in the air, so I don't know.
14   Q.   Okay.  And so Saul told you not to worry.
15   A.   Saul told me not to worry about it, you
16 know, that it will calm down, don't worry about it,
17 just go back to work, get your work done.
18   Q.   Okay.  And did you have any other
19 encounters with Pete after this?
20   A.   No.
21   Q.   Okay.  And did -- did you ever see Pete in
22 the parking lot --
23   A.   No.
24   Q.   -- after that?

16 (Pages 58 - 61)

Page 62

1    A.  No.
2    Q.  Okay.  And so when was the next time you
3 thought that you were discriminated against because
4 of your race?
5    A.  I applied for a position of advancement.
6 They had a co-pack coordinator position and another
7 position that required college education.
8    Q.  Which position was that?
9    A.  I think it was the coordinator position,
10 and there was a co-pack lead position that only
11 required high school, so I believe it was the
12 co-pack coordinator position that required college
13 education.
14    Q.  Okay.
15    A.  And I applied for it, and I never got
16 interviewed for that position.
17    Q.  For which one?
18    A.  For the co-pack coordinator.
19    Q.  Okay.  You applied.  You said you were
20 never interviewed?
21    A.  Never interviewed.
22    Q.  Okay.  And how did you apply?
23    A.  It was a sign-up sheet.
24    Q.  And what about the other position?

Page 63

1    A.  The co-pack lead, I got interviewed.  It
2 was a three-question interview.
3    Q.  And who interviewed you for that position?
4    A.  Mike Manzello.  And at the end of that
5 interview, I asked him about the co-pack
6 coordinator, and he told me that we would be
7 interviewing for that probably two weeks from now,
8 and I never got interviewed.
9    Q.  So you interviewed for the co-pack lead
10 position first?
11    A.  Correct.
12    Q.  And there you were interviewed by Mike.
13    A.  Right.
14    Q.  Okay.  And did he ever get back to you
15 with respect to that position?
16    A.  No.
17    Q.  Okay.  How long had you been working as an
18 employee for Kenco at that time?
19    A.  Five, six months as a Kenco employee.
20    Q.  Well, do you remember?
21    A.  This was around September, October, so
22 five, six months.
23    Q.  Okay.  Well, do you remember when you
24 applied?

Page 64

1    A.  I don't.
2    Q.  Okay.  Okay.  And then you said you
3 applied for the co-pack coordinator position?
4    A.  Yes.
5    Q.  And that was just by the sign-up sheet?
6    A.  Yes.
7    Q.  And you said you were never interviewed
8 for that.
9    A.  Never interviewed for it.
10    Q.  Do you know who got the co-pack lead
11 position?
12    A.  I think his name was Rodney.
13    Q.  Rodney?
14    A.  Yeah.
15    Q.  Okay.  And his race?
16    A.  African-American.
17    Q.  And did you -- were you familiar with
18 Rodney in the workplace?
19    A.  We worked together.  I knew of him, but we
20 weren't anything outside of the job.
21    Q.  Okay.  And do you have any reason to
22 believe that he was not qualified for the co-pack
23 lead position?
24    A.  Well, I started before him.

Page 65

1    Q.  Okay.  How long before Rodney started had
2 you worked?
3    A.  I probably got hired in two to three weeks
4 before Rodney did.
5    Q.  Okay.  And so you said that Rodney's
6 African-American?
7    A.  Yes.
8    Q.  And so are you saying that the reason why
9 you didn't get that position is because of your
10 race?
11    A.  I'm saying that I didn't get the position
12 that I originally applied for, was the coordinator
13 position, and the lead position was after that, but
14 the lead position interview was before the
15 coordinator position.
16    Q.  Okay.  You lost me.  Sorry.  So I thought
17 that you applied for --
18    A.  The coordinator position was a sign-up
19 sheet.
20    Q.  Okay.
21    A.  Then the lead came -- the lead position
22 came after that.
23    Q.  And was that also a sign-up sheet?
24    A.  Correct.

17 (Pages 62 - 65)

Page 66

1 Q. Okay.
2 A. So what I'm saying is that when I had
3 applied for the coordinator position, I would think
4 that would come first, but it didn't. The lead
5 position came up, and it was less education than
6 was required for the first position.
7 Q. Okay.
8 A. So I felt that I was being -- I guess
9 racial against -- against the education part of
10 having the knowledge and the education but getting
11 interviewed for the lesser position. Do you
12 understand what I'm saying?
13 Q. Well, you applied for both positions. You
14 got an interview for one position and not an
15 interview for another position, correct?
16 A. Right.
17 Q. Okay. So is your claim that you didn't
18 get chosen as a co-pack -- in the co-pack lead
19 position, do you think that was racially motivated?
20 A. I believe so because if you have a
21 position that requires that you have all your ducks
22 in a row, you have the education, you have the
23 experience and then you give me an interview for a
24 position that is lesser that only requires a high

Page 67

1 school diploma and then not even get interviewed
2 for the other position, I feel like that was
3 racially motivated.
4 Q. That what was -- okay. I think we need to
5 just break this down. And so you applied for the
6 co-pack lead position, correct?
7 A. Right.
8 Q. Okay. And you were not hired for the
9 co-pack lead position.
10 A. I was never interviewed or hired.
11 Q. I thought you said you were interviewed by
12 Mike Manzello.
13 A. For the coordinator position.
14 Q. I'm talking about the lead position.
15 A. The lead position, yes, I was interviewed.
16 Q. Okay. Right now let's just talk about the
17 lead position first.
18 A. Okay.
19 Q. Okay? So there was a sign-up sheet for
20 the lead position.
21 A. Correct.
22 Q. And you signed up that you were interested
23 in being interviewed; is that correct?
24 A. Yes.

Page 68

1 Q. And as a result of that, you were
2 interviewed by Mike Manzello?
3 A. Yes.
4 Q. And you did not get the position.
5 A. No.
6 Q. Okay. And the position went to a guy
7 named Rodney, who's an African-American guy.
8 A. Correct.
9 Q. And so with respect to that position --
10 we'll get to the next one in a minute, but with
11 respect to the co-pack lead position, do you
12 believe you didn't get that position because of
13 your race?
14 A. Yeah. Well, I think so because I started
15 before him.
16 Q. Right. But you and he are the same race.
17 A. Well, that's true, but, you know --
18 Q. Okay. And do you know -- were you in a
19 position to evaluate Rodney's work when you were
20 working?
21 A. I'm not a manager.
22 Q. Okay. And so do you have any information
23 that you were more qualified than Rodney for that
24 position?

Page 69

1 A. I had the best performance in the
2 warehouse. I had the best attendance in the
3 warehouse.
4 Q. Okay. And how do you know that?
5 A. Because I got -- I was informed that
6 through Kenco.
7 Q. Okay. Who told you that you were the best
8 in the warehouse?
9 A. We had performance evaluation sheets, and
10 I had the best results.
11 Q. And how do you know you had the best
12 results compared to everybody else?
13 A. That's what I was told.
14 Q. By?
15 A. Saul Beck.
16 Q. And when did he tell you that?
17 A. When I received the sheet.
18 Q. Okay. Any other reason that you think
19 that you didn't get the co-pack lead position
20 because of your race?
21 A. No.
22 Q. Okay. And so at the time that you applied
23 for this position, the work that you had been doing
24 was forklift operator; is that correct?

18 (Pages 66 - 69)

Veritext Legal Solutions

800-567-8658                                        973-410-4040

Page 70

1    A.  Correct.
2    Q.  Okay.  And had you done any other
3  warehouse associate jobs at that point like
4  picking?
5    A.  No.
6    Q.  Okay.  Okay.  And then you said you also
7  applied for the co-pack coordinator position.
8    A.  Correct.
9    Q.  And that was a sign-up sheet, and you said
10  you were never interviewed for that position.
11    A.  Correct.
12    Q.  Okay.  And do you know who ultimately got
13  that position?
14    A.  I believe Melissa Hansen.
15    Q.  And what is her race?
16    A.  Caucasian.
17    Q.  And do you have any information that you
18  are -- were more qualified for that position than
19  Melissa Hansen?
20    A.  I do, but -- based on information that I
21  received from Edith McCurry.
22    Q.  Okay.  And what did Edith McCurry tell
23  you?
24    A.  That Melissa Hansen didn't have a college

Page 71

1  education, she only had a high school diploma.
2    Q.  And how did you happen to have that
3  conversation with Edith McCurry?
4    A.  I didn't have that conversation with her.
5  This was during the EEOC process, and we were just
6  having conversation, and it came up.  I didn't ask
7  or anything.  She just gave me the information.
8    Q.  Okay.  So is that when you -- when you
9  found that out that Edith McCurry told you that
10  Melissa Hansen only had a high school diploma, is
11  that when you believed that it was a race issue?
12    A.  No.  I believed it was a race issue when I
13  didn't get interviewed and then she got the
14  position, and I was already a warehouse employee,
15  and at that time she wasn't even a warehouse
16  employee because they had it where they did
17  internal hiring first and then external, so that's
18  why I felt the motivation of racial.
19    Q.  And Melissa Hansen was an external
20  candidate?
21    A.  Correct.  To my knowledge.
22    Q.  Okay.  And so to your knowledge, she had
23  not worked for Kenco prior to being hired as a
24  co-pack coordinator.

Page 72

1    A.  Correct.
2    Q.  So you didn't have the ability to observe
3  her work.
4    A.  No.
5    Q.  Okay.  And at the time that you applied
6  for the co-pack coordinator position, you had not
7  been employed by Kenco for six months; is that
8  correct?
9    A.  I'm not sure.
10    Q.  You don't know either way.
11    A.  I don't remember if it was five, six
12  months or if I was six months or -- I don't know.
13  I don't know the exact dates.
14    Q.  Okay.  And the same thing with the co-pack
15  lead position, you don't --
16    A.  Well, I wouldn't know because Rodney
17  started after me, so if he got the position, then I
18  should have been qualified for the position.
19    Q.  Okay.  Any other reason that you think
20  that race -- your race had to do with your not
21  getting the -- or not being interviewed for the
22  co-pack coordinator position?
23    A.  No.
24    Q.  Okay.  And did you -- did you talk to

Page 73

1  anybody about not getting interviewed for the
2  co-pack position?
3    A.  Yeah.  I told you when I had the interview
4  with the lead -- for the lead position Mike said,
5  we'll be interviewing two weeks from now, and it
6  never happened.
7    Q.  Okay.  And so did you go back to Mike and
8  say, you said you were interviewing and I never --
9  nobody ever interviewed me?
10    A.  No.
11    Q.  Why not?
12    A.  I don't know.  I just didn't go back and
13  ask.  I didn't follow up.
14    Q.  Did you go to human resources?
15    A.  I didn't follow up because I didn't know
16  that the position was filled.  I was under the
17  impression that we were still going to be
18  interviewed for the position.  I didn't know the
19  position was filled at that time.
20    Q.  Well, when did you find out that the
21  position was filled?
22    A.  When Melissa Hansen had the job.
23    Q.  Okay.  And so at that point you knew the
24  position was filled, right?

19 (Pages 70 - 73)

Page 74

1    A.   Yes.
2    Q.   And at that point you felt that it was a
3  racial issue that you were not interviewed for that
4  position and she was hired; is that correct?
5    A.   Correct.
6    Q.   Okay.  And so did you complain to anybody
7  about that?
8    A.   Why would I complain?  If there was -- if
9  there was nothing done about it, why -- what is
10  complaining going to do?  That was my position.
11    Q.   Okay.  So the answer is you didn't
12  complain to anybody about it.
13    A.   No, I didn't.
14    Q.   Okay.  Did you talk to Edith McCurry about
15  it?
16    A.   No, I didn't.  Well, I did ask her about
17  the requirements, and she told me that everybody
18  was -- could sign up for the position, but I didn't
19  refer to her about the position being filled.  I
20  just asked about the requirements of being able to
21  apply for the position.
22    Q.   And Edith McCurry's race is?
23    A.   African-American.
24    Q.   And so you're not interviewed for a

Page 75

1  position, and you -- you find out that it's being
2  filled and it's filled by a white female, and
3  you've already spoken with Edith McCurry, who told
4  you about the position.  Why didn't you go back to
5  Edith McCurry and say, I feel like this was a
6  racial issue?
7    A.   I didn't think of it.  I didn't think to
8  go with Edith at the time.
9    Q.   Okay.  And then did you also think that --
10  do you believe that -- you were not interviewed for
11  that position.  Do you think that was also a sex
12  reason based on your sex?
13    A.   Well, Melissa's a female.  I'm a male.  I
14  don't know.
15    Q.   Okay.  Other than the fact that Melissa's
16  a female and you're a male, is there any other
17  reason that you believe that she was hired for the
18  position and you weren't because of sex?
19    A.   I can't recall at this time.
20    Q.   Well, is there anything that would help
21  refresh your recollection?
22    A.   I don't know right now, not right now.
23    Q.   Okay.  So at this point at your
24  deposition, you can't recall any other reason why

Page 76

1  you would think that you were not interviewed for
2  the co-pack coordinator position because of your
3  sex other than the fact that Melissa's female and
4  you're not.  Is that fair?
5    A.   Right now, yes.  I'm -- I can't think of a
6  reason right now.
7    Q.   Okay.  Well, had you thought of a reason
8  at any other time?
9    A.   I probably did when I had my EEOC process.
10  It was more clear to me, but there's been a lapse
11  of two or three years since the incident has taken
12  place, so right now certain things I don't remember
13  at the time, and maybe it might come back to me
14  later down the road or if I, you know, have more
15  documentation in front of me to be specific, but
16  right now I don't remember.
17    Q.   Okay.  So as you sit here right now, the
18  only reason that you can think of that supports
19  your belief that Melissa was hired into the co-pack
20  coordinator position and you weren't was based on
21  sex discrimination is because she's female and
22  you're male.
23    A.   And education.  I was qualified.  I was
24  there as an employee.  She wasn't.  I believe that

Page 77

1  had a part in it too, not just sex.
2    Q.   I'm just asking you now about the sex.  I
3  understand you have other reasons, but I'm asking
4  you -- what I'm asking you is other than the fact
5  that Melissa is female and you're male and she got
6  the position and you didn't, is there any other
7  reason that you think that you didn't get the
8  position because of your sex?
9    A.   As I said before, right now I can't
10  recall.
11    Q.   Okay.  So right now you don't have any
12  other basis for -- to believe that Melissa was
13  hired into that position and you weren't based on
14  sex other than the fact that she's female and
15  you're male.
16    A.   I can't recall right now, so I can't say
17  either way.  I can't recall.
18    MS. MORAN:  Why don't we just take a brief
19  break.
20    THE VIDEOGRAPHER:  Going off the record at
21  12:44 p.m.
22       (Recess taken.)
23       (Whereupon, Henry Deposition
24       Exhibit 2 was marked for

20 (Pages 74 - 77)

Page 78

1    identification as of 10/20/2016.)
2    THE VIDEOGRAPHER: Beginning of Disc 2. We're
3    back on the record at 12:58 p.m.
4    BY MS. MORAN:
5    Q.  Okay. Mr. Henry, I've now put in front of
6    you what's been marked as Deposition Exhibit No. 2.
7    It's got Bates stamps at the bottom, Kenco 0019 --
8    I'm sorry -- 00197 through 00199, and it's a charge
9    of discrimination that you filed with the Illinois
10   Department of Human Rights, Charge No. 2015CF0990,
11   and it appears that you filed it on October 21 of
12   2014. Is that correct?
13   A.  Correct.
14   Q.  Okay. And that is your signature on the
15   first page --
16   A.  Yes.
17   Q.  -- in the lower right-hand corner?
18       And all the information -- you signed it
19   declaring that under penalty that everything on
20   this charge is true and correct to the best of your
21   knowledge and belief?
22   A.  Correct.
23   Q.  Okay. Okay. So the allegation, you say
24   you were hired in March of 2014 by Kenco. That's

Page 79

1    correct?
2    A.  March or April.
3    Q.  Okay. Well, here you said March of 2014,
4    and you filed this back in 2014.
5    A.  Okay.
6    Q.  So does that help refresh your
7    recollection?
8    A.  Yeah. I was just going based on what we
9    had said earlier, between March and April, but it
10   says March here.
11   Q.  And then you have -- this is the charge
12   that you filed where you said that you were
13   harassed by Pete, who attempted to hit you with a
14   forklift?
15   A.  Correct.
16   Q.  Okay. And is that the situation that
17   you've already testified to?
18   A.  Yes.
19   Q.  And so is it fair to say, then, that that
20   incident occurred on October 8 of 2014?
21   A.  The 8th or the 9th because it's the
22   third-shift position, so the date might have
23   changed into nighttime. It might have started the
24   8th, between the 8th and the 9th of October.

Page 80

1    Q.  Okay. And then you claim that Pete
2    attempted to hit you with his forklift. You claim
3    that it was racial, but then you also claim that it
4    was retaliatory for filing an earlier charge. Is
5    that correct?
6    A.  That -- the reason for Pete or the
7    harassment from the --
8    Q.  I'm looking at -- so Section I, Roman
9    Numeral I, is a claim that you were being harassed
10   on October 8 by Pete because of your race, correct?
11   A.  Correct.
12   Q.  Okay. And then -- and we've talked about
13   that already.
14   A.  Right.
15   Q.  Is there anything else that you haven't
16   testified to that you think is significant about
17   this incident that...
18   A.  Based on Pete or the company?
19   Q.  Well, just the incident with Pete.
20   A.  No.
21   Q.  Okay. And then the second, Roman Numeral
22   II, says that you were harassed on October 8 in
23   retaliation for filing an earlier discrimination
24   charge with the Illinois Department of Human

Page 81

1    Rights, correct?
2    A.  Correct.
3    Q.  Okay. And the harassment was by Pete; is
4    that correct?
5    A.  Correct.
6    Q.  Okay. And how did Pete -- what
7    information do you have that Pete knew that you had
8    filed a previous charge with the Illinois
9    Department of Human Rights?
10   A.  Well, it was -- I feel like -- not the
11   harassment from Pete, intentionally Pete, but the
12   harassment of the company allowing the harassment
13   to continue to go on from the first incident to the
14   next incident and nothing being done about what was
15   going on between me and him. That was what I meant
16   from the harassment, not harassment of Pete knowing
17   anything about my allegations, but the harassment
18   of the company allowing these things to continue to
19   go on.
20   Q.  Well, that's not what you say here,
21   though. You say here, on October 8, 2014, I was
22   harassed by Pete, last name unknown, nonblack
23   coworker, who attempted to hit me with his
24   forklift.

21 (Pages 78 - 81)

Page 82

1  A.  Right.  Harassment --
2  Q.  And you said -- and then No. 3 says, the
3 harassment followed the filing of my discrimination
4 charge with such a period of time as to raise an
5 inference of retaliatory motivation.
6     So here you say you were harassed by Pete?
7  A.  Harassed by Pete after he got off his
8 forklift to try to hit me with the forklift,
9 harassment from Pete from the previous allegation,
10 but the retaliatory motivation was from the company
11 allowing these things to continue to go on.
12  Q.  Well, what do you mean, allowing the
13 things to go on?  You --
14  A.  The first incident was reported, the
15 second incident was reported, and there was nothing
16 done between the time frame for -- to my knowledge,
17 of any disciplinary action upon Pete.
18  Q.  Okay.  So this, then, is about whether
19 Pete received any disciplinary action after the
20 first or second incident?
21  A.  Correct.  He never -- I was never aware of
22 anything being done because the company has a
23 policy for harassment.  They have a policy that
24 indicates that they do not put up with any type of

Page 83

1 racial threats or anything of that nature, so I
2 felt that that's a violation of their company
3 policy.
4  Q.  So what was the retaliation?
5  A.  As far as what -- as far as what?
6  Q.  I'm trying to have a better understanding
7 of what you're saying here.  In your charge you say
8 you were harassed by Pete, correct?
9  A.  Correct.
10  Q.  Now you're saying that you were retaliated
11 against by Kenco for filing an earlier charge; is
12 that correct?
13  A.  Correct.
14  Q.  Okay.  And how were you retaliated against
15 by Kenco for the earlier charge?
16  A.  For never -- never doing any follow-up on
17 the incidents that happened between me and Pete.
18  Q.  Okay.  And so you already testified that
19 you're not aware whether Pete was disciplined for
20 the first incident, the look in the mirror
21 incident?
22  A.  Correct.
23  Q.  Okay.  And then you didn't have any other
24 incident with Pete, you testified to, until the

Page 84

1 forklift incident on October 8 or 9?
2  A.  Correct.
3  Q.  And you testified earlier that your
4 understanding was that Pete was suspended initially
5 for that.
6  A.  That night.
7  Q.  And other than that, you're not aware of
8 any actions that were taken by Kenco against Pete
9 for the incident?
10  A.  Not to my knowledge, because they have a
11 zero tolerance for workplace incidents, so if you
12 have zero tolerance for workplace incidents, to my
13 knowledge, that means that you would be fired, to
14 my knowledge.
15  Q.  Okay.  So is it -- am I understanding you
16 correctly that you think that Kenco retaliated
17 against you by not firing Pete for the forklift
18 incident?
19  A.  Well, it goes back from the first
20 incident.  You didn't fire him from that incident,
21 and there was a zero tolerance policy then.  You
22 hired him.  You awarded him with a job there.  Then
23 this incident happens, and, to my knowledge, he was
24 just sent home.  He wasn't fired.

Page 85

1  Q.  What's the zero tolerance policy that
2 you're talking about?
3  A.  I don't have it in front of me, but I've
4 seen it.
5  Q.  Uh-huh.  What does it say?
6  A.  I don't know it word for word.  I can't --
7  Q.  Just describe it as best as you can.
8  A.  I just did.  I told you that they have a
9 zero tolerance policy for workplace incidents of
10 harassment, racial slurs, of that nature, so --
11  Q.  Then your understanding of what that
12 policy means is this -- am I understanding you
13 correctly that if somebody -- if an employee, not a
14 manager, but an employee makes some kind of a
15 racial comment then that person -- the only
16 recourse is that person should be terminated, as
17 far as you're concerned?
18  A.  As far as the policy, I don't have it in
19 front of me, so I don't know word for word, but
20 speculating, I would believe that that would be the
21 case.
22  Q.  I'm not asking you to speculate.  I'm
23 asking you what your belief is.  So your belief is
24 that since Pete was not terminated, his employment

Page 86

1 wasn't terminated for the incident with the comment
2 about the mirror, then you think that was
3 retaliatory.
4    A.   I can only speculate because I don't have
5 the documentation in front of me to tell you word
6 for word what the policy states word for word, so
7 speculation, I believe that to be the case.
8    Q.   Right.  That's what I'm asking you, is
9 your belief is that if somebody complains that
10 somebody made a racially derogatory statement that
11 the only recourse for the employer is to terminate
12 that person.  Is that correct?
13    A.   I don't know -- I wouldn't know word for
14 word.  That's what I'm saying.
15    Q.   I understand.  I'm asking for the general
16 understanding that you have.  I'm not asking you to
17 repeat it verbatim.  I'm not asking you to quote
18 from it.  I'm asking what is -- I'm trying to
19 understand the basis for the claim here in this
20 charge which says that you were harassed by Pete,
21 but now you're saying you were retaliated against
22 by Kenco, and so I'm trying to understand why you
23 believe you were retaliated against by Kenco when
24 it comes to the incidents with Pete.

Page 87

1    A.   Because there was never anything done
2 between -- on the policy it states, to my
3 knowledge, that if there is an incident of a
4 coworker, that coworker should come to work and
5 feel comfortable in the workplace, that if there is
6 any type of harassment, any racial slurs, that that
7 would lead to termination, under my knowledge.
8 That's why I'm saying retaliation from the company.
9    Q.   Because the company did not terminate
10 Pete.
11    A.   Because they never -- right.
12    Q.   Okay.  Any other basis for the retaliation
13 claim against Kenco related to this charge?
14    A.   Not at this time.
15    Q.   Okay.  Is there any other time?
16    A.   I'm just saying not at this time, not that
17 I can think of at this time.
18    Q.   Okay.  And you understand that your
19 testimony at a deposition is an important event in
20 your lawsuit?
21    A.   I understand that.  That's why I don't
22 want to say certain things without having the
23 knowledge, and I don't have it in front of me, so I
24 don't want to say specifically this is that or this

Page 88

1 is that.  I don't have that document or that policy
2 in front of me to say, well, this is what the
3 policy says.
4    Q.   I understand.
5    A.   So that's why I'm saying to my knowledge
6 of what I think -- yes, at that time, I think it
7 was a retaliation for me filing the case through
8 the EEOC and nothing being done for the
9 disciplinary of the occurrences that happened
10 between me and Pete.
11    Q.   And so if you were to subsequently find
12 out that actually Pete was disciplined, would that
13 change your view?
14    A.   Well, he was disciplined the last time,
15 sent home, but, to my knowledge, the policy has a
16 zero tolerance for workplace incidents.
17    Q.   Okay.  And how did you come -- and zero
18 tolerance to you means termination?
19    A.   Zero tolerance to me means not acceptable
20 in the workplace.
21    Q.   Okay.  So it doesn't necessarily mean that
22 somebody who engages in behavior that's
23 unacceptable in the workplace must be fired.
24    A.   No.  Being fired is an option on the

Page 89

1 policy, I believe.
2    MS. MORAN:  Okay.  Okay.  Let's go back to your
3 first charge.
4       (Whereupon, Henry Deposition
5       Exhibit 3 was marked for
6       identification as of 10/20/2016.)
7 BY MS. MORAN:
8    Q.   Okay.  Mr. Henry, you're now looking at
9 what's been marked Deposition Exhibit No. 3, and
10 that is a charge that you filed with the Illinois
11 Department of Human Rights on July 9 of 2014; is
12 that correct?
13    A.   Yes.
14    Q.   And that's your signature in the lower
15 right-hand corner of the first page of Deposition
16 Exhibit No. 3?
17    A.   Uh-huh, yes.
18    Q.   Okay.  And just for the record, Deposition
19 Exhibit No. 3 is Charge No. 2015CF0034, and it's
20 Bates-stamped No. 1600 through 1603.
21       Okay.  And why did you file this charge,
22 Mr. Henry?
23    A.   This was the first few allegations of what
24 I felt was racially motivated.

23 (Pages 86 - 89)

Page 90

1    Q.   Which was what?
2    A.   Well, I used to ask Pete -- I mean, Mike
3    if I could come in or start work earlier.  He would
4    tell me no, but he would allow Pete and other
5    nonblack employees to come in earlier to start
6    shifts when we had mandatory overtime, as I stated
7    to you before, and this --
8    Q.   Did you get overtime at that time?
9    A.   Yeah, but I had to do it on the end of the
10   shift, not the beginning of the shift.
11   Q.   Okay.  And why do you have a right to
12   overtime before your shift as opposed to after your
13   shift?
14   A.   Other people were allowed to do it, so I
15   felt I should be able to do it too.
16   Q.   Okay.  And who was allowed to do it, as
17   far as you knew?
18   A.   As I know, it was Pete was able to do it,
19   Esmeralda was able to do it, to my knowledge.
20   Those are just a few times that I can think of
21   offhand.
22   Q.   Okay.  Anybody else you can think of
23   besides Pete and Esmeralda?
24   A.   That's it right now that I can think of.

Page 91

1    Q.   What's Esmeralda's race?
2    A.   I believe she's Filipino.
3    Q.   Okay.  And was -- when Pete got overtime
4    before his shift, did he also get overtime, to your
5    knowledge, after his shift?
6    A.   No.  He would come in early to do his
7    shift.
8    Q.   Okay.  And Esmeralda, was she given
9    overtime after her shift, if you know?
10   A.   I'm not aware.
11   Q.   Okay.  So you did get overtime.
12   A.   Yes.
13   Q.   But your overtime was after your shift
14   instead of before your shift.
15   A.   Correct.
16   Q.   Okay.  And that's the reason -- and you
17   thought that was racially motivated because Pete
18   and Esmeralda were allowed to work overtime before
19   their shift, and you were only allowed to work
20   overtime after your shift; is that correct?
21   A.   Well, those are nonblack employees, so I
22   felt that if they're able to do it why can't I do
23   it, and I asked all the time.  It should be some
24   form of equalness in that decision process.

Page 92

1    Q.   Do you know whether the overtime that you
2    worked -- did you -- how that compared to the
3    overtime that Pete or Esmeralda worked?
4    A.   A solid ten hours, two hours before or two
5    hours after, and I wanted to do the two hours
6    before so I can go home earlier, but I never was
7    able to do the two hours before.  Always after the
8    shift.
9    Q.   Okay.  So you're not complaining -- then
10   is it fair to say that you're not complaining about
11   the amount of overtime, you're complaining about
12   when you worked the overtime?
13   A.   Correct.
14   Q.   I'm sorry?
15   A.   Correct.
16   Q.   And you're not -- just so I'm clear,
17   you're not complaining that Pete and Esmeralda got
18   more overtime than you did.  You're complaining
19   that they were allowed to work before their shift
20   instead of after.
21   A.   Correct.
22   Q.   And what -- did Esmeralda also work the
23   third shift?
24   A.   Yes.

Page 93

1    Q.   And then you mentioned that shifts are
2    rotating?
3    A.   No.  I mentioned that the supervisors
4    rotate.
5    Q.   Okay.  But you never rotated.
6    A.   No.
7    Q.   It's only the supervisors that rotated,
8    not nonsupervisory employees?
9    A.   We have our regular shift unless Kenco was
10   to come in with different shifts.  That's what I
11   stated too, that at that time Kenco was changing
12   the shifts around, so it was a third shift, then it
13   was a 3.1, 3.2, then it was a 3.3.  Then it was --
14   it was only one and two second shift, and then they
15   canceled out the third shift altogether, so at that
16   time there was a lot of different shifts going
17   around, so I can't recall what shift I was on and
18   when.
19   Q.   Okay.  And you claim that the
20   motivation -- one of the motivations for not
21   allowing you to work overtime before your shift was
22   because you're a male; is that correct?
23   A.   Situated to Esmeralda being able to work,
24   yes.

24 (Pages 90 - 93)

1    Q.   Okay.  But Pete was also able to work
2  overtime before his shift.
3    A.   That was racial.  He's white.  I'm black.
4    Q.   I see.  So the reason why you think that
5  it was racial was because Pete and Esmeralda were
6  allowed to work overtime before their shifts but
7  you were not.
8    A.   They're nonblack.
9    Q.   Okay.  And the reason why you think that
10  it was because of your sex is because Esmeralda,
11  who was allowed to work overtime before her shift,
12  is female.
13    A.   Correct.
14    Q.   Okay.  Is there any other reason, any
15  other information that you have that you were not
16  being allowed to work overtime prior to your shift
17  because of your sex?
18    A.   I don't know because I asked several
19  times, so I don't know if there's any other reason
20  besides what --
21    Q.   Okay.
22    A.   -- what I'm telling you.
23    Q.   So when you asked Mike Manzello whether
24  you could work overtime before your shift, what did

1  he tell you?
2    A.   No.
3    Q.   Okay.  And did you ask for a reason?
4    A.   He wouldn't give one.
5    Q.   So you did or did not ask for a reason?
6    A.   Yes.  I -- he wouldn't give one.
7    Q.   Okay.  So what did he say?  When you asked
8  him what the reason was, what did he say?  I won't
9  give you one or --
10    A.   He didn't say anything.  He just said, you
11  can't work overtime earlier, and that was it.
12  There was no reason that he gave.  That was his
13  answer.
14    Q.   Okay.  And so are you aware of anybody
15  else at Kenco at that time who was not allowed to
16  work overtime before their shift?
17    A.   No, I'm not.
18    Q.   Okay.  And so going -- staying with this
19  charge, on the page -- second page, which is
20  designated 1601, you state that in late February
21  2014 or early March 2014 is when you applied for
22  the position of co-pack coordinator; is that
23  correct?
24    A.   Correct.

1    Q.   Okay.  And you state earlier that you were
2  hired in December 2013.
3    A.   Through a temp agency.  That's what
4  that -- not hired as a Kenco employee, but hired to
5  work there at the facility.
6    Q.   Right.  So in December 2013 you were
7  working as a temp.
8    A.   Correct.
9    Q.   And -- and then you were hired in mid
10  April of 2014 by Kenco?
11    A.   Well, this states March, but I believe it
12  was between March and April.
13    Q.   Okay.  So somewhere between March and
14  April of 2014 --
15    A.   Correct.
16    Q.   -- you were hired by Kenco?
17    A.   Correct.
18    Q.   Okay.  And so right after you were hired
19  by Kenco, you applied for a promotion; is that
20  right?
21    A.   Yes.
22    Q.   Okay.  Are you aware that Kenco has a
23  policy that says that current employees need to be
24  in their position for six months before they're

1  promoted?
2    A.   Well, if that was the case, then that
3  would refer to Melissa Hansen as well.
4    Q.   Okay.  Well, Melissa Hansen wasn't a --
5    A.   I was --
6    Q.   Let me just respond to that.
7  Melissa Hansen was not a current employee when she
8  was hired into that position; isn't that correct?
9    A.   I guess.  I don't know if she was or not,
10  but --
11    Q.   Okay.
12    A.   -- to my knowledge --
13    Q.   But I -- just on that point, I thought
14  that you testified that she was hired from the
15  outside, that --
16    A.   Correct.  She was an outside employee.
17    Q.   Okay.  And so she was hired as an outside
18  employee for that position, correct?
19    A.   Correct.
20    Q.   Okay.  So it wasn't a promotion for her.
21  It was a hire, correct?
22    A.   I guess so.
23    Q.   Okay.  And so -- but you were already
24  working there in -- working for Kenco in February

25 (Pages 94 - 97)

Page 98

1  or March of 2014, correct?
2    A.  Correct.
3    Q.  So when you applied for the vacant
4  position of co-pack coordinator, you were an
5  employee of Kenco; is that correct?
6    A.  Correct.
7    Q.  Okay.  And at that point in time, you had
8  not been working for Kenco for six months; is that
9  correct?
10    A.  Correct.
11    Q.  Okay.  Is there anybody else that you're
12  aware of that was working for Kenco and then got a
13  promotion before the six-month period had passed?
14    A.  Well, we talked about Rodney Carroll
15  earlier.  I got hired in two weeks before him.  He
16  got advanced, and he wasn't there six months as a
17  Kenco employee, and he got advanced into the
18  company.
19    Q.  Okay.  And just remind me.  His race?
20    A.  He's black.
21    Q.  Okay.  Okay.  In --
22    A.  And --
23    Q.  Go ahead.
24    A.  I want to refer back to the six-month rule

Page 99

1  that you're stating, is that Edith told me that
2  there was -- the position was qualifiable to any
3  employee.  There was never -- I was never told that
4  you have to be there for six months.  That was not
5  on the hire sheet that -- the qualifications never
6  stated in order to apply for this job you need to
7  be a Kenco employee for six months.  It just had
8  the qualifications of education and background
9  information.  It never stated that you had to be an
10  employee for six months to advance in the
11  workplace.
12    Q.  Okay.  Well, did you ever see anything at
13  Kenco that indicated that you needed to work there
14  for six months and have good performance before
15  you're considered for a promotion?
16    A.  No, I didn't.
17    Q.  Okay.  Did you ever have a conversation
18  with Edith McCurry about that requirement?
19    A.  No, I didn't.  She -- well, when she put
20  up the posting, I asked her could I apply for the
21  position.  She told me yes, so at that time if
22  there was a six-month provision for employees, she
23  should have told me that then before I signed up,
24  and then I would have never signed up for the

Page 100

1  position, but since she didn't tell me that, I felt
2  that the position was qualifiable to anybody that
3  had the qualifications.
4    Q.  And when you spoke with Edith about it,
5  did you have a conversation about when you began
6  working for Kenco?
7    A.  No.  I just asked if I could apply.
8  There's nothing in more detail than that.
9    Q.  Okay.  So you didn't tell her that you
10  hadn't been working for six months yet.
11    A.  Well, she's HR.  She probably would know
12  if I worked there for six months or not.
13    Q.  But at the time that you had the
14  conversation with Edith McCurry, do you know
15  whether she knew how long you had been working for
16  Kenco?
17    A.  I'm not aware.  Only thing that I asked
18  her was could I apply for the position.  She told
19  me yes.
20    Q.  Okay.  And so what information do you have
21  that the -- that the fact that you weren't
22  interviewed for the position of co-pack coordinator
23  was in retaliation for you having complained about
24  race discrimination?

Page 101

1    A.  Well, to my knowledge of what I told you
2  earlier, about the information that Edith gave me
3  about Melissa Hansen.  Her education was lesser
4  than mine, so that would mean that I have more
5  education.  I didn't know anything about a
6  six-month time period, but the qualifications were
7  that you had to have a bachelor's degree.  Her
8  qualifications does not have a bachelor's degree.
9  She had a high school diploma.
10    Q.  And how do you know that?
11    A.  From Edith McCurry.  That's the
12  information she -- that I told you earlier that she
13  gave me.
14    Q.  Okay.  And so if Edith McCurry -- you're
15  totally relying on what Edith McCurry told you for
16  that information.
17    A.  Well, had I not known, I would have just
18  went off me having the experience and the knowledge
19  for the position and never being interviewed for
20  the position.
21    Q.  Okay.  And so what information do you have
22  that the reason why you weren't interviewed for the
23  position was connected to your complaint to
24  Mike Manzello that you were harassed by Peter?

26 (Pages 98 - 101)

Page 102

1    A.   Well, there was never any interview.
2    There was never any follow-up.  Even if there
3    wasn't an interview, there was never a follow-up to
4    say that these are the reasons why we didn't
5    interview or these are the reasons why you didn't
6    get the position.  There was never any follow-up of
7    any kind.
8    Q.   Okay.  Any other basis connecting the
9    complaint that you made about Pete to the fact that
10   you didn't get the interview?
11   A.   Pete?  What do you mean?
12   Q.   You say in your charge that you were --
13   you had complained to Mike Manzello that you were
14   racially harassed by Pete, correct?
15   A.   Are we -- I didn't know we were going back
16   to the -- this one.  This one?  I thought we
17   already covered why I was -- how I felt harassed by
18   Pete and retaliated by the company.
19   Q.   Oh, well, you have a lot of allegations
20   here.  You've got a complaint with a lot of
21   allegations, so I'm running through everything, so
22   if it's repetitious perhaps there's some repetition
23   here, but I just want to make sure that we're --
24   that I've covered everything.

Page 103

1    A.   Yeah.  We're clear.
2    Q.   Okay?  So the -- are you testifying, then,
3    that the reason why you believe that you were not
4    interviewed for the co-pack coordinator position
5    was because you had complained about Pete earlier?
6    Right?  That's what you're saying here.  Is that --
7    is that what you're saying, or if not, what are you
8    saying?
9    A.   I don't believe I said that earlier.  I
10   believe what I told you earlier was that I was
11   harassed by Pete.  The company never did anything
12   between the things that happened between me and
13   Pete.  That was the retaliation from the company.
14   The harassment came from Pete.  I thought I said
15   that earlier.
16   Q.   Okay.  So the retaliation, then, are you
17   saying, was the fact that you were just never
18   interviewed for the position?
19   A.   Yes.  From the company retaliation.
20   Q.   Okay.  And why do you think that was
21   connected with the fact that you had complained
22   about Pete?
23   A.   Connected?
24   Q.   Yeah.  How -- I'm not understanding.  I

Page 104

1    understand you complained to Mike that Pete made a
2    racially derogatory comment.  This was after
3    somebody else brought that to Mike's attention; is
4    that correct?
5    A.   Yes.  That's what I stated earlier.
6    Q.   Right.  And so then you say you applied
7    for a vacant position and you weren't interviewed.
8    A.   Right.
9    Q.   So what information do you have that the
10   reason that you weren't interviewed was because you
11   had made a complaint to Mike about Pete?
12   A.   The two are two different things.  I
13   stated that we had -- I had an argument with Pete
14   in the beginning that led to us going upstairs.
15   Then we had another incident where Pete tried to
16   hit me with a forklift.  That had nothing to do
17   with the interview.  The interview was the
18   retaliation from the company allowing these things
19   to continue to go on within the warehouse, nothing
20   being done between the issues of me and Pete.
21   That's where the retaliation came in, that I feel
22   the company retaliated on me for filing charges on
23   the company.
24   Q.   Well, at that point when you say filing

Page 105

1    charges, what other charges had you filed?  Isn't
2    this the first charge that you filed, this
3    Exhibit 3?
4    A.   Yes.  That was -- I was still an employee.
5    Q.   Right.  So this is the first charge that
6    you filed; is that correct?
7    A.   This one?
8    Q.   July, yes.
9    A.   Yes.
10   Q.   Is it correct that that's the first one?
11   A.   The first charge.
12   Q.   Okay.  So how can you have been retaliated
13   against by Kenco for filing a charge if you hadn't
14   filed a charge up until July 9?
15   A.   Well, I didn't get fired from Kenco until
16   October 14, 15.
17   Q.   We're going to get to that.  I'm talking
18   about the charge that you filed on July 9 of 2014.
19   In that charge you allege that you -- you claim
20   that you were retaliated against for complaining
21   about race discrimination in the workplace, and you
22   state that the retaliation was that you were not
23   interviewed for the position.
24   A.   In this particular -- in this particular

27 (Pages 102 - 105)

Page 106

1 complaint, the retaliation would probably come from
2 the incident that happened between me and Pete that
3 never -- anything was never done.
4     Q. Okay. And so is that the only information
5 that you have to support your belief that you were
6 not interviewed for the position because you had
7 earlier complained?
8     A. I don't know why I wasn't interviewed for
9 the position. I have no idea why they didn't
10 interview me. I can't speculate why Kenco didn't
11 interview me for the position. Only thing I can
12 tell you is, to my knowledge, I was never
13 interviewed. There was never a follow-up. There
14 was never a reason given as to why I wasn't
15 interviewed.
16     Q. Okay. Is there anything else?
17     A. Not unless you have any more questions.
18     Q. Well, I mean anything else with respect to
19 that question. Is there any other reason that you
20 believe that you were retaliated by Kenco because
21 you had complained to Mike about Pete?
22     A. No.
23     MS. MORAN: Do we have --
24     MS. ARGENTIERI: 1315?

Page 107

1     MS. MORAN: Yes.
2         (Whereupon, Henry Deposition
3         Exhibit 4 was marked for
4         identification as of 10/20/2016.)
5 BY MS. MORAN:
6     Q. Okay. Mr. Henry, you're now looking at
7 what's been marked Deposition Exhibit No. 4, and
8 for the record it's Bates-stamped Nos. 610 through
9 611, and it relates to Charge No. 2015CF1315. And
10 okay.
11     So, Mr. Henry, this is the third charge
12 that you filed; is that correct?
13     A. Yes.
14     Q. And this is with respect to the
15 termination of your employment?
16     A. Correct.
17     Q. And you were terminated on -- well, let's
18 just start. That's your signature at the lower
19 right-hand corner of the first page?
20     A. Yes.
21     Q. And you were discharged on October 25,
22 2014?
23     A. No.
24     Q. No?

Page 108

1     A. That's when I received the letter in the
2 mail, but the letter indicated that I was
3 discharged on the 14th.
4     Q. Okay. Well, your charge says -- on Page 2
5 No. 3, says, on October 25, 2014, I was discharged.
6     A. Well, that's when I was discharged
7 formally. That's when I received the letter in the
8 mail. Up to that point I didn't know I was
9 discharged, so up -- but on the letter it stated
10 that I was discharged on October 14, but the letter
11 didn't come into the mail until October 25. Do you
12 have a copy of the --
13     Q. I am going to show it to you in just a
14 minute. We're just getting copies right now. I'm
15 just using --
16     MS. ARGENTIERI: The first page.
17     MS. MORAN: Yes.
18     MS. ARGENTIERI: Okay.
19     MS. MORAN: For now.
20         (Whereupon, Henry Deposition
21         Exhibit 5 was marked for
22         identification as of 10/20/2016.)
23 BY MS. MORAN:
24     Q. Okay. Mr. Henry, you're looking at a

Page 109

1 document that's Bates-stamped No. 3. It's
2 Deposition Exhibit No. 5, and it's dated October
3 20, 2014. Is that the termination letter you were
4 just talking about?
5     A. Yes.
6     Q. And so the letter says that your
7 employment was terminated effective October 14; is
8 that correct?
9     A. Correct.
10     Q. 2014?
11     A. That's what it says.
12     Q. And it says that you had violated the cell
13 phone/electronic device use policy on October 8.
14     A. Allegedly.
15     Q. That's what the letter says.
16     A. Correct.
17     Q. Okay. And they said -- and the letter
18 also states that they had wanted to inform you of
19 your termination on October 14 but you didn't
20 return to work following the personal day that you
21 took on October 10.
22     A. Yes.
23     Q. And why didn't you return to work?
24     A. I had a day off.

28 (Pages 106 - 109)

Page 110

1   Q.  After the personal day?
2   A.  That was the personal day.  That was the
3   weekend.  Personal day was on a Friday.  Saturday
4   and Sunday I was off from work.  That was my
5   regular off days.
6   Q.  Okay.  And the -- there were attempts to
7   contact you, and they were unable to reach you?
8   A.  I didn't receive any attempts.
9   Q.  Okay.  Okay.  So let's go to that incident
10  on October 8.  What is your understanding of what
11  happened?
12  A.  There was a picture of a candy spill, and
13  apparently I was fired.  I was never given a reason
14  why.
15  Q.  Okay.  When you say it was a picture of a
16  candy spill, what do you mean?
17  A.  There was a picture of a candy spill in
18  the warehouse that was posted to my Facebook page,
19  and then this letter came in the mail that said I
20  violated the cell phone policy, but it never told
21  me what I violated.
22  Q.  Okay.  And you said it was posted to your
23  Facebook page?
24  A.  Correct.

Page 111

1   Q.  Did you post it?
2   A.  No, I didn't.
3   Q.  So how can somebody else post something to
4   the Facebook page?
5   A.  They can tag you in the picture.  Just
6   like if I took a picture of you right now, I could
7   tag you in the picture, and it would be on your
8   Facebook page.  I don't have to be friends with
9   you.
10          (Whereupon, Henry Deposition
11          Exhibit 6 was marked for
12          identification as of 10/20/2016.)
13  BY MS. MORAN:
14  Q.  Okay.  Mr. Henry, you're now looking at a
15  photo that's a color photo.  It's Deposition
16  Exhibit No. 6, and it's identified Bates No. 165.
17  Is that the picture of the candy spill you were
18  just referring to?
19  A.  Correct.
20  Q.  Okay.  And can you identify who's in that
21  picture?
22  A.  I forgot their names.  They're just Kenco
23  employees, though.
24  Q.  Okay.  So you don't know any of their

Page 112

1   names?
2   A.  I forgot their names.
3   Q.  Okay.  Well, if I mention the names, might
4   that help refresh your recollection?
5   A.  Possibly.
6   Q.  Okay.
7       Thank you.  Okay.  Do you know
8   Dylan Brooks?
9   A.  Yes.
10  Q.  Okay.  Is he in that picture, as far as
11  you can tell?
12  A.  It's hard to see his face.
13  Q.  Okay.  Is it your testimony that you
14  weren't there when this picture was taken?  Is that
15  your testimony?
16  A.  My testimony is that I was -- I was not in
17  the picture.  I was -- I came in the aisle later to
18  help clean up the spill, but to my testimony, I was
19  not in the picture.
20  Q.  Okay.  So none of the -- there's three
21  individuals that are in the picture; is that
22  correct?
23  A.  Correct.
24  Q.  Okay.  And none of them are you.

Page 113

1   A.  No.
2   Q.  Okay.  And is it your testimony that you
3   didn't take the picture?
4   A.  Correct.
5   Q.  Okay.  And are you aware that you were
6   identified as the person who took the picture?
7   A.  No, I'm not.
8   Q.  Pardon?
9   A.  No, I'm not.  That was never told to me.
10  Q.  Okay.  So you're not aware of that.
11  A.  No.
12  Q.  Okay.  And did you have a cell phone in
13  the factory?
14  A.  No, I didn't.
15  Q.  Okay.  Do you know what happened to
16  Dylan Brooks in terms of his employment with Kenco?
17  A.  No, I don't.
18  Q.  You don't know?
19  A.  No, I don't.
20  Q.  And is Dylan Brooks -- what is his race?
21  A.  He's black.
22  Q.  Okay.  And what about
23  Francisco Villarreal?  Do you know what happened
24  with his employment after this incident?

29 (Pages 110 - 113)

Page 114

1    A.   No, I don't.
2    Q.   And do you know what his race is?
3    A.   He's Mexican.
4    Q.   Are you aware of the policy that says that
5  there's no cameras or phones allowed in the Manteno
6  plant?
7    A.   I'm aware of the cell phone policy that
8  I've seen, but I've never heard of that one.
9    Q.   Well, what cell phone policy have you
10 seen?
11   A.   I've seen that there's a policy for cell
12 phones in the building as long as you have a
13 handheld device that's like a Bluetooth or hands
14 free.
15   Q.   I'm sorry.  So is it your testimony that
16 you're allowed to use cell phones in the plant?
17   A.   My testimony is that the policy that I saw
18 says that you can have a cell phone while not
19 operating a forklift if you have a handheld device.
20 That's to my knowledge of the policy that I saw.
21     MS. MORAN:  Thank you.
22          (Whereupon, Henry Deposition
23          Exhibit 7 was marked for
24          identification as of 10/20/2016.)

Page 115

1  BY MS. MORAN:
2    Q.   Okay.  Mr. Henry, you're looking at what's
3  been marked Deposition Exhibit No. 7, and for the
4  record, it's a Kenco policy entitled cellular
5  phone, slash, electronic device use policy, and
6  it's Kenco 112 to 113.  Have you ever seen this
7  policy before?
8    A.   Yes.
9    Q.   And when did you see it?
10   A.   During my EEOC process.
11   Q.   Okay.  So is what you're saying you were
12 not aware of this policy when you were employed by
13 Kenco?
14   A.   No, I wasn't.
15   Q.   And so you had referred to that you were
16 aware that you need to use a hands-free method if
17 you have your phone if you are operating a vehicle
18 on company time, correct?
19   A.   Well, 3.1.1 says, Kenco prohibits use of
20 cellular phones without the use of a hands-free
21 method for any purpose while operating a vehicle on
22 company time.
23   Q.   Right.  And that's what you referred to
24 earlier, correct?

Page 116

1    A.   Correct.
2    Q.   Okay.  And so then directing your
3  attention to Page 2, you see 3.3.4?
4    A.   Yes.
5    Q.   Okay.  And that says, in facility areas
6  where trade secrets and proprietary information are
7  accessible, the use of cellular devices and/or PDAs
8  is prohibited without prior authorization from the
9  site manager.
10   A.   Yes.  I see that.
11   Q.   And were you aware of that policy when you
12 were working for Kenco?
13   A.   No, I wasn't.
14   Q.   Okay.  And so the area where this picture
15 was taken, is there -- to your understanding, is
16 there proprietary information in there?
17   A.   I don't see anything that says Kenco
18 anywhere in the picture, so I don't know.
19   Q.   Okay.  Well, is there proprietary
20 information of Mars?
21   A.   It just says M&M.  It doesn't say Mars.
22   Q.   Okay.  Well, do you know who makes M&Ms,
23 what company makes M&Ms?
24   A.   No.

Page 117

1    Q.   And so you don't have any idea what those
2  M&M boxes are doing, then, in the facility; is that
3  correct?
4    A.   Well, to my knowledge, it's a candy
5  distributor.
6    Q.   I'm sorry?
7    A.   I said to my knowledge, Mars is a candy
8  distribution center.
9    Q.   Okay.  Are you aware that Mars actually
10 makes candy?
11   A.   Yes, I am.  But there's no indication that
12 this is a Mars facility or a Kenco facility in the
13 picture.  This could be a warehouse anywhere.  I
14 mean, it could be anything.  It doesn't indicate
15 anywhere in the picture that it's Mars.  Maybe it's
16 a Mars product, but it doesn't indicate that that's
17 Mars or Kenco.
18   Q.   Okay.  So you don't see any problem, then,
19 with somebody taking this picture and posting it on
20 Facebook.
21   A.   I don't see the problem if somebody's
22 tagging me in the picture and posting it on my --
23 on my Facebook, because Kenco never showed me that
24 they had a cell -- I mean a social media policy

Page 118

1 that I would -- if I was to tag -- be tagged in the
2 picture and post it to Facebook, that it would
3 violate any social media policy.
4    Q. You said that you were tagged in the --
5    A. Correct.
6    Q. Okay. But you're not in that picture.
7    A. No, I'm not.
8    Q. So how were you tagged?
9    A. I was tagged by Dylan Brooks.
10    Q. And how do you know that?
11    A. Because he sent it to my Facebook page.
12    Q. Brooks sent it to your Facebook page?
13    A. Correct.
14    Q. And how would you know that?
15    A. Like I told you, if I was to take a
16 picture of you and I'm not friends with you on
17 Facebook, it would indicate who the picture came
18 from and if I want to accept it or not, so if I
19 took a picture of you, you would have an indication
20 on your end that Vern Henry took a picture of you,
21 do you want to accept it and put it on your
22 Facebook or not.
23    Q. Right. So I understand that if there's a
24 picture of me that it could be tagged --

Page 119

1    A. Correct.
2    Q. -- and I could be identified. But you
3 said you're not in that picture.
4    A. Correct.
5    Q. So how were you tagged, then?
6    A. I just told you I got the picture --
7 Dylan Brooks tagged me in the picture. He sent it
8 to my Facebook page.
9    Q. See, I guess I'm not understanding. My
10 understanding is -- what you described before is
11 that if there's a photo of somebody in the picture
12 you can tag them.
13    A. No. He can -- like I can tag your name.
14 You know, if I took a picture of you, you're not
15 going to be in the picture until I tag your name on
16 Facebook, right?
17    Q. Right. But you're not in the picture.
18    A. Exactly. That's what I'm -- I don't
19 understand what you --
20    Q. So here's what I'm not understanding.
21 Maybe I'm not being clear. What you've described
22 is that somebody -- doesn't have to be you -- can
23 tag you -- tag your picture in a photo that was
24 taken, and if they tag you, it appears on your

Page 120

1 Facebook page; is that correct?
2    A. But they have to include your name.
3    Q. I understand. Okay. And let's just
4 describe. Tagging means your name comes up.
5    A. Correct.
6    Q. Okay. And so when you tag somebody in
7 Facebook --
8    A. Uh-huh.
9    Q. -- that person is in the picture, right?
10    A. No.
11    Q. No? How do you tag somebody who's not in
12 the picture?
13    A. If I took a picture of you and we're not
14 friends on Facebook, I can tag your name on
15 Facebook. You have the authorization to accept the
16 picture or deny the picture.
17    Q. Understood. I'm --
18    A. Once you accept the picture, then it posts
19 on your Facebook page.
20    Q. Okay. I got it.
21    A. We don't have to be friends for me to send
22 a picture to you.
23    Q. Totally understand that, totally
24 understand that. But in the example that you're

Page 121

1 giving, you said if you take a picture of me --
2    A. Correct.
3    Q. -- and you tag my picture --
4    A. Correct.
5    Q. -- okay -- now, what -- so I'm asking, you
6 said you're not in that picture.
7    A. Correct.
8    Q. Okay. So how were you tagged?
9    A. I just told you Dylan Brooks tagged me in
10 the picture.
11    Q. In other words, he put your name with
12 somebody else's picture. Is that what you're
13 saying?
14    A. Whoever took the picture, I don't know,
15 but he tagged me in the picture.
16    Q. Where were you tagged? Show me which
17 person you were tagged as.
18    A. What do you mean?
19    Q. Okay. You keep giving me the same
20 example. You keep giving me the example that says
21 that if you take my picture --
22    A. Right.
23    Q. -- we don't have to be friends on
24 Facebook. If you tag my name on the picture --

31 (Pages 118 - 121)

Page 122

```
 1    A.  Right.
 2    Q.  -- it will come into my Facebook account,
 3  right?
 4    A.  Correct.  We're clear there.
 5    Q.  We're clear there.
 6    A.  Okay.
 7    Q.  So how is it, then, that you were tagged
 8  if there's no picture of you there?  How is it that
 9  you were tagged?
10    A.  It doesn't have to be a picture of me.  It
11  could -- whatever this picture is right here, I was
12  tagged into the picture.  Do you understand what
13  I'm saying?
14    Q.  I do not.
15    A.  Okay.  How do I explain this?  That's why
16  I gave you an example of me taking a picture of you
17  and us not being friends on Facebook.
18    Q.  I understand that, but that's not in
19  the --
20    A.  That's the same -- that's why I'm giving
21  you that same example.
22    Q.  It's not the same example because the
23  example that you keep giving me is where I am in
24  the picture --
```

Page 123

```
 1    A.  No.
 2    Q.  -- and -- that's what you keep saying.
 3    A.  Okay.
 4    Q.  I take a picture of you.
 5    A.  Okay.  Let me take -- okay.  I'll take a
 6  picture of the room.  You don't have to be in the
 7  picture.  I'll take a picture of the room --
 8    Q.  Right.
 9    A.  -- get your name, tag you in the picture.
10  That picture will post on your Facebook page.
11    Q.  That's not tagging.
12    A.  That's what --
13    Q.  How are you tagging if there's a picture
14  of a room and there's nobody in the room, there's
15  nobody to tag?
16    A.  I don't understand what you mean.  I could
17  take a picture of anything and tag you in the
18  picture.  I don't have to be your friend.
19    Q.  I understand you don't have to be my
20  friend.  I thought there has to be a person in the
21  picture who you're tagging.
22    A.  No.
23    Q.  No?  So what is being tagged?  I don't
24  understand.
```

Page 124

```
 1    A.  I don't understand.
 2    Q.  I understand that maybe it got sent to
 3  you.  I don't know.
 4    A.  That's what --
 5    Q.  That's what the claim is.
 6    A.  That's what the tag means.
 7    Q.  No.  That's not what -- the tag means that
 8  when you're in Facebook and there's a picture and
 9  there are individuals in the picture you can put
10  their names on the people who are in the picture.
11  You tag them.
12    A.  But you don't have to be -- that's not the
13  case.  If I have a picture on Facebook, you don't
14  have to be in the picture for me to tag you in the
15  picture.  It could be a picture of me on vacation,
16  and I can tag people in the picture, and it will
17  post on your Facebook page.
18    Q.  How will it post on my Facebook page if
19  we're not friends?  Why would you tagging other
20  people and not me --
21    A.  I was just giving you an example of what
22  it could be if we weren't friends.
23    Q.  I'm saying, you weren't friends with the
24  individuals in this picture; is that correct?
```

Page 125

```
 1    A.  No.
 2    Q.  Facebook friends?
 3    A.  No.
 4    Q.  And so -- and you're not in that picture.
 5    A.  No, I'm not.
 6    Q.  So how were you tagged?
 7    A.  The only thing I can do is tell you what
 8  I've told you.  I don't know any other way to make
 9  it clear for you than what I've told you.
10    Q.  Okay.  So this picture did arrive in your
11  Facebook; is that correct?
12    A.  Correct.
13    Q.  Okay.  And so what did you think when you
14  got it?
15    A.  I didn't think anything of it.
16    Q.  Isn't it a little bit odd that you just
17  get this Facebook picture?
18    A.  Well, I was in the aisle -- I came down
19  the aisle later on, like I was explaining to you,
20  so I had already saw the spill, so when it posted
21  to my Facebook page, I didn't think anything of it.
22  I had already seen the spill in the warehouse.
23    Q.  Okay.  And what did you do when you saw
24  the spill?
```

32 (Pages 122 - 125)

Page 126

1   A.  Helped them clean it up.
2   Q.  Okay.  So you helped clean that up?
3   A.  Correct.
4   Q.  Okay.  And that was after the picture was
5  taken?
6   A.  Yes.
7   Q.  Okay.  Who did you help clean it up?
8   A.  Helped Francisco.
9   Q.  Okay.  So you and Francisco cleaned up
10  that mess that's reflected on the picture.
11   A.  That was before -- yeah.  That was before
12  I had to do some more work for Saul.
13   Q.  Okay.
14   A.  But before that I was there helping.
15   Q.  Okay.  And so are you aware that Francisco
16  said that you took that picture?
17   A.  No, I'm not.
18   Q.  Are you aware that -- and you deny taking
19  that picture.
20   A.  Correct.
21   Q.  Okay.  And so is what you're saying that
22  it's not necessarily proprietary because nobody
23  would know where that warehouse was?  If it appears
24  on Facebook, they won't know that it's a Mars

Page 127

1  facility.
2   A.  That's not what I said.  I said there's no
3  indication that it says Kenco or Mars in the
4  picture.
5   Q.  Other than all the boxes of M&Ms strewn
6  about.
7   A.  Other than the boxes of M&Ms.  It could be
8  at Kmart.  It could be at Sears.  It could be at
9  Walmart.  There's no indication that this is a
10  Kenco or Mars facility.
11   Q.  Do you not see any problem with somebody
12  taking this picture, then, and posting it?
13   A.  Not as an employee.  I'm not a supervisor,
14  so --
15   Q.  I'm just asking.  Do you see any problem?
16  Just given what you know about the company's
17  policies, do you see any problem with somebody
18  taking that picture?
19   A.  At that time, no, I don't -- I didn't see
20  a problem with it.
21   Q.  Okay.
22   A.  At this time right now even seeing the
23  policies, I don't -- I've seen pictures on Google,
24  on the Internet of warehouse spills, so I don't see

Page 128

1  a problem with it, no.
2   Q.  And do you see that -- would you agree
3  that whoever did take that picture was violating
4  Kenco's policy that says that the use of cameras in
5  areas -- I'm sorry -- in a facility where trade
6  secrets and proprietary information are accessible,
7  cellular devices are prohibited?
8   A.  What is a PDA?
9   Q.  Okay.  Well, just how about cellular
10  devices?
11   A.  The use of cellular devices is prohibited.
12   Q.  Correct.
13   A.  That's what it says.
14   Q.  Right.  In facility areas where trade
15  secrets and proprietary information are accessible.
16   A.  That would be a violation of the policy.
17   Q.  Whoever took that picture.
18   A.  Correct.
19   MS. MORAN:  All right.
20       (Whereupon, Henry Deposition
21       Exhibit 8 was marked for
22       identification as of 10/20/2016.)
23  BY MS. MORAN:
24   Q.  Okay.  Mr. Henry, you're now looking at a

Page 129

1  group exhibit that's been marked Deposition Exhibit
2  No. 8.  Have you seen any of this before?
3   A.  No, I haven't.
4   Q.  Okay.  Take a look at it.  It's Kenco --
5  it's marked Pages 166 through 172.  Okay.  And so
6  were you aware at all when you were working at
7  Kenco that there were signs posted where there were
8  no cameras or phones with cameras allowed in
9  certain areas of the plant?
10   A.  I never saw these signs, never paid
11  attention to them really.
12   Q.  Okay.  So you can't say.  Then, since you
13  didn't pay attention, you don't know whether they
14  were there or not.
15   A.  I don't know.
16   Q.  You don't have any recollection of
17  seeing --
18   A.  No, I don't.
19   Q.  And so the -- turning to the second page,
20  167, that says front door, you never noticed that
21  sign when you entered the front door?
22   A.  No.
23   Q.  Okay.  And same thing with respect to the
24  next page, 168?

33 (Pages 126 - 129)

Page 130

1    A.  No.
2    Q.  And then there's a sign -- you never
3  noticed in the shipping office that there's a sign
4  that is reflected in Page 169 that says no cameras,
5  no phones with cameras allowed?  You never noticed
6  that?
7    A.  Never noticed it.
8    Q.  Okay.  And then inside the warehouse
9  there's a picture.  It says, no cell phones allowed
10  in the warehouse.  You never noticed that.
11    A.  Never noticed any of these that you're
12  showing me, never.
13    Q.  Okay.  And then the same thing with
14  Pages 171 and 172.
15    A.  Never seen it.
16    Q.  And so when you say you've never seen it,
17  are you saying that they weren't there or you just
18  didn't pay attention so you don't really know?
19    A.  I don't know if they were there or not
20  because I've never seen it.  I've never paid
21  attention to these signs, so I don't know if they
22  were there or if they were.  I don't know.
23    Q.  Okay.  And is it fair to say that one of
24  your responsibilities as a warehouse associate is

Page 131

1  to follow all of Kenco's standard operating
2  procedures?
3    A.  Procedures that I've signed my name to.
4    Q.  So if there were procedures that
5  you didn't sign your name to, is it your testimony
6  that you don't need to follow those procedures?
7    A.  Procedures that I wouldn't know anything
8  about.  I would have knowledge of things that I
9  signed my name to, so things that I didn't sign my
10  name to I wouldn't have knowledge of, so I wouldn't
11  know.
12    Q.  And so is it your testimony that if you
13  didn't sign your name to a policy then you didn't
14  have knowledge of a policy?
15    A.  Correct.
16    Q.  Is that what you're saying?
17    A.  Correct.  And that's -- they were informed
18  to me, and if they were informed to me, majority of
19  the things that were informed to me have a
20  signature and a date by me.  If they don't have a
21  signature and a date, then I wouldn't be aware of
22  what these policies are.
23    Q.  Okay.  And so what policies did you sign
24  that you were aware of?

Page 132

1    A.  I don't know.  I don't recall.  I would
2  have to see the -- if you have my employee -- the
3  employee book on me, I guess it would be in there.
4    Q.  Okay.
5    A.  Those are the policies that I signed.
6    Q.  So I just want to get an understanding, a
7  better understanding of what your understanding is.
8  So if you go work for an employer and the employer
9  has policies as to how to run the business, if
10  you're working there and you didn't sign off on the
11  policy, then you don't think you need to follow it;
12  is that right?
13    A.  No.  That's not what I'm saying.
14    Q.  Okay.
15    A.  What I'm saying is that if I have not seen
16  the policy, if I have not signed the policy, I
17  would have no indication of what the policy is or
18  states or what it does.
19    Q.  Okay.  And is it fair to say that a
20  manager could actually inform you of a policy?
21    A.  That's very true, but if they don't, then
22  you have no recollection of what the policy is.
23    Q.  Okay.  So you're not saying, then --
24  because this is what I thought you were saying.

Page 133

1  You're not saying that if you haven't signed the
2  policy you don't need to abide it.  You're saying
3  you need to know about the policy.
4    A.  No.  What I'm saying is that if I have not
5  signed and dated a policy, then I have no knowledge
6  of what a policy is, says or states.  That is what
7  I am saying.
8    Q.  Okay.  So what you're saying is, then, if
9  a manager tells you this is what the policy is but
10  you haven't signed it, you don't need to follow it.
11    A.  No.  What I'm saying is if I have no
12  signature, date, I have no knowledge of that
13  policy.  That's what I'm saying.
14    Q.  That's what I'm saying.
15    A.  No.  You're saying if I don't have to
16  follow that.  That's not what I'm saying.  I'm
17  saying I have no knowledge of a policy to follow
18  it.  If I have no knowledge of where the bathroom
19  is, I don't know where it is to go, right, until
20  somebody tells me the bathroom is around the
21  corner.  Then I have knowledge of where it is.
22    Q.  But you didn't sign a document that said,
23  here's where the bathroom is, but you still had
24  knowledge, right?

34 (Pages 130 - 133)

Page 134

1    A.   Right.  That has to be informed, though.
2 Someone has to inform me, and then -- but the
3 protocol for a workplace, to my knowledge, is that
4 to be effective to the employee it should be a
5 signature and a date for the employee to know
6 specifically what indicates in the policy.
7    Q.   Okay.  Is fighting on company premises
8 okay?
9    A.   I wouldn't do it.
10    Q.   Okay.  Do you think it's -- do you think
11 there's a policy -- do you think Kenco had a policy
12 that said there's no fighting on premises?
13    A.   I think Kenco had a policy of the
14 harassment that I got from Pete.  I have never seen
15 it.
16    Q.   Okay.  So this is the question that I
17 have, though.  If there's policy that says -- are
18 you aware of a policy that Kenco has that says
19 there's no fighting on company premises?
20    A.   I've never seen it.
21    Q.   Okay.  So you think it's okay, then, to
22 have a fight on company premises because you never
23 signed it or saw it; is that right?
24    A.   Well, that boils down to me knowing right

Page 135

1 from wrong.  Everybody doesn't know right from
2 wrong, so some people can answer that question
3 differently, so I can't sit here and say that it's
4 okay or it's not okay.  Everybody has a different
5 opinion on that.
6    Q.   Okay.  You mentioned Dylan Brooks.  Can
7 you identify him in the picture?
8    A.   Barely.  I can't see his face.
9    Q.   Do you know -- and I'm sorry if I'm
10 repeating myself here, but do you know whether
11 Brooks was fired for violating the cell phone
12 policy?
13    A.   I have no recollection of anybody that got
14 fired or disciplined because I wasn't at the
15 warehouse at that time.
16    Q.   Okay.  So as far as your personal
17 knowledge, is it your belief that you were the only
18 one that was fired as a result of this incident?
19    A.   To my knowledge.  To my knowledge, it
20 doesn't have Dylan's or anybody else's name in the
21 reason or the indication of me being fired, so how
22 would I know if anybody --
23    Q.   Well, you might not know, right.  So you
24 just don't know.

Page 136

1    A.   Right.
2    Q.   Okay.  Are you aware of any other Kenco
3 employees who used their cell phones while in the
4 warehouse?
5    A.   No, not to name.
6    Q.   Okay.  Do you have an e-mail address?
7    A.   Yes, I do.
8    Q.   Okay.  What is it?
9    A.   Vernhenry.
10    Q.   Vern, V-e-r-n, Henry.
11    A.   H-e-n-r-y, 31@gmail.com.
12    Q.   Is that the only e-mail address that you
13 have?
14    A.   I have another one,
15 ultimatelawncare1981@yahoo.com.
16    Q.   Ultimatelawncare -- I'm sorry.  Give it to
17 me again.
18    A.   -- 1981@yahoo.com.
19    Q.   Okay.  Any other e-mail addresses?
20    A.   No.
21    Q.   And you have -- you allege that there is
22 a -- that there's a conspiracy against you by
23 Kenco; is that right?
24    A.   Conspiracy, I felt like the management

Page 137

1 conspired against me.
2    Q.   And who is that when you say management?
3    A.   Mario Lopez.  And I stated that because of
4 my unemployment hearing.
5    Q.   I'm not clear.  What do you mean by that?
6    A.   I had an unemployment hearing, and
7 Mario Lopez was the representative for Kenco.
8    Q.   Okay.  And what happened there?
9    A.   He said there was never an investigation
10 done by Kenco which led to my termination, and he
11 was asked how did he know that I was in the picture
12 or taking the picture, and he stated to them that
13 he didn't know.
14    Q.   Okay.  And so what does that have to do
15 with the -- I'm not clear on the conspiracy.
16    A.   That they conspired to fire me.  Without
17 an investigation how do you know that -- how do you
18 come to a conclusion that I violated the Kenco
19 phone policy if I was never interviewed or if there
20 was never anyone asking me what happened or
21 anything of that nature?
22    Q.   Okay.
23    A.   That's a conspire to -- conspired against
24 me to terminate me.

35 (Pages 134 - 137)

Page 138

1   Q.   And who was in the -- who was involved in
2   that conspiracy?
3   A.   Mario and Kelvin Walsh.
4   Q.   And Mario, you're basing it on what he
5   testified at an unemployment comp hearing?
6   A.   Of him having no knowledge.
7   Q.   Of an investigation?
8   A.   Of an investigation.
9   Q.   And Kelvin Walsh?
10  A.   And Kelvin Walsh was his superior.
11  Q.   So how do you know that he was involved in
12  a conspiracy to fire you?
13  A.   Well, I mean, in order to fire, you have
14  to go through the general manager, right, or
15  does -- I don't know how the protocol of chain of
16  commands works, but I felt that as a manager you
17  can't fire me without the authorization of the
18  general manager.
19  Q.   Okay.  And -- okay.  And so --
20  A.   And --
21  Q.   Kelvin Walsh, you say Kelvin Walsh was not
22  working at Kenco in October 2014 when you were
23  fired.
24  A.   Okay.  I wasn't aware of that.

Page 139

1   Q.   Okay.  So if that's true that he was not
2   working for Kenco at the time that you were
3   terminated, how would he be involved in the
4   conspiracy?
5   A.   Then it would be the next chain of
6   command.  If Kelvin Walsh -- to my knowledge, I
7   thought he was still employed.  If he wasn't, then
8   it would be the next chain of command, whoever
9   replaced him and whoever was the general manager at
10  that time, same situation, different players.
11  Q.   Okay.  And so who was the general manager
12  of the plant when you became employed?
13  A.   Kelvin Walsh.
14  Q.   And then what was your understanding of
15  what Mario Lopez's --
16  A.   Mario Lopez took Mike Manzello's position,
17  to my knowledge.
18  Q.   Okay.  Are you aware of any difference
19  between a general manager and an operations
20  manager?
21  A.   I believe the operations manager is
22  above -- or I mean the general manager is above the
23  operations manager.
24  Q.   Okay.  And so what is your understanding

Page 140

1   of what Mike Manzello's position was?
2   A.   Floor manager.  And Kelvin Walsh was above
3   him, to my knowledge.
4   Q.   Okay.  And so what's your understanding as
5   to what Kelvin's position was?
6   A.   I thought he was the general manager.
7   Q.   Okay.  And Mario Lopez?
8   A.   I thought he took Mike Manzello's
9   position.
10  Q.   Okay.  But directing your attention to
11  Deposition Exhibit No. 5, which is your termination
12  letter, that's signed by Mario Lopez; is that
13  correct?
14  A.   Correct.
15  Q.   Okay.  And then he has the title there,
16  general manager?
17  A.   Yeah.  That's -- now that I see that, it's
18  because I told you to my knowledge.  I didn't know
19  that.
20  Q.   Right.  So I'm helping refresh your
21  recollection.
22  A.   Yeah.  I see that now.
23  Q.   You see that Mario Lopez was general
24  manager?

Page 141

1   A.   So who was the manager beneath or above
2   him at that time?  Because when I was there
3   Kelvin Walsh was the general manager or the
4   operations manager, and Mike Manzello was general
5   manager or operations manager.  I don't know which
6   position they held, so that's why I said same
7   situation, different players.  There's different
8   people in different positions, but --
9   Q.   And so what --
10  A.   -- same situation.
11  Q.   What was the conspiracy, then, that you're
12  complaining about?  Was that to terminate your
13  employment?
14  A.   To terminate me without an investigation.
15  Q.   Okay.  Anything else?
16  A.   Not at this time, not that I know of.
17  Q.   And why are you suing Kelvin Walsh?
18  A.   Because he has information that led to the
19  harassment that was taking place at the warehouse
20  between me and Peter as well as everybody else that
21  I had put in there, Mike Manzello.  They all have
22  knowledge of what took place.
23  Q.   Okay.  So am I understanding you correctly
24  that the reason why you've sued Kelvin Walsh is

36 (Pages 138 - 141)

Page 142

1 because he has knowledge of the harassment that you
2 complained about with Pete?
3    A.   Correct.
4    Q.   Anything else?
5    A.   They have knowledge of my whole -- of the
6 whole time I was there. They have knowledge of my
7 performance as an employee. They have knowledge of
8 my attendance as an employee. These are things
9 that they have knowledge that no one else would
10 know.
11   Q.   Is that the same thing for Mike Manzello?
12   A.   Correct. He's the one that in the
13 beginning that was only the person -- he's the only
14 one that has knowledge of what took place in that
15 room if there was no one else in that room besides
16 me and him and then me and him and Pete, so yes.
17   Q.   That's why you're suing Mike Manzello?
18   A.   For the knowledge of the case.
19   Q.   And what about David Jabaley?
20   A.   I guess he would take Kelvin Walsh's place
21 or -- yeah. I think he was --
22   Q.   Is it possible that he took over
23 Mike Manzello's position as operations manager?
24   A.   Yeah. That's what I was saying. I don't

Page 143

1 know which -- who had the -- if it was Mario or
2 David. I don't know their positions that they
3 held, general manager, operations manager, but --
4    Q.   Okay.
5    A.   -- they replaced those with --
6    Q.   And why are you suing them, David and
7 Mario?
8    A.   Because Mario and David conspired to fire
9 me without an investigation.
10   Q.   Okay. And you said Mario and David
11 conspired to fire you?
12   A.   Whoever was in position at that time that
13 I was fired. It wouldn't have been Kelvin and Mike
14 because you said they were terminated at that time,
15 but they were part of the reason in the beginning
16 of my lawsuit, so I added them into the lawsuit.
17   Q.   Okay. So it's based on their
18 involvement --
19   A.   Correct.
20   Q.   -- and knowledge of your work. That's why
21 you're suing them?
22   A.   Correct. That, and I feel like they
23 conspired and retaliated against me and allowed the
24 harassment to go on and didn't follow company

Page 144

1 policy and protocol. Those are a lot of reasons
2 too, so yes.
3    Q.   Okay. And so the harassment that you
4 speak of consists of what? The issues with Pete?
5    A.   Correct.
6    Q.   Okay.
7    A.   We talked about that earlier.
8    Q.   We did. And I'm not going to go back over
9 what we already talked about, but I just want to
10 make sure I understand. So the harassment is the
11 incidents that you had with Pete, and the
12 retaliation is because you think that nobody did
13 anything to Pete. Is that part of it?
14   A.   Well, nobody did anything for me in that
15 situation. There was no protocol of following
16 policy for the employee that's being harassed in
17 that situation. There's certain things that are to
18 take place to make me feel comfortable of coming to
19 work, to make me feel safe coming to work, to make
20 me be able to interact with other employees at
21 work.
22   Q.   You didn't feel safe coming to work?
23   A.   No.
24   Q.   Okay. And why didn't you feel safe?

Page 145

1    A.   Because I was harassed and threatened by
2 Pete.
3    Q.   Okay. Anything else?
4    A.   That's the only problem that I had at that
5 job, was the harassment with Pete. There's no
6 other things that I had problems with at the job
7 besides not being promoted, but as far as
8 harassment, we're talking about Pete.
9    MS. MORAN:   Okay.
10          (Whereupon, Henry Deposition
11          Exhibit 9 was marked for
12          identification as of 10/20/2016.)
13 BY MS. MORAN:
14   Q.   Okay. Mr. Henry, now you've got
15 Deposition Exhibit No. 9 in front of you, and
16 that's a copy of your amended complaint; is that
17 correct?
18   A.   Correct.
19   Q.   Okay. Who drafted this?
20   A.   I on behalf of Internet research along
21 with the help of my sister.
22   Q.   Okay. And who actually typed it?
23   A.   My sister.
24   Q.   Okay. And what's your sister's name?

37 (Pages 142 - 145)

Page 146

1    A.  Kimberly Wesley.
2    Q.  Okay.  So there's 224 paragraphs to your
3  complaint, and so it's your testimony that you
4  prepared this by yourself --
5    A.  No.
6    Q.  -- relying on the Internet?
7    A.  No.
8    Q.  Okay.
9    A.  With the information I received from other
10  parties that have cases against Kenco.  They helped
11  me out.  My sister helped me out.
12    Q.  And so who else helped you out with your
13  amended complaint?
14    A.  Not helped, but gave me information.
15    Q.  Okay.  Who gave you information for your
16  complaint?
17    A.  The three names that I gave you earlier.
18    Q.  Okay.  Could you repeat them please?
19    A.  Edith McCurry, Lynn and Mary.
20    Q.  Okay.  And what information did
21  Edith McCurry give you with respect to your amended
22  complaint?
23    A.  Basically how to put it together, what to
24  use, what not to use, what information that she had

Page 147

1  available.  Everybody had different information
2  available to give me that I used in the complaint,
3  and so I can't pinpoint in Line 6 or Line 7 this is
4  what they gave me, but as a whole they gave me
5  information to file my complaint.
6    Q.  Okay.  And so what information without,
7  then -- you said you got information from Edith,
8  Lynn and Mary Madison.  Without specifying which
9  person gave you what information, what information
10  did you get from them that --
11    A.  They gave me information that I wouldn't
12  know as a regular employee and because they were in
13  different positions than I was, and they knew
14  different information that I would not know.
15    Q.  Okay.  Like, for example, what?
16    A.  Cell phone policy, besides what I saw on
17  the Internet or company protocol or harassment
18  policy, certain things as we've been going in the
19  process of EEOC.  I don't -- I don't know specific
20  to tell you directly.  There's been a lot of
21  information.  There has been a lot of documents.  I
22  don't know to the point I'll tell you this is
23  exactly what they gave me.  This is -- I don't know
24  to tell you that.  I could just tell you as a

Page 148

1  general thesis that I was helped collectively.
2    Q.  Okay.  And when you said, "on the
3  Internet," what did you -- what did you look for on
4  the Internet that helped you with your amended
5  complaint?
6    A.  Well, as I stated before, I Googled who
7  had cases against Kenco, and once I saw who had
8  cases against Kenco, I reached out and asked them
9  could they help with my case.  Seeing that I don't
10  have -- not represented by anyone and I'm a pro se,
11  I don't know terminology, certain terminology and
12  certain things when I go to court, so I seeked
13  help.  That was the intelligent thing to do.  If
14  you don't know how to do something, then you seek
15  help.
16    Q.  Okay.  Well, let me direct your attention
17  to Page 3 of Deposition Exhibit No. 9.  Okay.  And
18  so there's boxes that are checked, and it's
19  Paragraph No. 11.  It says, the defendant
20  intentionally discriminated against plaintiff, and
21  then it says check only those that apply.
22    A.  Uh-huh.
23    Q.  And the first thing that you checked is by
24  failing to hire the plaintiff.

Page 149

1    A.  I meant as far as promoting.
2    Q.  Okay.  But there's another -- No. 3 says,
3  by failing to promote the plaintiff.  That's No. 3.
4    A.  Yeah.  I didn't see that, but this -- I
5  think I amended this complaint several times since
6  this one.
7    Q.  Well, this is -- this is the last
8  complaint that we have.  I know you have amended
9  it, but this was filed on May 11, and this is the
10  last complaint that we have that was filed.
11    A.  Okay.
12    Q.  So just to correct this, so you're not --
13  is it fair to say, then, that you're not claiming
14  that you were discriminated against because you
15  were not hired?
16    A.  Yeah.  I was talking about promotion.
17    Q.  Okay.  So that was just a mistake to --
18    A.  Correct.
19    Q.  Okay.  Okay.  And we've talked about the
20  termination.  We've talked about the fail to
21  promote, and we've talked about the failing to stop
22  harassment, and I think you testified that it was
23  Pete that was doing the harassment.
24    A.  Yeah.  That's what's on file.

38 (Pages 146 - 149)

Page 150

1    Q.  Okay.  And then you have here H.
2  Subsection H says that you were coerced,
3  intimidated, threatened or interfered with your
4  enjoyment of rights.  What do you mean by that?
5    A.  The reasons that I've given you already as
6  far as intimidation when I was in the interview
7  with Mario -- I mean, not Mario, but Mike about the
8  situation that happened between me and Pete, the
9  threatening from Pete of -- that he intentionally
10  tried to hit me with a forklift.  I don't know what
11  else.
12    Q.  Okay.  Is there any other -- is there any
13  manager of Kenco who you felt coerced by?
14    A.  Mike Manzello.  I told you I felt that way
15  in the beginning of this deposition.
16    Q.  Okay.  And how did you feel coerced by
17  him?
18    A.  He was the only one in the room, so
19  whatever I say is my word against his.  There's
20  no -- anybody else to take notes of the
21  conversation we had, so if you're a general manager
22  or operations manager, I would think that both of
23  you should be in the room to listen to what both of
24  us have to say.

Page 151

1    Q.  This is with respect to the incident with
2  Pete?
3    A.  Correct.
4    Q.  Okay.  And so the reason why you felt like
5  you were coerced was because --
6    A.  Because instead of going to corporate,
7  we -- I was told can we squash this as men.
8    Q.  Okay.  Anything else?
9    A.  No.
10    Q.  Okay.  And is that the same thing with
11  respect to the intimidation?
12    A.  Yeah.  Intimidating because you already
13  told me that you got the drinking buddy, so when I
14  get up here and you're asking me can we squash this
15  instead of saying, well, we can take care of this
16  or to solve this problem, then that's intimidating
17  to me.
18    Q.  Okay.  I thought you testified earlier
19  that he says -- that he said to you two, can't we
20  resolve this like men?
21    A.  That's what I just said.
22    Q.  Oh, okay.  You said something about
23  squashing, and so I was a little confused.
24    A.  Well, the same -- different words.  I'm

Page 152

1  sorry to use that, but --
2    Q.  They are very different, and so I think
3  it's important to distinguish them.
4    A.  Well, in my terminology that I talk,
5  squashing means to stop, to put an end to, so as me
6  saying squash a beef or squash this, that means to
7  end it, to stop it.
8    Q.  Uh-huh.  And it also means to resolve it?
9  Is that what that means, if you end a dispute and
10  you resolve it?
11    A.  No.  The resolve means to have clarity,
12  or, you know, like resolve means to me that
13  there's -- that I feel a different way leaving the
14  room than I did coming in.  That's resolve.
15    Q.  And you didn't feel like it was resolved?
16    A.  No.  I felt that it wasn't resolved
17  because there was nothing done about it.  It was
18  just a conversation in a meeting and brushed under
19  the rug.
20    Q.  Okay.  Threatening, it says here.  Anybody
21  threaten you other than what you've testified
22  already about Pete?
23    A.  No.
24    Q.  Okay.  Nobody else besides Pete; is that

Page 153

1  right?
2    A.  No.  That's correct.
3    Q.  Okay.  And so you said squash is your
4  word; is that fair?
5    A.  Yeah.  That's just the terminology I use
6  at that time.
7    Q.  Okay.  And is that something that Manzello
8  used?  Did he use that word squash, or is that your
9  characterization?
10    A.  That's just -- no.  Word for word what he
11  used was, just can we -- what can we do as men to
12  get this problem dealt with or over with?
13    Q.  Okay.  What -- you said that after that
14  incident one of the things that they -- what they
15  decided to do was not have you work on the same
16  shift, is that right, you and Pete?
17    A.  Yes.  After that incident they went to
18  different shifts.
19    Q.  Okay.
20    A.  And they kept Pete on first shift, and
21  they put me on third shift.
22    Q.  I thought you were already on the third
23  shift.
24    A.  Not when I first started.  When I first

39 (Pages 150 - 153)

Page 154

1  started we were on -- we were all on first -- they
2  only -- at that time they only had two shifts,
3  first and second.
4     Q.  So you're talking about when you were
5  hired as a temp?
6     A.  Right.  When I came in in December, there
7  was only two shifts throughout that period,
8  throughout that -- from December to October there
9  were eight or nine different shift changes
10 throughout that period of time, so I don't -- I
11 couldn't sit here and tell you if I was on 3.1,
12 3.2, 3.3 or if I was on second because I don't know
13 if it was a one or two.  It was so many different
14 shift changes and different ideas, and I couldn't
15 tell you.
16    Q.  Okay.  Well, you claim that Monstwillo was
17 assigned to a premium shift and was a more
18 favorable shift than you.
19    A.  First shift is premium.  You can get up
20 early and you get off and you get to sleep at night
21 regularly like everybody else, and, you know, third
22 shift, you have no life.  Like right now I haven't
23 been asleep at all.
24    Q.  So did you apply for a position on the

Page 155

1  first shift?
2     A.  No.  The shifts were given by Mike.  They
3  wasn't nothing that you could apply for.  It was --
4     Q.  Did you ask Mike if you could be
5  transferred to the first shift?
6     A.  Well, when I went in there, he gave me
7  what he had available.  He said, this is what we
8  have for you, you can pick between the two.
9     Q.  And what were you picking between?
10    A.  It wasn't a premium shift.  It wasn't a
11 first shift.  It was only a second and a third
12 shift.
13    Q.  Okay.  And what did you pick?
14    A.  I picked third.
15    Q.  Okay.  And did you ask him why would
16 Monstwillo get the first shift?
17    A.  I didn't know Monstwillo had the first
18 shift at that time.
19    Q.  Okay.  How did you learn that?
20    A.  From coming to work and seeing that he was
21 still on the first shift.
22    Q.  Okay.  And so after you learned that he
23 was on the first shift, did you ask Manzello why is
24 he getting the better shift if he's the one that

Page 156

1  harassed me and I'm getting the worst shift?
2     A.  No.  I took that upon -- that was his
3  decision that he made to make sure that there was
4  nothing more to happen between me and him.  I
5  wasn't thinking about the shift at that time.  I
6  was more thinking about the resolvement of us
7  having incidents with each other, and that's what
8  he said that he was going to do.
9     Q.  Okay.  And did you think at the time that
10 the two of you being on different shifts would help
11 resolve the issue?
12    A.  Pete is the only person I ever had a
13 problem with at that warehouse, so why wouldn't it
14 be?
15    Q.  So at the time you thought it was a -- it
16 may be a good resolution to the problem between you
17 and Pete.
18    A.  Yeah.  At that time that was a good
19 resolution until they came with a different shift
20 to put us back on the same shift together.
21    Q.  Okay.  Where did you get the information?
22 In Paragraph 114 of your complaint you state, on or
23 about March 26, 2014, Michael L-a-n-o-u-e,
24 nonblack, completed a job application for the

Page 157

1  co-pack coordinator's position.
2        How did you know that?
3     A.  Like I told you before, Lynn, Mary and
4  Edith gave me information that I wouldn't know
5  because they were in different positions than I
6  was.
7     Q.  Okay.  So this is information that you
8  learned after your termination.
9     A.  Correct.  This is -- these are all -- this
10 was filed after I was terminated.
11    Q.  Right.  I understand, but I don't know
12 when you had knowledge, right?
13    A.  Yeah.  But I'm just saying this is all
14 information that was --
15    Q.  Okay.
16    A.  -- that was held after I was terminated.
17 I didn't --
18    Q.  Okay.  And you got that information from
19 Edith McCurry?
20    A.  I don't know who specifically.  I just
21 know collectively everybody gave me information.
22    Q.  Okay.  And Jeffery Keller, how did you
23 learn that he completed a job application for the
24 co-pack coordinator's position?

Page 158

1   A.   The same way.
2   Q.   And so nobody asked you about the incident
3   that resulted in your termination?
4   A.   No.
5   Q.   You didn't have any conversation with --
6   A.   No.
7   Q.   -- any manager about it?
8   A.   No.  I know I was -- well, I didn't know I
9   was being terminated.  I was sending in doctors'
10  notes.
11  Q.   And what were the doctors' notes for?
12  A.   For time off of work.
13  Q.   What did you need time off from work for?
14  A.   Well, one, I was having anxiety attacks
15  when Pete threatened me that he was going to come
16  back up to the job, and seeing that they already
17  had shootings and various things happen at the
18  warehouse, I was intimidated and scared.  We don't
19  have any -- or at that time they didn't have any
20  security in the parking lot, so, of course, I was
21  frightened or threatened for my life because he had
22  already tried to hit me with a forklift and
23  admitted that he did it on purpose, so quite
24  naturally I was scared, so I went to the doctor.

Page 159

1   Q.   Okay.  And when did you first go to the
2   doctor?
3   A.   I don't know the date.
4   Q.   Okay.  Approximately?
5   A.   I don't know the approximate date.
6   Q.   You were working at the time?
7   A.   This was when I was on leave, when I had
8   my off day, probably that Sunday.  I checked into
9   South Suburban, and they treated me.
10  Q.   And how did they treat you?
11  A.   Just gave me some pills to take, to calm
12  my anxiety down, and I was still feeling that same
13  way the next day, and I went and found -- online I
14  found a psychiatrist.
15  Q.   Okay.
16  A.   And I went to him and --
17  Q.   What's his name?
18  A.   I can't think of it offhand.
19  Q.   Okay.  How many times did you see him?
20  A.   Three.
21  Q.   Okay.  And when was that?
22  A.   It was all in -- still in October,
23  November.
24  Q.   In October and November of 2014?

Page 160

1   A.   Well, no.  It was all in October of 2014.
2   And then after I got fired, I still went and saw
3   him in November.
4   Q.   Okay.
5   A.   And then I didn't have any more income.
6   He charged $50 a session, and I just continued to
7   do what he told me to do at home.
8   Q.   Which was what?
9   A.   Just certain exercises to do to clear --
10  get myself right.
11  Q.   Okay.  Did he prescribe any medication for
12  you?
13  A.   Yes.
14  Q.   Okay.  And are you still taking that
15  medication?
16  A.   No.
17  Q.   And do you know what the name of that
18  medication was?
19  A.   I forgot.
20  Q.   How often did you take it?
21  A.   Once a day.
22  Q.   For how long?
23  A.   For a period of a week.
24  Q.   Okay.  And then how come you stopped?

Page 161

1   A.   Couldn't afford it.
2   Q.   The pills?
3   A.   Yeah.
4   Q.   Okay.  And was the last time that you saw
5   the psychiatrist -- was that in November of 2014?
6   A.   Yeah.  On -- yeah, November.  I believe
7   so.  So Kenco, they fired me while I had doctor
8   leave.  I faxed over doctors' notes periodically
9   while I was on leave from my doctors, and on the
10  14th they had received doctors' notes that
11  indicated that I would have two days off work, or
12  the last doctors' note that I sent over stated that
13  I wasn't able to come to work until approval by the
14  doctor, and they looked past that, which is stated
15  in the letter that you're reading.
16  Q.   In the termination letter, Deposition
17  Exhibit No. 5, it says while we received a doctor's
18  excuse from you on October 16, 2014, the decision
19  to terminate your employment was made prior to that
20  date.  Besides, the doctor's excuse does not
21  address the facts or circumstances underlying the
22  reason for your termination.
23  A.   Yeah.  But that's -- still on the doctor's
24  note you can't fire someone with authorization of a

41 (Pages 158 - 161)

Page 162

1 doctor's note.
2    Q.  Okay.  And do you have any kind of
3 disability that has been diagnosed?
4    A.  I don't know if -- I don't know what the
5 diagnosis was that he gave me.  I would have to
6 call him and ask.  It's been a while since I've
7 been over there.
8    Q.  Who's --
9    A.  But I believe that I've given you the
10 doctors' records for you to know what I was treated
11 for and what I was going through at that time.
12    Q.  And who's Curtis Varrett?
13    A.  That's the guy that was -- that's the lead
14 that was in there with Ivan and them when Pete was
15 calling up to the office.
16    Q.  I'm sorry?
17    A.  That's the lead that I was telling you
18 about earlier.  I couldn't remember his name.
19    Q.  Yeah.
20    A.  That's the guy that -- one of the leads
21 that were in there in the office when Pete was
22 calling up saying that he was going to come back up
23 to the warehouse.
24    Q.  Okay.  So from your understanding what did

Page 163

1 Curtis Varrett -- what is he a witness to?
2    A.  He's the one that answered the phone call.
3    Q.  Answered the call --
4    A.  -- from Pete when I told you that he was
5 calling back up to the job harassing, saying that
6 he was going to come back up there and I shouldn't
7 be in the parking lot.
8    Q.  That Curtis Varrett is the one who --
9    A.  Made the phone -- he answered the phone
10 call.
11    Q.  Who answered the phone?
12    A.  Right.
13    Q.  Where was the phone?
14    A.  In the shipping office.
15    Q.  Okay.  And were you there?
16    A.  No.  I was working.
17    Q.  Okay.
18    A.  I told you they told me about the calls
19 when we took a smoke break.  Ivan informed me that
20 he was calling back up there.
21    Q.  Okay.  So am I understanding you correctly
22 that Curtis Varrett was in the shipping office when
23 he answered a call from Pete, who was threatening
24 you in the parking lot?

Page 164

1    A.  No.
2    Q.  Is that right?
3    A.  No.  He was threatening, saying that he
4 was going to come back up to the job.  This was at
5 the same time that he had got suspended that day
6 for trying to hit me with the forklift.
7    Q.  Okay.  And so what did Curtis tell you
8 that Pete told him?
9    A.  Curtis didn't tell me anything.
10 Ivan Flores told me that Pete was calling up to the
11 warehouse.
12    Q.  Okay.  Ivan Flores told you that Pete was
13 calling up to the warehouse --
14    A.  -- threatening, saying that he was going
15 to come back up there, as I stated before.
16    Q.  Threatening -- threatening Curtis --
17    A.  Threatening me.
18    Q.  So --
19    A.  Curtis is the one that answered the phone.
20    Q.  Let me just see if I understand.
21 Ivan Flores told you that Curtis Varrett said that
22 he had answered a call from Pete after the incident
23 with the forklift, and in that phone call Pete told
24 Curtis, according to Ivan, that he was going to

Page 165

1 harass you?
2    A.  That he was going to come back up there to
3 the job and that I shouldn't be in the parking lot.
4    Q.  Okay.  Any other reason, any other
5 information you have about Curtis Varrett, the
6 lead?
7    A.  He's just a lead.  That's all I can tell
8 you.
9    Q.  But, I mean, other than this --
10    A.  No.  That's it.
11    Q.  -- this information that you got from
12 Ivan Flores.
13    A.  That's the only part that Curtis plays in
14 that.
15    Q.  And Ivan Flores, what position did he
16 hold?
17    A.  He was a lead.
18    Q.  Okay.  And Ivan Flores's race?
19    A.  Mexican.
20    Q.  Okay.  And Curtis Varrett?
21    A.  Black.
22    Q.  Okay.  And you list as a person with
23 knowledge as Javier Baron.
24    A.  It's another incident that happened in the

42 (Pages 162 - 165)

Page 166

1 warehouse.
2    Q.   Which -- what are you talking about?
3 Sorry.
4    A.   Just the harassment from me and Pete.  He
5 knows the --
6    Q.   He's a witness to the --
7    A.   He's a witness to --
8    Q.   -- forklift incident or something else?
9    A.   Just in general, just the incidents with
10 me and Pete.
11   Q.   Well, you testified to two incidents.
12   A.   Correct.  That's why I said the incidents.
13   Q.   Okay.  So he's a witness to both
14 incidents.
15   A.   Right.
16   Q.   And when you say he's a witness, was he
17 there -- are you saying he overheard Pete say to
18 you the things that you said he said?
19   A.   He would just have knowledge of what was
20 going on between me and Pete that wasn't getting --
21 since that wasn't getting reported.
22   Q.   And how would he have that knowledge?
23   A.   As a warehouse employee, he had knowledge
24 just like Terrence Lindsey had the knowledge.

Page 167

1    Q.   So now I'm not clear.  Javier, is he a
2 witness to the incidents or just general?
3    A.   Just general.  Like I stated, he's just an
4 employee that would have general knowledge of the
5 situation between me and Pete.  Terrence Lindsey
6 has firsthand knowledge of what happened between me
7 and Pete.  Curtis only has information of what was
8 told on the phone call, and Ivan referred the
9 message.
10   Q.   And Tammi Fowler, who is she?
11   A.   I only met her once.  I was told that she
12 was an HR.
13   Q.   Okay.  And so what knowledge does she have
14 regarding your claims?
15   A.   She has knowledge that I sent in doctors'
16 notes and that she -- and that I asked for time
17 of -- that I had time of leave, and all this was
18 before they decided to fire me, and she gave the
19 order to terminate me.
20   Q.   How do you know that?
21   A.   From collective information that I got
22 from Edith, Mary and Lynn.
23   Q.   So Edith, Mary or Lynn told you what about
24 Tammi Fowler?

Page 168

1    A.   Through an e-mail that was sent that was
2 before the date that I was fired that she knew
3 about the doctors' notes beforehand and still
4 terminated me.
5    Q.   And you said there's an e-mail that shows
6 that?
7    A.   Correct.
8    Q.   And who has that e-mail?
9    A.   I guess one of the three.  I wouldn't know
10 which one.
11   Q.   They didn't give you the e-mail?
12   A.   No.
13   Q.   You didn't ask for it?
14   A.   No, I didn't.  I didn't think I needed it
15 at that time.
16   Q.   Did you see it?
17   A.   No.  But I believe them.
18   Q.   So what are they saying they have?  They
19 have an e-mail that --
20   A.   An e-mail that states that Tammi Fowler
21 had knowledge of my leave of absence, doctors'
22 notes before they decided to fire me.
23   Q.   Well, don't you think that's a significant
24 document?

Page 169

1    A.   I mean, I can get it.  It's not anything
2 that I can't get.
3    Q.   Yeah.  I mean --
4    A.   I can still get it.
5    Q.   So we're in this discovery period here,
6 Mr. Henry, and part of that discovery period is
7 producing information that relates to your claims,
8 and so, yeah, you need to produce that.
9    A.   Well, I never was asked for it, so I
10 didn't know I needed to produce it.
11   Q.   Well, you were asked for any documents
12 that related to any of your claims.
13   A.   I didn't know that related at the time
14 because I didn't know that that would come up.
15 Like how was I to know that you needed that
16 information?
17   Q.   I'm telling you now.
18   A.   That's why I just said I can still get it.
19   Q.   Okay.
20   A.   So I don't know --
21   Q.   Okay.  We'll look forward to receiving
22 that.
23        Now, when did you first have conversations
24 with Edith McCurry?

43 (Pages 166 - 169)

Page 170

1    A.   I don't know the date.
2    Q.   I mean, did you have conversations with
3  her while you were employed --
4    A.   No.
5    Q.   -- by Kenco?
6    A.   No.
7    Q.   Did you ever have any communications with
8  her while you were employed by Kenco?
9    A.   Yes.
10   Q.   Okay.  And so what kind of communications
11 did you have with her?
12   A.   I told you earlier that I asked her about
13 the sign-up sheet for the advancement in the
14 workplace.
15   Q.   Right.  Other than what you've already
16 testified to, right.  You did say that.  Is there
17 anything else other than asking her about the
18 sign-up sheet?
19   A.   Not -- I didn't never see her like that.
20 I worked third shift.  She worked first shift, so I
21 wouldn't see her during the day.
22   Q.   Okay.  And did you ever e-mail her?
23   A.   No.
24   Q.   Okay.

Page 171

1    A.   Well, yes.  I e-mailed her or faxed over
2  to her my first South Suburban documentation, and
3  after that I faxed over to the office where I --
4  so, yes, I did have communication with her one time
5  after the sign-up sheets.
6    Q.   Okay.  Other than those two incidences,
7  did you have any --
8    A.   No.
9    Q.   -- communications with -- I know.  You've
10 got to wait until I --
11   A.   Oh, I'm sorry.
12   Q.   I know you know where I'm going, but --
13 other than the two incidents that you've just
14 testified to, did you have any other communications
15 with Edith McCurry while you were working for
16 Kenco?
17   A.   No.
18   Q.   Okay.  And when were you provided with
19 the -- with a copy or allowed -- not provided a
20 copy, but allowed to read the e-mail that you
21 testified shows that Tammi Fowler knew --
22   A.   I haven't --
23   Q.   -- about the LOA?
24   A.   I never read it.  I just was told.

Page 172

1    Q.   And what were you -- what were you told?
2    A.   I was told that Tammi Fowler had knowledge
3  that I was sending doctors' notes in before the
4  termination date.
5    Q.   Okay.  With respect to your claim about
6  the overtime hours, working -- that you were upset
7  that you weren't allowed to work overtime before
8  your shift versus after your shift -- right?
9    A.   Correct.
10   Q.   Are you familiar with that?
11        What are your damages for that?
12   A.   What do you mean?
13   Q.   Well, you worked overtime after your
14 shift.  You're saying, I didn't get to work -- I
15 would have rather gone home early and worked
16 overtime before my shift, but I was told I could
17 only work overtime after my shift, so I'm just
18 wondering.  Other than the perhaps less convenient
19 overtime schedule, is there any other way that you
20 were damaged by that?
21   A.   I was giving you a comparison that there
22 were nonblack employees and -- that were able to
23 work overtime earlier than I was.
24   Q.   No.  I understand that.  I'm asking you,

Page 173

1  what are you out of pocket from that?
2    A.   I'm not out of pocket.  The situation in
3  that was the disparity of race and how I felt that
4  it was racially influenced because they were
5  nonblack employees, and I was black, and they were
6  allowed to do it.
7    Q.   Okay.  It was -- that's more about your
8  belief that there was race discrimination as
9  opposed to there were hours that they were getting
10 that you weren't getting.
11   A.   Yeah.  That's what I put in the EEOC.
12   Q.   Okay.  So what have you done in terms of
13 employment since your departure from Kenco?
14   A.   Last year I started working for myself,
15 started my own landscaping business.
16   Q.   And when did you start that?
17   A.   I believe 2000 -- end of 2000 -- well,
18 October 2014.
19   Q.   You began the business in October of 2014?
20   A.   When I -- 2015.  I'm sorry.
21   Q.   Okay.  So you were terminated --
22   A.   Yeah.
23   Q.   -- in October of 2014?
24   A.   In 2014 I received unemployment.  After

44 (Pages 170 - 173)

Page 174

1 that -- in 2015 I started my own landscaping
2 business.
3     Q.   Okay.  And you think it was in October
4 of -- no?
5     A.   No.  I had the dates mixed up.  It's
6 April.
7     Q.   April?
8     A.   April 2015.
9     Q.   Okay.  And what's the name of your
10 business?
11     A.   Ultimate Lawn Care.
12     MR. DAVIES:  I missed that.  What was that?
13     THE WITNESS:  Ultimate Lawn Care.
14     MR. DAVIES:  Ultimate?
15 BY MS. MORAN:
16     Q.   And do you have any employees?
17     A.   No.
18     Q.   Okay.  And before you started the
19 landscaping business in April 2015, what did you do
20 between October 2014 and then other than collect
21 unemployment?
22     A.   Nothing.  Side jobs.
23     Q.   Okay.  And so did you apply for work?
24     A.   Yeah.  I couldn't find anything.  It's a

Page 175

1 requirement for me to file for jobs while on
2 unemployment on JobLinks.com, and I couldn't find
3 anything.
4     Q.   And do you have any records relating to
5 your job search?
6     A.   Yes.
7     Q.   Okay.  And have you produced those
8 records?
9     A.   I don't know.  I don't believe I have.
10     Q.   Okay.  So those are records that --
11     A.   Employment records.
12     Q.   -- that we would ask you to produce.
13     A.   Okay.
14     Q.   Because they relate to your lawsuit.
15     A.   Okay.
16     Q.   So we'll come up with an e-mail with a
17 list of the documents that you've agreed to --
18     A.   Okay.
19     Q.   -- produce.
20          Okay.  And so -- and the Ultimate Lawn
21 Care --
22     A.   So how do I go about -- like what?  Do I
23 just give you the job link?  Like I don't know how
24 to do that.

Page 176

1     Q.   Well, do you have any documents?
2     A.   No.  It's online.  It's just online.
3     Q.   It's all online?
4     A.   Yeah.
5     Q.   So I don't know.  We'll figure it out and
6 let you know.
7     A.   All right.
8     Q.   Okay.  Okay.  And so what were your
9 earnings in -- last year from April of 2015 through
10 the end of the year for the Ultimate Lawn Care?
11     A.   I didn't make any earnings.  I made a
12 loss.  I bought equipment, and I didn't make a
13 profit.  So I spent $1500 on a tractor, $150 on a
14 Weedwacker, $800 on a trailer, and through that
15 period of time, I was trying to build clientele, so
16 I didn't really make any money.
17     Q.   Okay.  And what about this year, in 2016?
18     A.   I did a little bit better, but I took
19 another loss because the tractor that I had, I had
20 to put that in the shop.  The engine went out in
21 it, and I had to spend another 1500, but I still
22 haven't gotten it out of the shop, so it's still
23 sitting there, so this year I probably made in
24 profit $1200 outside of the losses that I've made

Page 177

1 because I don't have a lot of clientele yet.  I'm
2 trying to build my clientele up.
3     Q.   Sure.  Do you file taxes every year?
4     A.   I filed taxes on my Ultimate Lawn Care
5 last year, and I haven't filed -- I haven't filed
6 this for -- for this year.
7     Q.   2016 yet, right.  You haven't filed, but
8 you do have -- you did file in 2014 income tax
9 returns?
10     A.   Yeah.
11     Q.   And in 2015?
12     A.   Yeah.
13     MS. MORAN:  Okay.  Do we have that form?  Let's
14 take a break.  We're running out of video.
15     THE VIDEOGRAPHER:  Going off the record at 2:54
16 p.m., end of Disc 2.
17          (Recess taken.)
18     THE VIDEOGRAPHER:  Beginning of disc 3.  We're
19 back on the record at 3:21 p.m.
20 BY MS. MORAN:
21     Q.   Okay.  Mr. Henry, when you received this
22 letter, the termination letter a few days after
23 October 20 -- I assume they mailed it to you, and
24 it said that you had violated the cell phone

45 (Pages 174 - 177)

Page 178

1 policy, and when you got that, what was your
2 reaction?
3    A.  I didn't know what I violated, so I called
4 up there, and I couldn't get in contact with
5 anyone.
6    Q.  Who did you call?
7    A.  I just called the regular -- whatever that
8 number was at the time --
9    Q.  Okay.
10    A.  -- just trying to --
11    Q.  How many times did you call them?
12    A.  I just called once.
13    Q.  And what happened when you called?
14    A.  Left a message for Mario to return my
15 phone call.
16    Q.  Okay.  And he never did?
17    A.  No.
18    Q.  And did you -- how come you didn't call
19 again?
20    A.  Just followed up with my doctor and had
21 him forward over doctors' notes thinking that they
22 would honor the doctors' notes for the reasons --
23 they said that having anything to do with my
24 termination, but it was for the incident that

Page 179

1 happened before the date that's on there or after
2 the date, whichever.
3    Q.  Right.  So I guess my question is -- you
4 get this termination letter.  You think that it's a
5 false reason for your termination; is that right?
6    A.  Correct.
7    Q.  Okay.  And so you call and you leave a
8 message for Mario Lopez, who's the general manager;
9 is that correct?
10    A.  Correct.
11    Q.  And he's the one who signs your
12 termination notice on October 20, termination
13 letter, right?
14    A.  Right.
15    Q.  And so -- and you're surprised by this,
16 right?
17    A.  Well, yeah.  It was a shock.
18    Q.  Yeah.  And so you leave a message, and he
19 doesn't call you back, and you never make any other
20 attempts to call?
21    A.  What was I supposed to do?  If you're not
22 returning and you send me a letter saying that I
23 was already terminated, what am I -- what rights do
24 I have at that point in time to do?  What can I do?

Page 180

1    Q.  I don't know.  What about Edith McCurry?
2    A.  What can she do if they already sent me a
3 letter saying that I'm terminated?
4    Q.  I don't know.  I guess you'd have to --
5    A.  That's why we're here now, because I'm --
6 that's how I'm fighting it now.
7    Q.  Okay.
8    A.  Couldn't do anything then.
9    Q.  Why not?
10    A.  What could I do then?
11    Q.  Why not?
12    A.  What could I do?
13    Q.  Call somebody, keep calling every day to
14 say, somebody, I want somebody to talk to me about
15 why I was terminated, I wasn't -- I was unfairly
16 terminated.
17    A.  If they treat me like that without giving
18 me the reasons why or returning my phone calls,
19 there's no reason for me to continue to call and
20 call for ignoring.  I just took it up in court.
21 That's why I went to the EEOC.
22    Q.  No.  I understand that.  You went to the
23 EEOC or the Illinois Department of Human Rights
24 while you were working there, so I'm wondering.

Page 181

1 Here you get terminated, and why don't you make
2 more effort than just one voice mail to
3 Mario Lopez?
4    A.  Because I was sending doctors' notes that
5 gave me leave of absence before this, so if you're
6 going to violate that and tell me that you got the
7 doctors' notes but you're still going to terminate
8 me, what could I have done differently than what I
9 did?  I saved myself for getting the doctors'
10 notes.  That was covering me for having the job.
11 If you're taking the doctors' notes but you're
12 telling me that you got the doctors' notes but
13 you're not going to acknowledge them, what else can
14 I do?
15    Q.  Well, you weren't terminated about the
16 doctors' notes.  Your termination was about the
17 cell phone violation.
18    A.  But the doctors' notes were what was
19 providing me the time of leave from the job while I
20 was not there.
21    Q.  I know.  But that -- you know, you were
22 terminated for violating a cell phone policy.
23 That's what you were told in the termination
24 letter.

46 (Pages 178 - 181)

Page 182

1   A.  Correct.

2   Q.  The doctor's note, though, doesn't have
3  anything to do -- if you violated -- what if you
4  had -- what if you were terminated for punching
5  somebody in the face?  What would the doctors'
6  notes have to do with that?

7   A.  What I'm saying is that I'm sending
8  doctors' notes while I'm off work before I get this
9  letter, so if you're not acknowledging my doctors'
10  notes, what indication do I have that -- who can I
11  talk to to give me answers besides Mario Lopez?
12  And I called and you don't answer, and then when I
13  go to the unemployment hearing, you tell me you had
14  no reason -- any knowledge of why you fired me, or
15  you had no knowledge of an investigation, so what
16  was I supposed to do at that time -- that's what
17  I'm asking -- that I didn't do, that I tried to do?

18  Q.  Okay.

19  A.  What else could I have done?

20  Q.  I guess -- I guess that's what you thought
21  you could do, just one phone call even though the
22  letter says we've made repeated attempts to contact
23  you and --

24  A.  They never made any attempts to contact

Page 183

1  me.  That's what the letter states, but that's not
2  necessarily what happened.  I didn't get any
3  attempts.  This is the only thing that I got, was
4  in the mail.

5   Q.  Uh-huh.  And --

6   A.  And so when I made an attempt to call
7  back, I didn't get any response, so what am I
8  supposed to do?

9   Q.  And when you called back who did you leave
10  a message for?

11  A.  I left a message to speak to Mario Lopez.

12  Q.  So you left a message in the general
13  mailbox?

14  A.  No.  Just on the regular voice mail.

15  Q.  And what did you say?

16  A.  This is Vernon Henry, I'm calling, I got
17  the letter in the mail, I want to know why -- what
18  cell phone policy did I violate, because it doesn't
19  specify on here.  I don't have this -- I didn't
20  have this policy at hand at that time, so I don't
21  know what CPRM 6.4 means.

22  Q.  Sure.  And so you called.

23  A.  I didn't get an answer.

24  Q.  Didn't get an answer, so that was that.

Page 184

1  Okay.

2   A.  I called, didn't get an answer.  I sent
3  doctors' notes, and they refused the doctors'
4  notes, so if you're not going to acknowledge my
5  doctors' notes that give me leave of absence before
6  you give me a fire date, what else can I do?
7  That's my position, and that was my position.  What
8  else can I do?  So that's what I did.

9   Q.  Okay.  So what damages are you claiming in
10  your lawsuit?

11  A.  I'm claiming loss of wages.  Where is it
12  at in my complaint?  Because in my complaint will
13  tell you specifically what I'm claiming.

14  MS. ARGENTIERI:  It had the big binder clip in
15  there.  It looks like it might have been unclipped.

16  MS. MORAN:  Yeah.  This is the complaint.

17  THE WITNESS:  Yeah.  I'm looking for the page
18  that has the -- what I'm asking for.

19  MS. MORAN:  Okay.

20  THE WITNESS:  I don't see it on here.  Page 4.

21  Lost wages, liquidated double damages, front pay,
22  compensatory damages, punitive damages, prejudgment
23  interest, postjudgment interest and costs,
24  including reasonable attorney's fees and expert

Page 185

1  witness fees.

2  BY MS. MORAN:

3   Q.  Okay.  Anything else?

4   A.  Emotional distress.

5   Q.  Okay.  Anything else?

6   A.  That's it.

7   Q.  Okay.

8      (Whereupon, Henry Deposition
9       Exhibit 10 was marked for
10       identification as of 10/20/2016.)

11  BY MS. MORAN:

12  Q.  We have -- with respect to your lost
13  wages, Mr. Henry, we have a form that the IRS
14  provides to get a copy of your tax returns.

15  A.  Okay.

16  Q.  Would you fill this out before you leave
17  today?

18  A.  You got a pen?

19  Q.  Sure.

20  A.  What year?

21  Q.  What year for the --

22  A.  This says year or period requested.  What
23  year?

24  MS. MORAN:  Julie, so we'd be getting what?

47 (Pages 182 - 185)

Page 186

1 2014 and 2015 for income tax returns?
2    MS. ARGENTIERI: Yes, yeah.
3 BY MS. MORAN:
4    Q.  Okay.  Great.  And the only thing that you
5 need to put in here is your social security number.
6 That's how they identify you.
7       Okay.  Thank you.
8       Okay.  Mr. Henry, I showed you what was
9 marked Deposition Exhibit No. 10, and it's 2008
10 through 2014, and it's a charge of discrimination
11 filed on January 20, 2016.
12    MR. DAVIES: Just one moment.  The copy I have
13 begins with 2010.
14    MS. ARGENTIERI: Yeah.  That's --
15    MS. MORAN: Does it?  Oh, okay.
16    MS. ARGENTIERI: We can -- here's 09.  I don't
17 know that I have 08 in my copies here.  I don't
18 think there's anything of substance on it.
19    MS. MORAN: I think it's 2009 through --
20    MS. ARGENTIERI: Yeah, 9.
21    THE WITNESS:  What are you looking at?  2009.
22 BY MS. MORAN:
23    Q.  No, no.  Just the numbers at the bottom,
24 the numbers at the bottom.  So I'm going to direct

Page 187

1 your attention to the page at the bottom that says
2 2011.  Do you see where the numbers are at the
3 lower right-hand corner where it says Kenco?
4    A.  Yeah.  I don't have it.
5    Q.  You don't have 2011 here?
6    A.  No.
7    Q.  Would you mind just -- let me just
8 double-check.  Oh, this is a different -- different
9 than what I have.  That's weird.  They've got
10 different numbers.  I think this was produced
11 twice.
12    MS. ARGENTIERI: You can have that copy if that
13 helps.
14    MS. MORAN: Oh, this copy for him, rather?
15    MS. ARGENTIERI: If it's easier, yeah.
16 BY MS. MORAN:
17    Q.  Okay.  I think they're the same documents,
18 but somehow they were -- had different numbers.
19 Okay.  So directly -- directing your attention to
20 2011, do you have that now?
21    A.  Yeah.
22    Q.  Okay.  Okay.  And so you say that -- you
23 mention somebody here, Lori Varrel.  Never -- who
24 is she?

Page 188

1    A.  She worked in the -- upstairs in the
2 office.  I don't know what her title was.
3    Q.  And how did she interfere with your
4 rights?
5    A.  I believe she was the one that had the --
6 was in control of the faxes that I sent over for
7 the doctors' notes.
8    Q.  And how would you know that?
9    A.  Just collectively speaking from Lynn and
10 Mary and Edith.
11    Q.  I'm sorry.  So the other terminated Kenco
12 employees who you're in touch with gave you that
13 information?
14    A.  Yeah.  Collectively giving me the
15 information that I've received when I needed help.
16    Q.  Okay.  So Lori is the one who you believe
17 received the faxes from your doctor.
18    A.  Correct.
19    Q.  Is that how she willfully interfered with
20 your rights?
21    A.  I believe so.
22    Q.  Okay.  Is there anything else, any other
23 contact or information that you have about
24 Lori Varrel?

Page 189

1    A.  I don't have any other knowledge of her at
2 this time.
3    Q.  Melissa Hansen is the individual who got
4 the position who was hired from the outside; is
5 that correct?
6    A.  Correct.
7    Q.  Okay.  Other than the fact that she was
8 hired for that position, is there anything else
9 that -- any communications that you have -- had
10 with her or anything that you are -- you are
11 testifying that she did to treat you differently?
12    A.  She's probably included in the conspiracy
13 to fire me.
14    Q.  Melissa Hansen?
15    A.  Yes.  She was -- she was in a position of
16 management when I was there.  She was a manager.
17    Q.  And so what information do you have that
18 she had anything to do with your termination?
19    A.  Just people that I know with -- that have
20 authority at the time that I was employed.
21    Q.  I'm not clear.  Could you repeat it
22 please?
23    A.  Just people that would have authority at
24 the time that I was employed, that would have

Page 190

1 knowledge of my hire and fire, so --
2   Q.  Why do you believe that Melissa Hansen
3 would have that information?
4   A.  Because at the time that I was employed,
5 she was in a management position. She was a
6 general manager. She got --
7   Q.  Melissa Hansen was a general manager?
8   A.  She was a manager. She took Mike's
9 position before Mario Lopez was there.
10   Q.  Okay. And so what was her position when
11 you were employed?
12   A.  She was a manager.
13   Q.  Okay. Was she your manager?
14   A.  I don't know. I don't know if she was
15 mine or not, but I know she was a manager.
16   Q.  So just to be clear, the only reason that
17 you have her listed here as willfully interfering
18 with your employment is because she was a manager
19 at Kenco?
20   A.  Because she has knowledge of the -- of me
21 being fired at that time because she was in a
22 position of power.
23   Q.  Right. And so my question is, how do you
24 know what knowledge she has?

Page 191

1   A.  The same that I think about everybody
2 else. It's an opinion. I don't know -- I don't
3 have facts.
4   Q.  Okay. What about David Jabaley?
5   A.  As I stated before, he was -- I feel like
6 they were conspired against me to fire me without
7 an investigation, and he was involved because he
8 was -- in order to take steps of process, as you
9 say, he was the operations manager.
10   Q.  And so how do you know that he was
11 involved in the decision to terminate your
12 employment?
13   A.  Protocol. I would think that it's a
14 protocol for -- to get an employee terminated,
15 collective effort, not just one person.
16   Q.  And how do you know that he's one person
17 that would have had knowledge about your
18 termination?
19   A.  You told me earlier he was operations
20 manager, so, of course, he would have knowledge of
21 employees in the warehouse.
22   Q.  So the only information that you have
23 connecting David Jabaley to your termination is the
24 position that he held with Kenco.

Page 192

1   A.  Correct.
2   Q.  Nothing else?
3   A.  Not at this time. If I find some other
4 information, I would let you know.
5   Q.  Right. But you haven't -- up until today
6 you haven't had any other information.
7   A.  Up until -- no.
8   Q.  Okay. Fair enough. Okay. Tammi Fowler?
9   A.  I told you about her earlier.
10   Q.  Okay. Other than what you've already
11 testified about Tammi Fowler, any other information
12 that you have that she was treating you differently
13 because of your race or retaliating against you?
14   A.  As I know, as I stated before, I'll try to
15 get that e-mail to you, but she knew about my
16 doctors' notes before having them -- terminating
17 me.
18   Q.  Other than that, anything else?
19   A.  No.
20   Q.  Okay. And then what kind of nepotism was
21 going on?
22   A.  I'm not sure.
23   Q.  Okay. You have here in this -- you say,
24 fundamental rights of being free from being treated

Page 193

1 because of the hostile work environment, and then
2 you have harassment, and then you have nepotism.
3 How come you have nepotism in there?
4   A.  I'm not sure. It might be a typo.
5   Q.  Did you draft it? Is that nepotism -- is
6 that yours or --
7   A.  No. It might be something that was added
8 on the draft and put down. I don't know.
9   Q.  So you're not aware of any nepotism that
10 went on?
11   A.  No.
12   Q.  And the favoritism?
13   A.  Favoritism was in the shift change in the
14 shifts. We already conversed.
15   Q.  Yeah. Anything else other than what
16 you've already testified to?
17   A.  No.
18   Q.  Okay. You state that -- here that you
19 were subjugated to harsher and more strenuous work
20 assignments. Which were the more strenuous work
21 assignments that you were given?
22   A.  My workload.
23   Q.  The workload was --
24   A.  -- was more than the other people's. I

Page 194

1 guess they figured I can handle it.
2    Q.  So what do you mean your workload was more
3 than other people?  What does that mean?
4    A.  Work assignments were more than what other
5 people's work assignments were.
6    Q.  Who are the other people you're talking
7 about?
8    A.  Other employees.
9    Q.  I know.  But who?
10    A.  I can't say specifically.  I'm just saying
11 in general other employees.
12    Q.  Okay.  So as you sit here today, there's
13 not one person who you can identify who had easier
14 work assignments than you.
15    A.  I'd just say Pete.  He had -- he was a
16 picker.  I was a put-away guy and a picker of
17 products.
18    Q.  Okay.
19    A.  He did the same thing every day.  I did
20 different jobs every day.
21    Q.  Were you a picker?
22    A.  No, I wasn't.
23    Q.  Okay.  So you were -- Pete was a picker,
24 and you were not a picker; is that right?

Page 195

1    A.  Correct.
2    Q.  Okay.  And did you ask to be a picker?
3    A.  No.  You don't ask what you're to do at
4 the work.  You do what you're told to do.  You
5 don't ask -- you know, I don't -- you don't ask the
6 boss to --
7    Q.  Okay.
8    A.  -- give me this instead of that.  You do
9 what you're told to do.
10    Q.  Did you enjoy the work that you were doing
11 with the forklift?
12    A.  It was a job.  I was trying to advance in
13 the company because I didn't want to be on a
14 forklift for the rest of my life.
15    Q.  Right.  But you were hired to drive the
16 forklift?
17    A.  It was just something for me to do until I
18 can work my way up through the ranks.  I wasn't
19 trying to drive a forklift forever, so it was a job
20 to do until I can get to the next level.
21    Q.  And so is it, then, your testimony that
22 Pete as a picker was given less strenuous work
23 assignments than you?  Is that what your testimony
24 is?

Page 196

1    A.  He's one of them.  That's one that I
2 can -- that you told me I couldn't think of
3 anybody's name at the time, so I thought of him.
4 It was probably more people, but I can't think of
5 anybody else's name at this time, so he's not the
6 only one, but I'm quite sure --
7    Q.  Is there anything that would help refresh
8 your recollection?
9    A.  I'm quite sure there's other people, but I
10 haven't been employed at Kenco for two years.  I
11 don't remember everybody's name.
12    Q.  So as you sit here today at your
13 deposition, you cannot testify to anybody besides
14 Pete who were given less strenuous work assignments
15 than you; is that correct?
16    A.  You can talk about Pete.  You can say
17 Esmeralda.  I'm sure there's other people.
18    Q.  Who's Esmeralda?
19    A.  We spoke of her earlier with the -- the
20 shift -- she was able to work earlier than I was.
21    Q.  What was her position?
22    A.  I don't know her -- I don't know.  I just
23 know her name.
24    Q.  So you don't know what position she held

Page 197

1 with Kenco?
2    A.  She was a warehouse associate just like we
3 all were.  I don't know specifically what she did.
4 I just know she was an associate.
5    Q.  Okay.  And what did you see her doing that
6 was less strenuous than what you were doing?
7    A.  Sometimes she would just sort boxes.  She
8 wouldn't be on a forklift.
9    Q.  And did you want to sort boxes?  Is that
10 part of what you wanted to do?
11    A.  No.  I just wanted an easier workload, so
12 if my workload was the same every day, instead of
13 me being on the same thing every day, I would
14 rather do certain things that other people were
15 doing, but I'm not in a position to ask my
16 employer, let me do this, because I'm told to do
17 what my job details are to do.  I go to work.  I do
18 my job.  I go home.
19    Q.  Right.  And you wanted to work overtime.
20    A.  We all worked overtime.  I wanted to do my
21 overtime earlier.
22    Q.  Right.  Okay.  Okay.  And you said -- it
23 says here that you were treated differently because
24 you were subjected to greater scrutiny.  What does

50 (Pages 194 - 197)

Page 198

1  that mean?
2      A.  The harassment, the retaliation, the
3  workplace incidents.
4      Q.  Everything you've already testified to?
5      A.  Everything I've already said.
6      Q.  Okay.  And what about the hate crimes?
7  What hate crime are you talking about?  Is that
8  with Pete?
9      A.  Same thing I've already said, everything
10  I've already talked about.
11      Q.  Okay.  Anything else besides the incident
12  with Pete?
13      A.  Incident with Pete?  The conversation with
14  Mike.
15      Q.  The conversation with Mike was -- you're
16  calling a hate crime?  Is that what you're saying?
17      A.  I'm just naming things that would be in
18  that realm.
19      Q.  Well, so that's what I'm asking.  I'm
20  asking you to testify as to what your belief was
21  that you were subjected to hate crimes while you
22  were working as an employee at Kenco.
23      A.  The one hate crime that I can think of
24  specifically was the incident with Pete, the

Page 199

1  incident with Pete the second time that nothing was
2  done about, the first time that nothing was done
3  about.  Those are the hate crimes that I can
4  specify that I have knowledge about.
5      Q.  Okay.  Anything else?
6      A.  No.
7      Q.  Who drafted this?  Do you know?
8      A.  I'm not sure.  I didn't type it.
9      Q.  Okay.  And so what was -- you mentioned
10  that there was a cover-up.  What was the cover-up,
11  Page 3, Subsection B under conspiracy?
12      A.  Not to report to corporate.  If there
13  wasn't a cover-up, then corporate would know about
14  the incidents that were happening.
15      Q.  Okay.  Anything else?
16      A.  No.
17      Q.  Okay.  You mentioned that you were out on
18  FMLA in --
19      A.  No.  I --
20      Q.  -- Subsection C.
21      A.  I applied for FMLA.  They denied me.
22      Q.  Okay.  Do you know why they denied you
23  FMLA?
24      A.  Said I didn't have enough hours.

Page 200

1      Q.  Right.  Do you know that you need to be
2  working for an employer for a year before you are
3  eligible for FMLA?
4      A.  Well, it was either the time frame or the
5  year, so it was the hours accumulated, or it was
6  one of the two.  It wasn't just one thing.  It
7  was -- you can have either/or, the time accumulated
8  or the --
9      Q.  What's the source of your information for
10  that?
11      A.  Specifically from -- whatever the
12  organization is.  I forgot the name of -- Hartford,
13  The Hartford.
14      Q.  An insurance company?
15      A.  That's who I applied for the FMLA through,
16  and they told me it was the amount of hours that I
17  needed.
18      Q.  So do you disagree with that
19  determination?
20      A.  I felt that I had enough hours.
21      Q.  You felt that you were wrongfully denied
22  FMLA leave.  Is that what you're saying?
23      A.  Yes.  I had enough hours to be approved
24  for FMLA.

Page 201

1      Q.  How many hours was that?
2      A.  I would have to look at it.  I don't know
3  specifically offhand.
4      Q.  And you had only -- you had worked for
5  Kenco for how long, how many months?
6      A.  Five or six.
7      Q.  Okay.  Are you still suffering emotional
8  distress regarding your -- the way you were treated
9  at Kenco?
10      A.  Well, I was.  Up to just now, I just now
11  found a job in the same industry, so before that I
12  was unable to work around other people because of
13  the situation with Pete.
14      Q.  I'm not sure.  What do you mean?
15      A.  With the incident with Pete, I didn't feel
16  comfortable working around other employees because
17  I didn't know what other employees were capable of
18  doing, so since that time frame, I tried to find
19  other positions outside of the warehouse work, and
20  I was unable to because of that situation, because
21  I didn't feel comfortable working around other
22  employees in that type of environment based on the
23  situation that I had with Pete.
24      Q.  When you say with people -- so you had one

51 (Pages 198 - 201)

Page 202

1 person who called you a name and then tried to hit
2 you with a forklift, right?
3    A.  Yes.
4    Q.  Okay.  And that one individual, the issues
5 that you had with that one individual made you feel
6 like you could never work in any warehouse again?
7    A.  In a warehouse setting in that situation,
8 yes.  That's how I felt.
9    Q.  Okay.  And so how would you describe the
10 emotional distress that you felt?  When did it
11 begin?  When did it end?  How did it feel?
12    A.  Just not being able to feel comfortable in
13 a workplace setting in a warehouse mode or
14 sometimes having dreams or thinking about the
15 situation that I had with Pete and how nothing was
16 done about it or being in situations where I felt
17 like I was a good employee and I didn't deserve to
18 be treated like that.  It was just a lot of things.
19        And what happened is that over the time
20 period I just pretty much -- I got over it
21 personally but with myself, and I said that, you
22 know, I can't let one incident affect my -- rest of
23 my life.  I still have to make an income, so I just
24 have to be a stronger person.

Page 203

1    Q.  Okay.  So as you sit here today, you feel
2 like you're feeling better now that you have your
3 own business?
4    A.  Well, I just started a job.  This is my
5 first week.
6    Q.  This is your -- I'm sorry.  Is this your
7 business or a different --
8    A.  No.  I work for someone else.  I work for
9 a company.
10    Q.  Oh, okay.  Well, who do you work for?
11    A.  I work for Staffing Network.
12    Q.  Staff Network, Staffing Network or --
13    A.  Yeah.
14    Q.  And is that a temp service or --
15    A.  Yes.
16    Q.  Okay.  And when did you start working for
17 them?
18    A.  This is my first week.  Started on Monday.
19    Q.  Okay.  And what about the business that --
20 the landscaping business that you were talking
21 about?
22    A.  I still do that on the side.
23    Q.  And so how much do you make at Staffing
24 Network?

Page 204

1    A.  $11 an hour.
2    Q.  Okay.  And where did they place you?
3    A.  It's in Manteno.  It's at Dawn Foods.
4    Q.  So that is a -- is it a warehouse?
5    A.  It's a bakery.  It's a warehouse, but it's
6 a bakery.
7    Q.  And what do you do for them?
8    A.  Make brownies.
9    Q.  So you assist in the production of the
10 product?
11    A.  Correct.
12    Q.  Okay.  And what do you do when you make
13 the brownies?  What's your responsibility?
14    A.  I'm just on the line putting trays in the
15 oven and taking trays out of the oven.
16    Q.  And how long is that -- do you know how
17 long that assignment's supposed to last?
18    A.  I don't know.  This is my first week.
19    Q.  And how is it going?
20    A.  Right now I'm kind of tired.
21    Q.  Right.  But, I mean, just prior to today
22 how's it -- how's --
23    A.  It's been okay.
24    Q.  Okay.  And when did you first go to

Page 205

1 Staffing Network to apply?
2    A.  Two weeks ago.
3    Q.  And what made you decide to do that?
4    A.  Just like in every other job, you know,
5 you have your high periods and your low periods in
6 business, and right now it's at a low period
7 because it's about to be cold, season is about to
8 be over with.
9    Q.  Okay.  So it's --
10    A.  So I need to find something for the
11 wintertime.
12    Q.  To fill in for the slow time.
13    A.  Yes.
14    Q.  Okay.  All right.  Have you ever filed any
15 charges of discrimination against any other
16 employers?
17    A.  No.
18    Q.  Any lawsuits?
19    A.  No.
20    MS. MORAN:  Okay.  I think that concludes my
21 questions for now.
22        EXAMINATION
23 BY MR. DAVIES:
24    Q.  Okay.  Mr. Henry, we met briefly at the

52 (Pages 202 - 205)

Page 206

1 beginning of your deposition. My name's
2 Tom Davies. I'm representing Mars, Inc., who
3 you've also sued in this matter. I also will have
4 a fairly lengthy set of questions for you.
5      There are a couple of things. First I
6 want to try to go back over some of the things that
7 Ms. Moran covered to clarify some of the answers
8 from my perspective. I'm trying to understand your
9 conspiracy allegation, which is, you know, just
10 covered in some detail and who all the people are
11 involved in this conspiracy.
12      It's my recollection that among the people
13 you named are Kelvin Walsh, Mike Manzello,
14 David Jabaley, Mario Lopez, Tammi Fowler,
15 Melissa Hansen and perhaps this name that came up
16 very recently, Lori Varrel. Are those the people
17 that you allege engaged in this conspiracy against
18 you?
19   A.  Yeah. It was -- when I say conspiracy, it
20 was a -- when I feel they are the ones that
21 intentionally fired me or put this allegedly
22 picture-taking on me because there was never an
23 investigation done. No one ever came up to me and
24 asked me about it. I just -- I had time off, and

Page 207

1 then I received a letter in the mail saying that I
2 violated the cell phone policy.
3   Q.  Okay. Is there anyone else that you
4 allege is part of this conspiracy?
5   A.  No.
6   Q.  And Melissa Hansen, she's the person that
7 got the co-pack coordinator job, correct?
8   A.  Correct.
9   Q.  Is that the job she still held at the time
10 you left?
11   A.  When I was there, she was a -- in a
12 manager position.
13   Q.  Okay. And Tammi Fowler, you said she was
14 involved in HR for Kenco?
15   A.  I believe she was the HR of corporate.
16   Q.  So she worked out of Chattanooga?
17   A.  Yes.
18   Q.  And when you referenced corporate a couple
19 times in your deposition, you're referring to --
20   A.  Chattanooga.
21   Q.  -- Chattanooga?
22   A.  Chattanooga.
23   Q.  With respect to the actions of Pete -- and
24 I'm not going to even try to pronounce his last

Page 208

1 name -- with the forklift, did you ever file a
2 police report?
3   A.  Yes.
4   Q.  When did you file a police report?
5   A.  I filed a police report maybe two days
6 after the incident.
7   Q.  Okay. With what police department?
8   A.  Kankakee County Sheriff's Department.
9   Q.  And do you know the disposition of that?
10   A.  There was an investigation done, but there
11 was never a follow-up.
12   Q.  So there was no prosecution, to your
13 knowledge?
14   A.  Correct.
15   Q.  I want to take a look at, if you have the
16 exhibits handy, Exhibit 7. It's identified as the
17 cellular phone/electronic device use policy. You
18 were asked some questions about this by Ms. Moran.
19 On the first page you see 3.1 is for driving.
20   A.  Correct.
21   Q.  And then 3.2 at the very bottom begins
22 warehouse. You see where 3.2 is at the bottom of
23 Page 1?
24   A.  Yes.

Page 209

1   Q.  So what would follow that would relate to
2 the warehouse, correct?
3   A.  Well, I don't know, because you have to
4 drive a forklift. You're not walking around the
5 warehouse, so I would figure that that would
6 include the forklift operation.
7   Q.  Okay. You didn't assume that that --
8 because it was broken down between driving and
9 warehouse that driving involved people driving out
10 on the public roads?
11   A.  Nobody's going to drive a car in the
12 warehouse, so it wouldn't relate to a person
13 driving a vehicle.
14   Q.  But do you know if Kenco employees drive
15 cars on the road as well?
16   A.  No, I don't.
17   Q.  Okay.
18   A.  But I would think that this is a
19 warehouse --
20   Q.  In any event, 3.2 relates to the
21 warehouse, correct?
22   A.  Correct.
23   Q.  Let's look at 3.2.1, the use of personal
24 electronic devices such as cell phones, iPods,

53 (Pages 206 - 209)

Page 210

1  et cetera, is prohibited on site unless authorized
2  by the site manager for specific positions, paren,
3  jobs, close paren, comma, areas and times.
4       Did you ever get permission from the site
5  manager to have your cell phone at work?
6    A.  I never had my cell phone at work.
7    Q.  We reviewed at least three, perhaps four
8  separate charges that you filed with the Illinois
9  Department of Human Rights and/or the EEOC,
10  correct?
11    A.  Correct.
12    Q.  None of those named Mars as a
13  respondent --
14    A.  Right.
15    Q.  -- correct?
16       When you originally filed your complaint
17  in this matter in December 2015, you did not file
18  it against Mars, correct?
19    A.  Correct.
20    Q.  We're going to take some time now and look
21  through your complaint, so we'll be looking at
22  what's marked for purposes of this deposition as
23  Deposition Exhibit 9.  Do you have that handy?
24    A.  Yes.

Page 211

1    Q.  Before we get into the specifics of it,
2  what kind of signage was on the Manteno warehouse
3  in terms of whose building it was?
4    A.  Kenco.
5    Q.  Kenco.  It's correct that there was no
6  sign indicating it was a Mars facility; isn't that
7  right?
8    A.  Same -- yes, correct.  But when I worked
9  there as Tyson, there was no indication either, but
10  it was a Mars facility, though, in the --
11    Q.  In your opinion.
12    A.  Well, it was in the break room, the
13  conference room, rather, that it was a Mars
14  facility because they had the different
15  distribution centers, one in Atlanta and somewhere
16  else and Manteno.
17    Q.  In Paragraph 6 of your complaint, which
18  is -- so I can see the page numbers.  It's Page 8
19  of the complaint, and I'm using the page numbers
20  that are put on by the court at the very top of the
21  document.  See that?
22    A.  Page 8?
23    MS. MORAN:  Right at the very top.  You're on
24  Page 10.

Page 212

1  BY MR. DAVIES:
2    Q.  It's the thickest document you should
3  have.
4    A.  Yeah.  I've got everything but Page 8.
5    MS. MORAN:  Here's Page 8.
6    THE WITNESS:  Okay.
7  BY MR. DAVIES:
8    Q.  Okay.  Paragraph 6, you say that Kenco, a
9  third-party management company whom at all times
10  acted as manager, slash, agent of Mars, Inc.
11    A.  Correct.
12    Q.  What do you mean when you use the word
13  agent?
14    A.  Like -- just like Tyson, Kenco was a
15  person that ran your warehouse.  It's a third-party
16  corporation that runs the liability of your
17  corporation, so if you have a hub, you put Kenco in
18  there just like right now you have Xcel in there,
19  but it's still a Mars facility.
20    Q.  So do you understand the legal definition
21  of agent?
22    A.  No.
23    Q.  So when you used the word agent, you
24  weren't using it in its legal context.  You were

Page 213

1  using it in a more commonplace --
2    A.  Correct.
3    Q.  -- terminology.
4       Paragraph 10, you say that in matters
5  regarding compensation, terms, conditions, rights
6  and privileges, Henry's employment were governed
7  and controlled by defendant Mars, Inc., and its
8  super manager Kenco.
9    A.  Right.
10    Q.  First of all, let me ask you about this
11  term that you use throughout your complaint, super
12  manager.
13    A.  Right.
14    Q.  Where did you come up with that term?
15    A.  Basically I felt like Kenco was a -- how
16  do I say -- more so like it's -- they're working
17  for you.  Kenco writes the check, but it's funded
18  by Mars.
19    Q.  That's -- I'm asking you where you came up
20  with the term, though.  Did you just make it up --
21    A.  I made it up.
22    Q.  -- out of thin air?
23    A.  Yeah.  Made it up.
24    Q.  Okay.  Now, when you discussed previously

54 (Pages 210 - 213)

Page 214

1 in your deposition regarding your hiring by Kenco,
2 Mars wasn't involved in that at all, were they?
3   A.  No.
4   Q.  Mars wasn't involved in your termination,
5 were they?
6   A.  No.  But I felt --
7   Q.  Mars -- Mars wasn't involved in how Kenco
8 handled the issues involving Pete, were they?
9   A.  No.  But they were still liable for Kenco.
10   Q.  Based on what, in your opinion?
11   A.  Based on Kenco being a -- just a
12 distribution for Mars or to get off -- to me it's
13 just like when -- with Tyson or with Xcel, it's a
14 different party that runs your facility for you, so
15 you're still liable for Kenco, and Kenco has their
16 own insurance and their own agents that are liable
17 for Kenco, but at the end of the day, Mars is
18 liable for Kenco because Kenco was employed by
19 Mars.
20   Q.  Okay.  You understand that Mars and Kenco
21 had a contractual relationship for the operation of
22 the warehouse, correct?
23   A.  Correct.
24   Q.  And it's your position and it's the basis

Page 215

1 of your action against Mars that because of that
2 contractual relationship Mars is automatically
3 responsible for anything that happens at that
4 warehouse?
5   A.  That they are liable, they have liability
6 too.  That's my understanding.
7   Q.  For whatever happens because of the way
8 Kenco does things.
9   A.  Just because I feel like Kenco is a third
10 party working for Mars.
11   Q.  In Paragraph 13 -- now we're over on
12 Page 9 -- you say, Kenco upon information and
13 belief was acting as the agent of Mars, Inc., and
14 in its conduct and actions as alleged herein and
15 was acting in a capacity within the scope of its
16 authority, or if said conduct was outside the scope
17 of its authority, said conduct was known,
18 authorized and ratified by Mars, Inc.
19       First of all, who came up with that
20 language?
21   A.  Whoever wrote this.
22   Q.  That's my question.  Who wrote it?
23   A.  I'm not sure.  It was a collective effort
24 of a lot of people, so I don't know who gave that

Page 216

1 information at the time.
2   Q.  Okay.  Are we back to the group of
3 people --
4   A.  Correct.
5   Q.  -- that you mentioned before, Edith
6 McCurry --
7   A.  Correct.
8   Q.  -- Mary Madison and Lynn somebody?
9   A.  Yeah.  They've been helping me out
10 throughout my whole case.
11   Q.  Anybody else?
12   A.  No.
13   Q.  There's another person -- there are other
14 people that have filed lawsuits here, Morris Tyson.
15   A.  I don't --
16   Q.  Have you ever talked to him about this?
17   A.  I haven't spoken to them, no.
18   Q.  No e-mails, no text messages, nothing?
19   A.  No.  The only people I've spoken to is
20 people that had positions of higher power that
21 would know certain things.  Those people that
22 you're mentioning were regular employees.  I
23 wouldn't talk to them.  They wouldn't know anything
24 more than I would know.

Page 217

1   Q.  So when you use the phrase upon
2 information and belief, what information or belief
3 do you have regarding the allegations in
4 Paragraph 13?
5   A.  Just like I stated before, that Kenco was
6 working for Mars but Mars was still running
7 everything that happened through Kenco.
8   Q.  What do you mean, Mars was running
9 everything that happened through Kenco?
10   A.  Kenco was just like a -- what you would
11 say, a chaperone for the employees, but everything
12 was still through Mars.
13   Q.  Now, Kenco is in the business of running
14 warehouses, correct?
15   A.  Correct.
16   Q.  They work for many other companies besides
17 Mars, correct?
18   A.  Yes.  But it wasn't -- it wasn't Kenco's
19 warehouse.  It was Mars' warehouse.  That's why
20 they got replaced.  That's why they only had a
21 certain amount of contract to run the facility for
22 Mars.
23   Q.  Again, that's based on the contractual
24 relationship between the two parties, correct?

55 (Pages 214 - 217)

Page 218

1  A.  Right.
2  Q.  When you say they were acting within the
3  scope of its authority, what do you mean by that?
4  A.  I don't know.  I didn't write that.
5  Q.  So you have no clue what that means.
6  A.  No, I don't.
7  Q.  And -- never mind.
8      Paragraph 18, Kenco Logistics' corporate
9  structure, operating structure and legal
10  structuring is not synonymous with any other
11  company.
12      What are you saying there?
13  A.  I guess what I'm trying to say right there
14  is that in other companies the company is -- like
15  with Mars, Mars is ran by Mars.  It's not ran by a
16  third-party company, so -- or Kmart is ran by
17  Kmart.  It's not ran by another third-party
18  company.  Kenco is the only business that is a sub
19  of working for other businesses.
20  Q.  You think Kenco's the only company in the
21  United States that's set up like that?
22  A.  To my knowledge that I know about Kenco.
23  Q.  Don't temp agencies sort of work like
24  that?  They work for other companies?

Page 219

1  A.  But they just -- it's a temp agency,
2  though.  This is a little different.
3  Q.  What knowledge do you have regarding any
4  interaction between representatives of Mars and
5  representatives of Kenco?
6  A.  Just when we switched over to the new
7  system and Mars brought in their Mars people to
8  work at Kenco.
9  Q.  And how long did that take place?
10  A.  Two to three months.
11  Q.  When the system of --
12  A.  When the --
13  Q.  -- keeping track of orders was changed?
14  A.  When they went to a new system of the --
15  in the warehouse general.  I forgot what the name
16  of it was, but they went to a complete different
17  computer system, and they brought in specifically
18  Mars employees from a Mars warehouse to work at
19  Kenco.
20  Q.  When did this take place?
21  A.  This was around January through -- of 2014
22  through about April.
23  Q.  Do you know the name of a single Mars
24  employee that came to work --

Page 220

1  A.  I don't know.
2  Q.  -- at Kenco?
3  A.  I just know they were from Mars.  That's
4  what we were told.
5  Q.  Do you know what supposed Mars warehouse
6  they worked for?
7  A.  I believe it was in Atlanta.
8  Q.  Do you even know if there is a Mars
9  warehouse in Atlanta?
10  A.  I do.
11  Q.  Do you know what products they handle?
12  A.  I don't know.
13  Q.  How do you know there's a warehouse in
14  Atlanta?
15  A.  In the conference room they had the hub of
16  different facilities that were Mars facilities.
17  That's how I know.
18  Q.  Okay.  Would that same type of thing
19  mention Victorville, Kennesaw -- is that the
20  Kennesaw, Georgia, you're talking about?
21  A.  I don't know specifically.  I just know
22  they had different locations of different Mars
23  facilities.
24  Q.  Well, if you look at Paragraph 31 of your

Page 221

1  complaint, you mention the Mars -- what you
2  identify as the Mars distribution network, one of
3  those is Kennesaw, Georgia.
4  A.  Right.
5  Q.  Which is in the Atlanta area.
6  A.  Correct.
7  Q.  Is that the facility you're talking about?
8  A.  Correct.
9  Q.  And it has a management company, according
10  to your complaint, your allegation, of ABW.  Now,
11  do you know if they were employees of ABW that came
12  in or if they were actually Mars associates?
13  A.  I believe they were Mars associates
14  because Mars had -- was the only one at that time
15  that had that computer program in their warehouse.
16  Everybody else was on the other program, so they
17  came in to help us figure out how to work the
18  program.
19  Q.  Okay.  Leaving that issue aside for the
20  moment, on a day-to-day basis at the warehouse in
21  Manteno, do you know what type of interaction, if
22  any, took place between any Mars associate and
23  Kenco employees?
24  A.  No, I don't.  I wouldn't know that as an

56 (Pages 218 - 221)

Page 222

1 associate.

2   Q. In Paragraph 29 you refer to an on-site

3 regional distribution manager. Do you see that?

4   A. Uh-huh.

5   Q. Do you know who that was?

6   A. I believe it was -- I don't know his name.

7 I just know his face. It was a Mexican guy.

8   Q. What? A Mexican guy?

9   A. I believe so.

10   Q. To your knowledge, was there only one such

11 person on behalf of Mars throughout the time you

12 worked at that site?

13   A. Can you repeat that?

14   Q. Sure. To your knowledge, was there only

15 one person that filled the role of regional

16 distribution manager for Mars during the almost

17 year that you worked at the Manteno site?

18   A. Through my time there, I only saw you guys

19 from Mars when we needed help with the new computer

20 system.

21   Q. Okay. So that's -- that was the only time

22 they were physically on site?

23   A. Right. That's the only time I saw them.

24 I don't know.

Page 223

1   Q. So in Paragraph 29b when you say morning

2 meetings regarding the daily plan, who -- do you

3 know anybody that was present at any such morning

4 meetings?

5   A. Not from Mars, but I know Tammi Fowler

6 would come in and do it sometimes.

7   Q. She's the --

8   A. She would fly in from --

9   Q. Tammi Fowler's the Kenco HR --

10   A. Right.

11   Q. -- person from Chattanooga.

12   A. Right.

13   Q. Who provided you with the information

14 you've got in Paragraph 29?

15   A. Collective effort of the same people.

16 Majority of my complaint is a collective effort

17 from other parties of information that I wouldn't

18 know or that I wouldn't have access to.

19   Q. But do you understand that when you file a

20 complaint in federal court you're certifying that

21 it's accurate?

22   A. Well, I'm sure they have information

23 regarding what's being filed.

24   Q. So nobody from Mars had an office at

Page 224

1 Manteno, correct?

2   A. Not to my knowledge.

3   Q. And the only time you said you saw

4 somebody from Mars was during this transition from

5 the one computer system to another computer system.

6   A. Correct.

7   Q. Moving along now to Page 12, Paragraph 38,

8 it says, Mars, Inc., required Kenco Logistics and

9 Kenco Logistics agreed to be compliant with public

10 policy as it relates to codified laws of the land

11 just as it would with any employee.

12   A. Now, was this information -- I was told --

13 see, I never had you included in my complaint, in

14 my IDHR.

15   Q. We've covered that, yes.

16   A. I'm telling you. I've never had you

17 included. The information that was given to me was

18 that you were liable, and that's why I included you

19 into my court case, so the information that's been

20 given, I don't have knowledge of what you're asking

21 me firsthand, but the parties that have helped me

22 have the knowledge of what you're asking me.

23   Q. Well, okay. Let me ask you this question,

24 then: If you don't have personal knowledge of

Page 225

1 these facts, who can I talk to to get such personal

2 knowledge? Not just collectively some group of

3 people, you know. There's got to be somebody

4 that's given you this information --

5   A. Right.

6   Q. -- that I can ask specifically what they

7 know to see if there's any legal basis for it.

8   A. Well, Mary Madison and Edith McCurry are

9 the ones that give the information on this, on

10 Mars. They are the ones that would -- had -- know

11 that information. Everything on Kenco I was able

12 to do in a collective effort of other people.

13   Q. And am I correct, Mr. Henry, that you

14 named Mars in your amended complaint because

15 Madison and McCurry told you that there was a

16 theory under which Mars could be liable?

17   A. Mars, yes.

18   Q. All right. You don't -- you didn't --

19   A. I have no knowledge --

20   Q. -- have any intention before that --

21   A. Right. I have no knowledge.

22   Q. -- of including them.

23   A. Right, right.

24   Q. And you don't have any information

57 (Pages 222 - 225)

1 yourself that would --
2    A.  No, I don't.
3    Q.  -- support that.
4    A.  But because they have cases as well, I
5 just went with the best knowledge of what they
6 would tell me.
7    Q.  And can you as you're sitting here today
8 recall anything specifically that they told you
9 that they have or that they know that supports your
10 contention that Mars is liable for these actions?
11    A.  Just what they provided me with on the
12 complaint.
13    Q.  Just the language that they provided to
14 you.
15    A.  Correct.
16    Q.  So you don't even know what background
17 information or facts that they have to support
18 those allegations, correct?
19    A.  I don't know.
20    Q.  And maybe we can save some time because
21 obviously this complaint is filled with these types
22 of allegations.  Is it fair to say that anytime
23 there's a reference to Mars providing documents or
24 policies or anything else, all of that information

1 is information that was provided to you by
2 Mary Madison or Edith McCurry?
3    A.  Correct.
4    Q.  And if I were to ask you individually
5 about each of those paragraphs, your response would
6 be you don't know anything specifically yourself to
7 support that?
8    A.  Correct.
9    Q.  Moving ahead to Page 17, in Paragraph 73
10 you identify what are three separate tests of
11 employee status:  the common-law test, the economic
12 realities test and the hybrid tests.  Is that
13 information that was provided to you by somebody
14 else?
15    A.  Correct.
16    Q.  You don't -- as you're sitting here today,
17 you don't -- can't tell me the difference between
18 those tests, can you?
19    A.  No, I can't.
20    Q.  And in Paragraph 74 you explain or attempt
21 to explain why Mars was not initially named as a
22 respondent in the aforementioned charges, and --
23 because Henry did not have the specific knowledge
24 of the causal-connectional relationship between

1 Mars, Inc., and its super manager, Kenco.
2    A.  Correct.
3    Q.  Isn't it true as you're sitting here today
4 you still don't have the information, the specific
5 knowledge of the causal-connectional relationship
6 between Mars and Kenco?
7    A.  I don't have the information in front of
8 me, but I can access the information through Edith
9 and Mary.
10    Q.  But up until this point, you haven't seen
11 that information, correct?
12    A.  No.
13    Q.  They just told you they've got something.
14    A.  Correct.
15    Q.  Now, Paragraph 91 on Page 20, you say
16 overtime was mandated by Mars.
17    A.  Yes.  I know that for a fact.
18    Q.  Wouldn't it be true that Mars would demand
19 a certain amount of product be moved and so forth
20 and that it would be up to Kenco to decide whether
21 overtime was needed to do it?
22    A.  No, because at certain meetings that we
23 had, it would be from supervisors that it was not
24 just from Kenco.  It would be a fulfillment for

1 Mars that we worked certain hours to be --
2    Q.  In order to meet the needs of the
3 business.
4    A.  Correct.
5    Q.  And which supervisor specifically said
6 that was a direct order from Mars?
7    A.  If I can recall right now -- what's her
8 name?  Stacy Bushy.
9    Q.  Was she your manager?
10    A.  No.  She's a supervisor.  She was not my
11 supervisor, but we had overlapped shifts on
12 overtime days.
13    Q.  Jumping back a little bit to what would be
14 Page 16, although it's -- on my copy the page
15 number on this page is obliterated, Paragraph 75,
16 see that?
17    MS. MORAN:  Actually that would be on Page 18.
18    MR. DAVIES:  Oh, 18.  I'm sorry.  Thank you.
19    MS. MORAN:  That's okay.  Sure.
20    MR. DAVIES:  I can't count.
21    MS. MORAN:  Well, it's cut off.
22    MR. DAVIES:  I should have been able to
23 subtract one from 19.
24    MS. MORAN:  It's a long day.

58 (Pages 226 - 229)

Page 230

1 BY MR. DAVIES:
2  Q.  So see Paragraph 75?
3  A.  Yes.
4  Q.  This language about Mars had the
5 opportunity to participate in conciliation
6 proceedings, again, that's based on information
7 provided to you under this theory that
8 Mary Madison, Edith McCurry have?
9  A.  Correct.  Every -- any knowledge of Mars
10 would be through them that I haven't received yet,
11 so I'm not prepared to sit here and answer
12 questions from Mars to give you a collective or --
13 answer because I didn't prepare for this --
14  Q.  You understand --
15  A.  -- deposition.
16  Q.  -- Mr. Henry, you filed this lawsuit
17 naming Mars.
18  A.  Yeah.  But I didn't prepare --
19  Q.  This is my opportunity to ask you
20 questions about everything you know about the basis
21 for alleging Mars is responsible.
22  A.  Correct.
23  Q.  So this is your time to respond.  Tell me
24 what you know.

Page 231

1  A.  I didn't have time to prepare for this
2 deposition today.
3  Q.  Well, this is stuff that was in your
4 complaint that was filed several months ago.
5 You've had plenty of time to figure out --
6  A.  I'm just saying as far as the
7 documentation and everything that you're -- that
8 were required of me, I have access from the people
9 that I named to you.  That's all I have -- can
10 provide to you at this time.
11  Q.  Paragraph 76, you refer to the Eggleston
12 exception.  Do you have any clue what that is?
13  A.  No.
14  Q.  Looking at Paragraph 96 on Page 21 -- and
15 you can look back at Paragraph 95 to get the
16 context, but this is talking about the incident
17 that you testified at some length about earlier in
18 your deposition where Pete told you to look in the
19 mirror and check your skin color.
20  A.  Right.
21  Q.  In Paragraph 96 you talk about having it
22 being reported to human resources.  I want to make
23 sure I understand the sequence of events there.
24  A.  Okay.

Page 232

1  Q.  You didn't report it directly yourself,
2 correct?
3  A.  No, I didn't.
4  Q.  Terrence observed it, reported it to
5 Edith McCurry.
6  A.  Correct.
7  Q.  And it's your understanding that
8 Edith McCurry reported it to Kelvin Walsh.
9  A.  Correct.
10  Q.  And Kelvin Walsh talked to Mike Manzello,
11 and that's how you then had the meeting with
12 Mike Manzello.
13  A.  Correct.
14  Q.  And Mars -- nobody from Mars was involved
15 in any part of that process, correct?
16  A.  They didn't want to send it to corporate,
17 no.
18  Q.  Well, corporate references Chattanooga,
19 correct?  You've already testified to that.
20  A.  Yes.
21  Q.  Looking, for example, at Paragraph 127 on
22 Page 26, you refer to these and other policies,
23 procedures, protocols and forms are listed in
24 Defendants' Appendix F of top tier documents and

Page 233

1 governed by Policy CP-BR-4.2.1001.  Those are all
2 Kenco documents, correct?
3  A.  I'm not sure.
4  Q.  So again that's information that was
5 provided to you by McCurry or Madison?
6  A.  No.  It was just -- I'm not sure if that's
7 the Kenco policy or not.  I'm not sure.
8  Q.  Again, this is your complaint, Mr. Henry.
9 What were you referencing when you say these and
10 other policies are listed in Defendants' Appendix
11 F?
12  A.  I was referring to the policies that are
13 on the Web site.
14  Q.  Whose Web site?
15  A.  Kenco.
16  Q.  Kenco's Web site.  And those are Kenco
17 policies that are on Kenco's Web site, correct?
18  A.  Correct.
19  Q.  Okay.  And Page 37 of -- and
20 Paragraph 163, you were referencing -- let me just
21 read it.  Henry, upon information and belief,
22 alleges there were substantially more
23 non-African-American employees, especially in
24 management level positions, at the Manteno facility

59 (Pages 230 - 233)

Page 234

1  as well as other facilities.
2      Now, when you reference other facilities
3  there, you're talking about other Kenco facilities,
4  correct?
5      A.  Correct.
6      Q.  In Paragraph 181 on Page 40, you mention
7  Kenco began terminating persons in the photo
8  allegedly taken and posted to Facebook by Henry,
9  Dylan Brooks and Francisco Villarreal.  It was my
10  recollection earlier you indicated you weren't sure
11  whether or not anyone else was terminated.
12      A.  Correct.
13      Q.  Does this mean -- does Paragraph 181 mean
14  that those two individuals were terminated?
15      A.  Well, I didn't write this paragraph, so
16  I'm not aware of who was terminated.  That's to my
17  knowledge of what I stated earlier.
18      Q.  So who wrote this one?
19      A.  Like I told you earlier, it was a
20  collective effort of other people that helped me
21  write this.  Like I stated earlier, I didn't write
22  this complaint.
23      Q.  Help me understand this process, you know,
24  because we've got a --

Page 235

1      A.  Okay.
2      Q.  As Ms. Moran noted earlier, it's a 59-page
3  complaint --
4      A.  I'll help you.
5      Q.  -- with 204 paragraphs.  How are you and
6  Ms. Madison and Ms. McCurry exchanging information
7  so you were putting together a 204-paragraph
8  complaint?
9      A.  Okay.  I don't have a -- I wish I could
10  afford one.  I don't have a lawyer, so being a
11  pro se, a lot of information in this case is a bit
12  much for me, so I reached out to other people that
13  had cases in a similar situated -- situation.
14      So they had the information that I needed,
15  and they gave me the information, a collective
16  effort of information that everybody has on Kenco,
17  and they told me also to include Mars because Mars
18  was liability for Kenco.  That's how you came a
19  part in the lawsuit.  So as far as my complaint,
20  it's a collective effort of everybody that has
21  information regarding my -- the case against Kenco.
22      Q.  Okay.  Sitting here today, do you recall
23  who told you about Brooks and Villarreal being
24  terminated?

Page 236

1      A.  Under my own personal belief, I didn't
2  know anything about them being fired.
3      Q.  Okay.  Well, again, this complaint was put
4  together and then signed by you.  I'm just trying
5  to understand the process, how that happened.
6      A.  Well, certain things I read and certain
7  things I looked over, and I didn't read everything.
8      Q.  Was somebody doing cutting and pasting to
9  put this together?
10      A.  Well, it was certain people that would
11  type, and then I go back to it, type it some more,
12  go back to it, two or three weeks later go back to
13  it, so I wasn't looking at everything at the same
14  time.
15      Q.  So, again, Paragraph 181 is an example
16  where you don't know whether that's true or not as
17  you sit here today?
18      A.  I don't know if they were fired or not.
19  Like I said earlier, I had no indication if they
20  were fired or not.
21      MR. DAVIES:  Let's take a short break.
22      THE VIDEOGRAPHER:  Going off the record at 4:41
23  p.m.
24      (Recess taken.)

Page 237

1      THE VIDEOGRAPHER:  We're back on the record at
2  4:46 p.m.
3  BY MR. DAVIES:
4      Q.  Mr. Henry, I'll try to wrap this up as
5  quickly as possible at this point.  I do want you
6  to take a look at Paragraph 117 on Page 24 of the
7  complaint.  You refer to defendant Kenco has an
8  internal hiring promotion policy.  Again, that's a
9  Kenco policy, correct?
10      A.  Correct.
11      Q.  And I think we've covered this, but I just
12  want to, you know, make it clear.  It's not your
13  contention that Mars was involved in your hiring,
14  your firing, your -- whether you got the promotion,
15  didn't get the promotion or any of those specific
16  events, correct?
17      A.  Correct.
18      Q.  And they weren't involved in the
19  investigation or noninvestigation of the incidents
20  involving Pete and the harassment that you
21  experienced, correct?
22      A.  Correct.
23      Q.  And you never reported it to Mars.
24      A.  Well, I reported it to the authorities,

60 (Pages 234 - 237)

Page 238

1 but they never reported it to Mars.
2    Q.  Well, with respect to one incident, you
3 didn't report it.  Terrence did.  With respect to
4 the other, you reported it to your supervisor.
5    A.  Right.
6    MR. DAVIES:  And -- leave it there.  Nothing
7 further.
8    MS. MORAN:  I just have one other question.
9    MR. DAVIES:  Famous last words.
10    MS. MORAN:  Right.
11        FURTHER EXAMINATION
12 BY MS. MORAN:
13    Q.  Are you familiar with -- were you familiar
14 with Kenco having kind of a hotline complaint?
15    A.  No.  I was aware of a sheet you could put
16 up for -- in the warehouse.  You can write notes to
17 indicate if you want to change something or talk
18 about something on a board, but not a phone line.
19    Q.  I'm not sure what you mean.
20    A.  Like if you want to make suggestions in
21 the warehouse to change or safety concerns or
22 things of that nature, you could write on the
23 board.
24    Q.  Understood.  But if you had a complaint,

Page 239

1 are you aware that there's a -- were you aware that
2 there was a complaint line that you could call?
3    A.  I never heard of it.
4    MS. MORAN:  Okay.  That's all I have.
5    THE VIDEOGRAPHER:  Going off the record at 4:48
6 p.m.  This concludes the videotaped deposition of
7 Mr. Henry.
8        (Whereupon, the following proceedings
9         were had off the video record.)
10    THE COURT REPORTER:  Is there a question of
11 signature or --
12    MS. MORAN:  Mr. Henry, the way this works is
13 your deposition, I think I told you earlier, is
14 going to be put together in a booklet, like a --
15 you know, with all your testimony.
16    THE WITNESS:  Okay.
17    MS. MORAN:  Do you want to have the opportunity
18 to go to the court reporter and review your
19 deposition testimony to make sure that it was
20 accurate?
21    THE WITNESS:  Everything I said was true.  I
22 don't --
23    MS. MORAN:  You're going to waive that, then.
24    THE WITNESS:  Yes.

Page 240

1    MS. MORAN:  They just -- it is an option for
2 you to do that or not do that.
3    THE WITNESS:  Oh, no.  Everything I said was
4 true.  I don't -- I could waive it.
5    MS. MORAN:  Okay.
6    THE COURT REPORTER:  Do you need to order the
7 transcript?
8    THE WITNESS:  So I give this back to you?
9    MR. DAVIES:  She'll take that.
10    MS. MORAN:  All this is going to go to the
11 court reporter.
12    THE COURT REPORTER:  Do you need a copy?
13    MR. DAVIES:  Yes.
14        (Proceedings concluded at 4:50 p.m.)

Page 241

1 STATE OF INDIANA  )
2              ) SS:
3 COUNTY OF L A K E  )
4    I, KIMBERLY D. BURES, a Notary Public
5 within and for the County of Lake, State of
6 Indiana, and a Certified Shorthand Reporter of the
7 State of Illinois, do hereby certify that on the
8 20th day of October 2016, personally appeared
9 before me VERNON HENRY.
10    I further certify that the said witness
11 was first duly sworn to testify the truth, the
12 whole truth and nothing but the truth in the cause
13 aforesaid; that the testimony then given by said
14 witness was reported stenographically by me in the
15 presence of the said witness and afterwards reduced
16 to typewriting by computer-aided transcription, and
17 the foregoing is a true and correct transcript of
18 the testimony so given by said witness as
19 aforesaid.
20    I further certify that there were present
21 at the deposition the attorneys hereinbefore
22 mentioned.
23    I further certify that I am neither
24 counsel for nor in any way related to any party to

61 (Pages 238 - 241)

Page 242

1  said action, nor am I in any way interested in the
2  result or outcome thereof.
3       IN WITNESS WHEREOF, I do hereunto set my
4  hand and affix my seal of office at Chicago,
5  Illinois, this 3rd day of November 2016.
6
7
8



9      Certified Shorthand Reporter
10     CSR Certificate No. 084-003292.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

242

Veritext Legal Solutions

800-567-8658                                             973-410-4040